UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.  08-60953-CIV-COHN/SELTZER

| | |
|---|---|
| MICHAEL G. PLUNKETT, derivatively on behalf of SIMPLY FIT HOLDINGS GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CORT L. POYNER; DANIEL MINAHAN; DP MINAHAN, INC.; SILVERMAN & MINAHAN BEVERAGE COMPANY, LLC; THE SILVERMAN & MINAHAN GROUP, LLC; MAZEL TUFF, LLC; ROBERT L. COX; CARL FELDMAN; SMITTEN PRESS: LOCAL LORE AND LEGEND, INC. and ALTMAN & COMPANY P.C.<br><br>Defendants,<br><br>SIMPLY FIT HOLDINGS GROUP, INC.,<br><br>Derivative Plaintiff and Nominal Defendant. | **VERIFIED FIRST AMENDED COMPLAINT** |

## NATURE OF THE CASE

1.  This is a shareholder derivative action brought in the right of, on behalf of, and for the

benefit of Simply Fit Holdings Group, Inc. ("Simply Fit" or the "Company").  It is also an action

under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961 *et seq.*

("RICO"): it targets a true criminal enterprise, controlled by two convicted felons, one of whom

a Federal Court jury found liable for securities fraud as recently as April 3, 2008.  These persons

have dominated and controlled the Company for their own illicit benefit, even though they were

not shareholders, officers or directors of the Company.  They did so through unlawful means,

including assault and battery (*see* Exhibit U), threats, intimidation, bribery and wire fraud, and have used their domination to loot the Company of:

(a) At least $1,445,000 in cash;

(b) The purported transfer of the critical "Simply Fit$^{TM}$" trademark and related trade name, trade dress, trade secrets, formulas and other property (collectively, the "Simply Fit$^{TM}$ Mark" or "Mark") to defendant Silverman & Minahan Beverage Company, LLC ("S&M"), owned by defendants Poyner and Minahan, notwithstanding that the consideration for the Mark was intended to be and was paid for by the Company;

(c) Execution of an unconscionable self-dealing License Agreement by which S&M (controlled by defendants) purported to license the Mark to the Company (also controlled by defendants), under which defendants, who have already been repaid the entire cost of the Mark, stand to siphon off 25% of the Company's gross revenues (minus only cost of goods sold);

(d) Execution of self-dealing consulting agreements under which defendants Mazel Tuff, LLC and DP Minahan, Inc. would siphon off an additional 10% of the Company's gross revenues (minus only cost of goods sold), in addition to $20,000 per month in "consulting fees"; and

(e) The making of promissory notes aggregating $3,118,304 to Mazel Tuff to "repay" far more than anything actually advanced to the Company.

2.   This enterprise is continuing.  Defendants have stated their intent to conceal their self-dealing in disclosures to future investors.  In response to the filing of the original Complaint in this action, defendants threatened and harassed plaintiff, ordered the Company's agents, employees, supplier, labeler, distributors and customers to "cease and desist" from making or selling  Simply Fit, and thereby brought the Company's business to a crashing halt.

## PARTIES

### Plaintiff

3.   Plaintiff Michael G. Plunkett resides at 7 Milemore Court, Fort Salonga, NY 11768. Plaintiff is and at all times relevant hereto has been an owner of 400,000 shares of the Company's common stock.  While the Company, according to its CEO, maintains no complete stockholder list, on information and belief, plaintiff is the largest *bona fide* shareholder of record.

BOS 630173.1

4.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in prosecuting the Company's rights.  Plaintiff has retained experienced counsel, the undersigned law firm.  19 other shareholders have confirmed their support of this action.

5.   Plaintiff has made demand on the sole member of the Company's Board of Directors, defendant Robert Cox, to take action against the defendants.  Without limitation, on May 30, 2008 (*see* Exhibit A), plaintiff demanded that Cox act to ensure that:

(a) Simply Fit regain ownership of the Trademark and the right to commercialize the brand that it owned prior to the defendants' fraudulent transfer;
(b) Funds fraudulently transferred to the defendants be disgorged;
(c) Defendants not maintain control over the company or assert undue influence on its management; and
(d) Defendants' stock fraud scheme be immediately abandoned.

6.   Cox vacillated between supporting plaintiff's efforts by supplying records, on the one hand, and continuing to transfer cash to defendants, executing contracts he knew to be self-dealing, and otherwise aiding and abetting defendants' looting, on the other.

7.   Further demand would be futile, because: (a) Cox continued to participate in the transactions complained of; (b) Cox showed himself to be under the undue influence of the other defendants; (c) due to defendants' *de facto* control over the Company, Cox was unable and/or unwilling to take action; (d) defendants installed a hand-picked shill COO, defendant Feldman, who is aligned with them, has participated in their wrongdoing and is conflicted from prosecuting this action on the Company's behalf; (e) defendants have looted the Company so that it does not have the financial resources to maintain this action; and (f) Cox has admitted his wrongdoing, resigned, and there is no disinterested board upon which to make demand.

### The Derivative Plaintiff/Nominal Defendant

8.   Simply Fit is a Florida corporation with its principal place of business at 2501 NW 34th Place, Unit 24, Pompano Beach, Florida.  The Company's legitimate business is the

manufacture and distribution of premium 'functional beverages' for weight loss, nutrition, health and fitness. *See* <u>Exhibit B</u>. The Company's primary product is a sugar-free, non-carbonated weight loss beverage marketed under the Simply Fit[TM] name and logo. <u>Id.</u> The Company's products are of premium quality and superior taste, and have tremendous potential in the marketplace. <u>Id.</u> That potential has to date been completely thwarted by defendants' looting.

### Defendants

9.   Defendant Cort L. Poyner ("Poyner") (*alias* "Silverman") is, on information and belief, a resident of the state of Florida, with an address of 1768 Bay Drive, Pompano Beach, Florida 33062.  On April 3, 2008, the Securities and Exchange Commission ("SEC") obtained a jury verdict against Poyner in the case *Securities and Exchange Commission v. The Children's Internet, et al.*, Case No. C-06-6003-CW.  *See* <u>Exhibit C</u>.  Poyner is also a convicted felon.[1]

10. The SEC alleged (<u>Exhibit C</u>) that Poyner had defrauded investors in a start-up by falsely stating that its stock would be listed on a national stock exchange shortly (Poyner has made and continues to make similar false statements with respect to Simply Fit), and by failing to disclose that he was receiving a 25% commission for selling the stock (plaintiff is informed that Poyner has stated his intent to conceal his self-dealing transactions with Simply Fit).

11. The SEC charged Poyner with securities fraud in violation of §10(b) of the *Securities Exchange Act of 1934* (the "*Exchange Act*") and §17(a)(1) of the *Securities Act of 1933* (the "*Securities Act*"); engaging in the sale of unregistered securities in violation of §5 of the Securities Act; and acting as an unregistered securities broker in violation of §15(a)(1) of the Exchange Act.  After trial, on April 3, 2008, the jury found Poyner liable on all counts.

---

[1]   Among a number of criminal arrests and convictions, on July 24, 2003 Poyner pled *nolo contendere* to felony charges including possession of cocaine, delivery of drug paraphernalia, and possession, sale and delivery of a controlled substance. *State of Florida v. Cort Lee Poyner*, Crim. Case No. 03010269CF10A, 17th Judicial Circuit, Broward County, disposed October 31, 2003 (WESTLAW FL-BROWARD-DW 03010269CF10A). *See* <u>Exhibit D</u>.

12. Defendant Daniel Minahan resides, on information and belief, at 920 NE 16th Terrace #2, Fort Lauderdale, Florida 33334.  Minahan, too, is a convicted felon.[2]

13. Defendants Poyner (*a/k/a* "Silverman") and Minahan have conducted their criminal enterprise both individually and through the corporate defendants, which they own and control.

14. On information and belief, defendant Silverman & Minahan Beverage Company LLC is a Delaware limited liability company and defendant Silverman & Minahan Group LLC is a Florida limited liability company (hereinafter, jointly and severally "S&M").  On information and belief, S&M has a principal place of business at 1119 Vista Del Mar Drive, Delray Beach, Florida 33483, and is owned and controlled by Poyner and Minahan.  As detailed below, S&M is the entity to which Poyner and Minahan fraudulently transferred the Simply Fit[TM] Mark, which had a month earlier been acquired by Simply Fit, according to a sworn Declaration filed in the U.S. Patent and Trademark Office ("PTO") on May 22, 2007 (*see* Exhibit F).

15. Defendant DP Minahan, Inc. ("DP Minahan") is, on information and belief, a Florida corporation with a principal place of business at 920 NE 16th Terrace #2, Fort Lauderdale, Florida 33334. On information and belief, DP Minahan is owned and controlled by Minahan. DP Minahan is an entity through which Minahan has entered into a self-dealing consulting agreement with the Company and siphoned off at least $540,000 in cash, itemized *infra*.

16. Defendant Mazel Tuff, LLC ("Mazel Tuff") is, on information and belief, a Florida limited liability company with its principal place of business at 1768 Bay Drive, Pompano Beach, Florida 33062.  Mazel Tuff also lists a principal address c/o Robinson Brog./Attn: Mitchell L. Greene, 1345 6th Ave., 31st Floor, New York, NY 10105, and a registered agent, NRAI Services, Inc., 2731 Executive Park Drive, Weston, FL 33331.  On information and belief,

---

[2] Minahan pled guilty to a felony under 21 U.S.C. § 843(b) (use of a communications facility to distribute narcotics) and was sentenced to 12 months imprisonment. *United States v. Daniel Patrick Minahan*, U.S.D.C., S.D. Fla., Crim. Case # 00-mj-04177-LSS-1 (Exhibit E).

Mazel Tuff is owned and/or controlled by Poyner, who has held himself out to be its manager. Mazel Tuff is an entity through which Poyner has entered into several self-dealing contracts and instruments with the Company, and looted at least $905,000.00 in cash, itemized *infra*.

17. Defendant Robert Lee Cox is an individual who resides, according to a Schedule 13D filed on June 13, 2008 with the SEC, at 2501 N.W. 34th Place, Unit 24, Pompano Beach, FL 33069, and at 16 Woodhollow Lane, Fort Salonga, NY 11768.  Until June 25, 2008, Cox was President and CEO of both the Company and defendant Smitten Press.

18. Defendant Carl Feldman is an individual who resides at 3210 South Ocean Blvd., Highland Beach, FL 33487 and has a place of business at the same address.

19. Defendant Smitten Press: Local Lore and Legend, Inc. ("Smitten") is a shell public company originally incorporated in 1990 under the laws of Canada.  On May 8, 2007, Smitten filed Articles of Domestication and Incorporation in Nevada.  According to Smitten's June 13, 2008 Form 8-K, it has a principal place of business at 2501 N.W. 34 Place, Unit 24 Pompano Beach, FL 33069 – the same address as Simply Fit.

20. Defendant Altman & Company P.C. is, on information and belief, a New York State domestic professional corporation with its principal executive office at 260 Madison Avenue, New York, NY 10016 and an address for process of 265 East 66th Street, New York, NY 10021.

## JURISDICTION AND VENUE

21. This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331 because complete diversity of citizenship exists between the plaintiff and the defendants and the matter in controversy exceeds the sum of $75,000.

22. This court also has original jurisdiction over this civil RICO action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a), and may exercise supplemental jurisdiction over all state

law claims stated herein, pursuant to 28 U.S.C. § 1367 as all claims are directly related and inextricably intertwined.

23. Venue is proper in this district under 28 U.S.C. § 1391, because most of the defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property that is the subjection of the action is situated in this district.

24. This court has personal jurisdiction over each of the defendants.  Each defendant resides, has committed torts and has transacted business in the State of Florida, and one or more of the defendants may be found, has an agent, or transacts its affairs in this judicial district.

## FACTS

### Simply Fit Acquires the Simply Fit<sup>TM</sup> Trademark

25. Simply Fit was formed as a Florida corporation on April 2, 2007.  From its inception, Simply Fit was dominated and controlled by Poyner and Minahan, even though they concealed their role by not being shareholders, officers or directors.

26. As the name "Simply Fit Holdings Group, Inc." implies, Simply Fit was formed to own and to take advantage of the business opportunity presented by the "Simply Fit$^{TM}$" Mark. *See*  Exhibit B.  The Mark was originally owned by American Quality Beverages, LLC ("AQB"), which had applied to register the Trademark with the PTO on May 20, 2004.  *See* Exhibit F.

27. Shortly after it was formed, on May 22, 2007, Simply Fit filed Trademark Application Serial No. 76/677266 with the PTO, to register the Simply Fit$^{TM}$ Mark.  *See* Exhibit F.  The Application included a sworn Declaration by its President who, "warned that willful false statements … are punishable by fine or imprisonment," declared:  (a) Simply Fit is "the owner"

of the Simply Fit[TM] Mark; (b) Simply Fit is "entitled to use the Mark in commerce;" and (c) "no other person … has the right to use the Mark in commerce." *See* <u>Exhibit F</u>.

28. Defendants touted to investors Simply Fit's "milestone" that it had obtained "U.S. Trademark protection on the Simply Fit[TM] Brand" (<u>Exhibit B</u> at 6), "been granted applicable trademarks" (<u>id.</u> at 27), and obtained "trademark protection" on May 22, 2007 (<u>id.</u> at 28).

29. The Simply Fit[TM] Mark was and is indispensable to the business of Simply Fit: without it, Simply Fit could not market or sell its products or generate revenues.

**Defendants Make the First Attempt
to Expropriate the Simply Fit[TM] Mark**

30. On June 13, 2007, a month after Simply Fit had registered the Simply Fit[TM] Mark, Poyner and Minahan, through S&M, purported to purchase the Mark from AQB for $200,000 pursuant to an Asset Purchase Agreement. *See* <u>Exhibit G</u>, ¶2.

31. At the time of this purported transaction, Poyner and Minahan were affiliates and control persons of Simply Fit and owed it strict fiduciary duties.

32. Poyner and Minahan received consideration for the purchase price for the acquisition of the Mark from Simply Fit, in the form of Notes described immediately below, and then received far more than the purchase price in cash from Simply Fit. Nonetheless, in breach of their fiduciary duties to Simply Fit, they purported to acquire the Simply Fit[TM] Mark for S&M.

**Defendants Cause the Company to Sign
$1,000,000 and $2,118,304 Notes to Defendant Mazel Tuff**

33. On information and belief, from inception, Poyner, Minahan and S&M intended that Simply Fit would pay the consideration to acquire the Simply Fit[TM] Mark. Although Poyner, Minahan or an affiliate may have initially advanced funds to acquire the Mark, on or about June 1, 2007 they caused Simply Fit to execute a $1,000,000 Promissory Note to Mazel Tuff (<u>Exhibit</u>

I) by which they would be, and were, repaid the purchase price for the Mark in full. According to Cox, in September 2007, defendants caused the Company to sign a $2,118,304 Convertible Promissory Note and Agreement (the "$2,118,304 Note") to Mazel Tuff, which they back-dated to June 1, 2007. *See* Exhibit J.

34. Attached hereto as Exhibit K is a record from the Company's files entitled "Convertible Note Funding Schedule," which purports to itemize the advances to, for or on behalf of the Company aggregating the $2,118,304 Note. However, according to Cox, Poyner and Minahan have never been able to provide adequate backup documentation to the Company's independent public accountant to substantiate most of the alleged loan amounts.

35. However, *according to the Funding Schedule, one of the items charged to Simply Fit, and paid for by Simply Fit by the giving of the $1,000,000 Note and the $2,118,304 Note, was "$205,000.00" for the "6/18/07 Acquisition of AQB Beverage."* Moreover, as detailed below, Poyner, through Mazel Tuff, has already received at least $905,000.00 in cash from Simply Fit, and Minahan, through DP Minahan, has already received at least $440,000 in cash from Simply Fit. They have thus already been repaid the purchase price of the Mark.

36. Moreover, the Asset Purchase Agreement required Simply Fit – not S&M – to enter into an Employment Agreement with AQB's principal, Larry Alibrandi, and Simply Fit did so on the closing date, June 13, 2007. The Employment Agreement required Simply Fit – not S&M – to pay Alibrandi $70,000.00 per year. *See* Exhibit G, Schedule D.

37. Thus, *Simply Fit paid for the Simply Fit*[TM] *Mark in full – but Poyner and Minahan, through S&M, purported to take ownership of it.* Under the settled law of Florida, this set of facts constitutes breach of fiduciary duty, conversion and waste by Poyner, Minahan and S&M.[3]

---

[3] *Garner v. Pearson*, 545 F.Supp. 549 (M.D. Fla. 1982), *aff'd*, 732 F.2d 850 (11th Cir. 1984) is controlling. Persons who exercise *de facto* control over a company, whether or not they are officers or directors, owe "exacting fiduciary

38.  Additionally, the $2,118,304 Note was usurious and extortionate:  it required that all sums "loaned" be repaid with interest at the rate of **25%** per annum plus default interest equal to *another* **25%** per annum (or the highest rate allowed under Florida law, whichever was greater). Finally, the $2,118,304 Note permitted Mazel Tuff to convert its debt into common stock of Simply Fit at 2 cents per share.

### Defendants Purport to "License" Simply Fit's Mark to Simply Fit

39. Even though Simply Fit had filed the Trademark Application on May 22, 2007 (*see* Exhibit F) and given the $1,000,000 and $2,118,304 Notes to pay for the purchase of the Simply Fit™ Mark and other alleged expenses, a month later, on June 27, 2007, Poyner and Minahan caused S&M and Simply Fit to enter into a License Agreement ("License"), under which S&M purported to "license" the Mark to its rightful owner, and owner of record, Simply Fit.  A true copy of the License is attached hereto as Exhibit L.

40. In addition to the fact that Poyner, Minahan and S&M were fraudulently "licensing" a Mark to Simply Fit for which Simply Fit had already given consideration and was owner of record, the terms of the License were extortionate:  in addition to monthly fees, the License required Simply Fit to pay a royalty to S&M equal to 25% of Simply Fit's gross revenues, less only the cost of goods sold -- a fraction of the Company's overall expenses.  In addition, in the event of a merger (or any number of other "Significant Transactions"), Simply Fit was to pay S&M 20% of all consideration received.  In addition, unconscionably, the License was non-

---

obligations – uncompromising loyalty" to the company (*id.* 557) and "have the burden of proving both (1) their good faith in dealing with the corporations they controlled and (2) the inherent fairness of those dealings to those corporations, their shareholders and their creditors." (*Id.* 558).  "Clear and convincing evidence ... is required." (*Id.* at 561).  "Whenever an officer, control person or related corporation purchases assets with corporate funds, it holds those assets in trust for the corporation which had paid for them. And the paying corporation is the beneficial owner of such assets." (*Id.* 558–59).  "The fact that the [Company] actually paid over much of the purchase money after [S&M] took formal title to the [Trademark] (by repaying the loan used to buy that [Trademark] cannot defeat the trust." (*Id.* 560). "A control person using corporate funds to purchase assets taken in his name who purports to extinguish the beneficiary-corporation's rights in those assets by causing the corporation to waive or transfer those rights for overvalued consideration and long-term executory arrangements is a converter." (*Id.* 562).

exclusive: defendants' misstatements to investors that the license was "exclusive" notwithstanding, S&M purported to retain the right to license the Mark to others or to use the Mark to compete with Simply Fit. Thus, the License Agreement was (a) fraudulent; (b) extortionate; and (c) unconscionable.

41. Had Poyner and Minahan been acting in good faith and in the best interests of the Company, of which they were affiliates and control persons, they would have caused AQB to assign the Simply Fit™ Mark directly to its rightful owner, Simply Fit, as originally intended. Instead, they gratuitously inserted themselves in the middle to reap the benefits of the extortionate License Agreement.

### Defendants Cause the Company to Give Them "Consulting Agreements" on Egregious Terms

42. On June 27, 2007, the same day that Poyner and Minahan caused Simply Fit to execute the $1,000,000 Note and the License Agreement, they caused the Company to enter into two other self-dealing contracts: Consulting Agreements with Mazel Tuff (Poyner) and DP Minahan (Minahan), true copies of which are attached hereto as Exhibit M and Exhibit N. These Consulting Agreements obligated Simply Fit to pay Mazel Tuff and DP Minahan alleged consulting fees of $10,000 each, monthly. In addition, the agreements granted Mazel Tuff and DP Minahan the right to be paid 5% each of Simply Fit's gross revenues, less only cost of goods sold. This 10% of gross revenues was over and above the 25% of gross revenues that Simply Fit was obligated to pay Poyner and Minahan's other shill, S&M, under the fraudulent License Agreement -- for an aggregate liability of 35% of the Company's gross revenues. These arrangements were grossly unfair to Simply Fit and would financially cripple it: Simply Fit could not possibly be profitable if it had to pay 35% of gross revenues to S&M. Unsurprisingly, defendants did not include this extortionate obligation in their projections. Exhibit B at 32.

43. Still further, the Consulting Agreement gave Mazel Tuff (i.e., Poyner) an option to purchase 20,000,000 shares of Simply Fit stock at 30% of market price.

44. Any consideration provided to Simply Fit by Poyner, Minahan, S&M, Mazel Tuff and/or DP Minahan was grossly inadequate to support all of the purported obligations of Simply Fit to defendants. By any reasonable measure, taken as a whole, the contracts can only be characterized as an unconscionable scheme to siphon cash out of Simply Fit as quickly as it might be received – and that is exactly what the defendants proceeded to do.

### Defendants Acquire Smitten Press, a Public Company Shell, In Order to take Simply Fit Public and Manipulate the Price

45. Defendants' scheme was to take the Company public by merging it into an existing but dormant public shell company. Defendants targeted Smitten Press, a reporting company which, according to its March 31, 2008 Form 10-Q, was formed in 1990 under the laws of Canada and had never commenced active business operations. Its founder had died in September 2006, and its owners planned to sell a "controlling interest to a third party who would subsequently merge an operating business into" Smitten – a 'quick and dirty' way for Simply Fit to go public and for the defendants to reap their fortunes. Since the original Complaint was filed, Cox has confessed in writing that this was a "pump and dump stock scam." *See* Exhibit Y.

46. Cox has informed plaintiff that defendants funneled $600,000 in cash into a private account maintained by Cox. In turn, according to Smitten's Form 10-Q, on August 30, 2007, for $600,000 cash, Cox acquired 15,270,000 shares, or 68% of the outstanding common stock of Smitten Press, becoming its controlling shareholder and CEO.

47. Simply Fit had already paid the consideration for this acquisition, as well: the Convertible Note Funding Schedule includes $600,000 on August 15, 2007 for the acquisition. *See* Exhibit K. Nonetheless, the stock was put in Cox's name.

48. Cox aided and abetted Poyner's and Minahan's fraudulent concealment of their *de facto* ownership and control of Smitten Press: in disclosures to the SEC concerning the acquisition, Cox stated that he did not engage in any loan transaction in connection with the stock purchase, but utilized personal funds. These statements were, Cox has admitted, knowingly false: the cash to acquire the stock came from Poyner or Minahan.

49. Defendants used Cox as their shill to acquire control over Smitten, so as to conceal their role as controlling insiders of both companies. On information and belief, Poyner had to conceal his role for an additional reason: had he acquired the shares, he may have had to disclose felony convictions to the SEC on Schedule 13D.

50. Having achieved control of Smitten Press, on September 30, 2007 defendants caused it to issue an additional 10,000,000 shares to Cox "for services rendered." These shares were valued at $392,927. In fact, Cox had become employed by Smitten only one month earlier, and had obviously not provided services of that value. This transaction gave Cox an aggregate 25,270,000 shares, or 78% of Smitten's shares outstanding.

51. On information and belief, defendants' control and looting of Simply Fit was achieved by classic organized crime tactics: financial coercion, threats, intimidation, and even assault and battery. *See* Exhibit Y. Cox has informed plaintiff that on February 6, 2008, Poyner, Minahan and Feldman entered the premises of the Company. When Cox resisted certain demands, Poyner assaulted Cox and punched him repeatedly in the face. A photograph of Cox taken by a witness at 1:58 p.m. shortly after Poyner's assault and battery is attached as Exhibit U. Minahan and Feldman did nothing, aiding and abetting Poyner's assault and battery.

52. Cox has further informed plaintiff that on May 28, 2008, when Cox balked at certain acts by defendants, they forced Cox to agree to transfer shares of Smitten stock to a more trusted

shill, Feldman.  According to a Schedule 13D filed on June 9, 2008, Cox sold 20,270,000 of his

25,270,000 shares, representing 62.9% of the shares outstanding to Feldman for $20,270.  Eight

months earlier, less than half that number of shares – 10,000,000 – had been valued at $392,927.

On information and belief, Feldman acquired these shares as a participant in defendants'

conspiracy to loot the Company and commit securities fraud.

53. On information and belief, Feldman also purchased 3,000,000 shares of Smitten Press

stock and "flipped" them in a private sale to Mazel Tuff.  As of Smitten's Current Report Form

8-K filed with the SEC on June 13, 2008, Smitten's stockholders were as follows:

| Robert L. Cox | 5,000,000 | 15.5% |
| Carl Feldman | 20,270,000 | 62.9% |
| Mazel Tuff LLC | 3,000,000 | 9.3% |

54. Plaintiff has been informed that in another as-yet unreported transaction, Minahan (or

DP Minahan) has purchased 988,502 shares of Smitten Press stock from Kelly Smitten.

55. By these tactics, Poyner, Minahan, Feldman and Cox have obtained control of both

the Company and its reverse merger candidate.  They used the former to dominate, control and

loot Simply Fit; and, on information and belief, they intend to use the latter to control the "float"

– and thereby manipulate the price – of Smitten Press shares in their planned IPO.

56. Having engineered the fraudulent, self-dealing License, Notes and Consulting

Agreements, built-in 'spigots' that would gush cash to the defendants, the defendants had

achieved a stranglehold on the Company.  They were now ready to prime the pump by arranging

large-scale financing, and to get the cash flowing to themselves.

### Defendants Unlawfully Solicit Investments
### In Simply Fit from Unsuspecting "Friends and Family"

57. In the summer of 2007, defendants solicited and obtained investments aggregating

$570,900 from approximately 42 unsuspecting investors, including plaintiff.  In the subscription

agreement and Business Plan (Exhibit B) by which these sales were effectuated, defendants omitted to disclose their self-dealing contracts and made misstatements of material fact to investors. For example, defendants touted that Simply Fit had "exclusive" rights to the Simply Fit$^{TM}$ Mark (a misstatement they continued to make even in the Private Placement Memorandum filed with the SEC on March 6, 2008, *see* Exhibit H at 5), and touted Simply Fit's "milestone" achievement of "U.S. Trademark protection on the Simply Fit$^{TM}$ brand." (Exhibit B at 6, 28). These omissions and misstatements of material fact constituted securities fraud.

58. Defendants promptly began looting investors' cash. On December 3, 2007, Poyner induced two of his treating physicians to invest $70,000 in Simply Fit, and on December 7, these funds, rather than being invested in the Company, were siphoned off, $50,000 to Mazel Tuff and $20,000 to DP Minahan. *See* Exhibit O. On December 17, 2007, $4000 of a $15,000 investment was transferred in equal shares to Mazel Tuff and DP Minahan. *See* Exhibit O.

## Defendants Cause the Company
## to Assign Its Trademark to Them For Nothing

59. On January 24, 2008, Poyner and Minahan, aided by Cox, caused the Company to execute an Assignment and Assumption Agreement (the "Assignment"). *See* Exhibit P. The Company purported to assign its most valuable and indispensable asset, the Simply Fit$^{TM}$ Mark "and all intellectual property in, relating or pertaining to, or derived in any way from it," to S&M. On January 30 and again on March 17, 2008, defendants caused Simply Fit to record the assignment with the PTO. *See* Exhibit P.

60. By causing the Company to assign the Mark to S&M, Poyner and Minahan were implicitly admitting that their purported "License" to the Company on June 27, 2007 was fraudulent, because S&M was not the owner of the Mark they were purporting to "license."

61. Moreover, defendants paid nothing for their expropriation of the Company's key asset: they even made Simply Fit pay the expenses associated with giving away the Mark, such as the fee to record the Assignment with the PTO. *See* <u>Exhibit T</u>.

62. The transfer of the Company's Simply Fit<sup>TM</sup> Mark from Simply Fit to an entity dominated by control persons of the Company constituted not only an obvious conflict of interest and gross breach of the defendants' fiduciary duties, as *de facto* control persons, to the Company and its shareholders: it constituted a fraudulent conveyance, conversion, waste – outright theft of a corporate asset by controlling insiders for no consideration.

63. Defendants knew that their misappropriation of the Mark would be damaging to the Company, because they stated in the Company's Private Placement Memorandum ("PPM") filed with the SEC on March 6, 2008 (*see* <u>Exhibit H</u>):

> "The Company is ***totally reliant*** on the rights granted under the License Agreement for the purpose of promoting and selling the *SimplyFit<sup>TM</sup>* products. Accordingly, in the event that the License Agreement terminates for any reason, ***it would have a material adverse impact*** on the Company's business, including, but not limited to, the loss of the trademark rights granted pursuant thereto, and ***a complete inability on the Company's part to generate revenues***."

64. Defendants did not disclose to prospective investors that they had caused the Company to assign away for nothing the rights on which the Company was "totally reliant."

**Defendants Cause the Company to Amend the Trademark
License Agreement, Consulting Agreement and $1,000,000 Note,
<u>So As To Complete Their Stranglehold on the Company</u>**

65. On January 29, 2008, Poyner, Minahan and S&M orchestrated an "Amendment to License Agreement," <u>Exhibit Q</u>. Once again, they paid no consideration: the Amendment was entirely one-sided, increasing their already-extortionate control over the Company by granting them the following additional rights:

"For a period of five years after issuance of any shares pursuant to a Significant Transaction, the Company shall not take any action without the express written consent of [S&M] ... which will dilute or impair any securities issued to [S&M] as a result of a Significant Transaction, including any of the following actions: (A) amend its Articles of Incorporation; (B) ... change the designation, rights, options or preferences of any outstanding security; (C) create any class of securities; (D) pledge any of the Company's securities; (E) pay a dividend or make a distribution...; (F) subdivide [split] outstanding shares...; (G) combine (including by way of a reverse stock split) outstanding securities...; (H) engage in a reclassification; (I) offer, sell, issue or grant any securities...; (J) offer, sell, issue, grant or enter into any note...." See Exhibit Q.

Thus, Defendants gained control over the Company's ability to consummate any significant equity investment or financing, for five (5) years, for nothing in return. The Company assigned its key asset to the defendants – no consideration whatsoever flowed in the opposite direction.

66. Furthermore, by an Amendment to Consulting Agreement (Exhibit R) and an Amendment to the $1,000,000 Note (Exhibit S), each dated as of February 2008, defendants Poyner, Minahan, Mazel Tuff and Cox caused the Company – again, for nothing – to grant Mazel Tuff the same control over Company transactions as had been granted to S&M.

67. Having just caused the Company to assign the Simply Fit$^{TM}$ Mark to S&M outright, by letter dated May 15, 2008, S&M purported to "terminate" the License Agreement "for cause." Poyner, Minahan, S&M and Cox thus intentionally brought about precisely the event that they knew would have "a material adverse impact on the Company's business, including, but not limited to, the loss of the trademark rights granted pursuant thereto, and a complete inability on the Company's part to generate revenues."

68. The PPM states, under "Conflicts of Interest and Related Party Transactions":

"Cort Poyner is the sole owner of Mazel Tuff, Daniel Minahan is the sole owner of DP Minahan, and the individuals are the principal owners of [S&M]. Mazel Tuff is owed an amount to be determined but not more than $3,500,000, representing loans made to, or moneys advanced for the benefit of, the Company. In addition to shares of Common Stock which

may be issued to Mazel Tuff on conversion of the promissory Note, Mazel Tuff owns options to acquire 20,000,000 shares of Common Stock. Under the License Agreement, [S&M] is to be issued securities of the Company if the Company engages in certain significant transactions.... Also, Mazel Tuff and [S&M] must provide reasonable consent to certain actions by the Company, including any corporate reorganization, significant transaction and/or expansion of its business.... As a result, *Messrs. Poyner and Minahan, DP Minahan, Mazel Tuff and [S&M] are affiliates of the Company and either or both of Mazel Tuff and [S&M] may own a significant portion of the outstanding Common Stock. Accordingly, Mr. Poyner and Mr. Minahan, as principal owners and controlling persons of the entities have an interest in the Company beyond the ordinary course of dealing.* The interests of these parties may not necessarily be aligned with the best interests of the Company's shareholders.... Moreover, *if conflicts exist between the Company, on the one hand, and any or all of these entities on the other, the entities and their principal owners may exercise their rights to further their own interests and not those of the Company.*" (Exhibit H at 34–35).

[S&M] maintains substantial control over the manner in which the licensed intellectual property is exploited by the Company. [S&M's] rights include the right to approve sublicenses to third parties to allow them to manufacture, package and sell the licensed product... These rights of [S&M], as a practical matter, permit S&M to determine what products the Company may manufacture or sell." (Exhibit H at 27).

69. As "affiliates," "principal owners" and "controlling persons" of the Company, Poyner, Minahan, S&M, Mazel Tuff, DP Minahan, Cox and Feldman owed strict fiduciary duties to the Company and its legitimate stockholders under Florida law. In brazen violation of this duty, Poyner, Minahan, S&M, Mazel Tuff and DP Minahan, aided and abetted by Cox and Feldman, utilized every conceivable artifice to expropriate the Company's most critical asset for their own advantage. Their theft of the Company's key asset, and their acquisition of extortionate leverage and control over the Company, through a series of fraudulent transactions, for no consideration, when they were not officers, directors or shareholders of the Company, obviously violated the most fundamental principals of corporate law. But as their manipulations multiplied, the true nature of Poyner's and Minahan's conduct becomes clear: Poyner and Minahan were convicted felons, who acquired illicit control over an enterprise, through a pattern

of racketeering activity, conspiring to convert its assets for nothing.  If the criminal nature of their activity has not already become abundantly clear, it will become unmistakable shortly – because defendants proceeded to systematically loot the Company's cash.

**The Company and Rockwell Undertake
a Private Offering of Securities to Fund the Company**

70. On February 12, 2008, Simply Fit executed a Placement Agency Agreement with Rockwell Global Capital, LLC ("Rockwell"), under which Rockwell became Simply Fit's agent for a private offering of up to $5,000,000 of 10% notes, convertible into stock at a price of $.50 per share.  On March 6, 2008, Simply Fit filed a Notice of Sale of Securities under the Securities Act and the Private Placement Memorandum ("PPM") with the SEC.  *See* Exhibit H.

71. The Company and Rockwell proceeded to solicit investors pursuant to the PPM.  The PPM contained misrepresentations of material fact, and omitted to state facts the omission of which was materially misleading:  for example, defendants falsely represented to investors that Simply Fit had an "exclusive" license to use the Simply Fit[TM] Mark "to manufacture, process, package, market, promote and sell the Product … throughout the world for a term of 99 years" (Exhibit H at 5, 26), when in fact the License was non-exclusive.  Defendants omitted to state that the Company itself had originally registered, claimed ownership of and paid the consideration for the Simply Fit[TM] Mark, by giving Notes that included payment for this purchase, but that insiders exercising pervasive control over the Company had purported to "license" to the Company a Mark they did not own, then purported to buy the Mark the Company already owned, and six months later caused the Company to assign the Mark to S&M, after-the-fact and for nothing.[4]

---

[4] The "Material Agreements" section of the PPM discloses only the $1,000,000 Note (PPM at 29); it fails to disclose the $2,118,304 Note, stating that "the Company and Mazel Tuff are reviewing … additional advances and payments in order to determine the actual amount due from the Company."  But the Company had executed a $2,010,000 Note

### As Rockwell Injects Investors' Funds into the Company,
### Defendants Systematically Loot the Company's Cash

72. As Rockwell obtained investments, it remitted them to Simply Fit in four closings on February 22 ($710,000), March 7 ($800,000), March 17 ($800,000) and May 19, 2008 ($800,000). The PPM represented to investors that "the Company intends to utilize 10% of the proceeds of this Offering as partial repayment" of the Mazel Tuff Note (Exhibit H at 30, 36 ("Use of Proceeds")). The securities offering raised $3,110,000, 10% of which is $311,000. In clear violation of the PPM, Poyner and Minahan took $1,500,000 or more – 5 times what they were permitted under their SEC filing, and more than half of the net proceeds to the Company of the sale of securities (see ledgers and summary attached as Exhibit T):

    (1) On February 22, 2008, the Company received a net $570,650. On the same day, Poyner, Minahan and Cox caused the Company to transfer $200,000 to Mazel Tuff and $100,000 to DP Minahan. $570,650 came into the Company; and $300,000 – more than 50% – was siphoned out.

    (2) On March 10 and 18, the Company received net proceeds of $705,750 and $772,925. Poyner, Minahan and Cox caused the Company to transfer $5,999.55 to DP Minahan on March 12; $300,000 to DP Minahan and $500,000 to Mazel Tuff on March 18; $20,000 to Mazel Tuff on March 20; and $10,000 to Mazel Tuff and $10,000 to DP Minahan on March 28. $1,478,675 came in; $845,999.55 – 57% – went out.

    (3) On April 3, in the midst of looting Simply Fit and violating the terms of the PPM, Poyner was found liable for securities fraud in SEC v. The Children's Internet, Inc. et al. See Exhibit C. But Poyner was undeterred.

    (4) On May 29, the Company received $597,534.73, and Poyner and Minahan caused the Company to transfer $100,000 to DP Minahan and $100,000 to Mazel Tuff. See Exhibit T.

    (5) According to Cox, on June 6 and June 13, Poyner and Minahan caused the Company to transfer $30,000 to them to pay for a golf outing. Exhibit O.

---

and the $2,118,304 Note in September 2007, back-dating the latter to June 1. Cox has informed plaintiff that defendants have never provided documentation adequate to confirm any such loan amounts; that only between $104,000 and $150,000 could be verified; and that as a result, on June 20, 2008, the Company's independent public accounting firm resigned. (It also resigned as the registered public accounting firm for Smitten Press. See http://www.sec.gov/Archives/edgar/data/1315718/000111650208001046/exhibit161.htm.)

(6) On information and belief, Poyner, Minahan, Mazel Tuff, S&M and others acting in collusion with them have diverted still other funds of the Company and/or used Company funds to pay personal expenses, such as attorneys' fees for lawyers representing their interests, not the Company's.

73. Combined with the $74,000 taken in December described above, Poyner and Minahan looted at least $1,444,999.95 in six months. As a result, by June 16, 2008, two weeks after the last funding, the Company was insolvent, left with no working capital, little or no cash, grossly inadequate inventories, and no ability to conduct its business.

### Events Subsequent to Filing
### of the Original Complaint

74. The original Complaint in this action was filed on June 24, 2008. The next day, Minahan made a series of threatening calls to the plaintiff's home, threatening him with, among other things, arrest. Defendants have since engaged in an unremitting and perversely self-destructive campaign to interfere with and shut down Simply Fit. Plaintiff is informed that:

(a) On June 25, they purported to terminate the License to Simply Fit.

(b) On June 25–26, they sent 'cease and desist' letters to Overnight Labels, Inc., Simply Fit's label supplier; to King Juice, Inc., Simply Fit's manufacturer; and to Garal Wholesalers, Ltd., the largest distributor of Simply Fit products. They told these and other critical parties that any further activities with Simply Fit products could be conducted only with S&M, which has no ability whatsoever to make, sell or deliver such products.

(c) On or about June 30, 2008, the President of King Juice, Inc., Simply Fit's manufacturer, stated in an email:

"King Juice has received correspondence indicating a change in control of the Simply Fit Brand.... all production of Simply Fit and any release of any finished goods or raw materials is suspended until it is determined who we should be taking orders from.... we will commence debiting the account for storage charges of all finished product and raw materials."

(d) On or about July 1, 2008, defendants called the CEO of Allen Flavor Co. and told him that plaintiff was a 'bad guy' who had no right to market Simply Fit, and Allen could deal with S&M and no one else for Simply Fit products.

(e) King Kullen 57 Stores, the largest supermarket chain in Long Island, authorized the purchase of Simply Fit, and a product launch is imminent. This account took 6 months to develop and is vital to success in the region. Delivery delays caused by defendants are likely to destroy this opportunity.

(f) Defendants' interference with Simply Fit's ability to supply its newest distributor, A&E Distributors, threatens to destroy Simply Fit's Brand introduction in the New England region.

(g) As a result of defendants' looting: (i) Simply Fit's water purification system was repossessed for non-payment, making production impossible; (ii) Simply Fit has not paid its rent and its landlord intends to evict it; and (iii) Simply Fit has not paid its liability insurance premiums and its policy has been cancelled.

(h) There are substantial pending orders from, among other customers, Nutri-Sport Distributors (576 cases) and Healthy Image Central (1152 cases), which cannot be filled as a result of defendants' interference.

(i) There are receivable payments due to Simply Fit that are being held by distributors due to the deliberate confusion sown by defendants' interference, depriving the Company of desperately-needed working capital.

75. In one of their more outrageous acts, defendants commenced a retaliatory case, *Silverman & Minahan Beverage Company, LLC v. Robert L. Cox, Robert K. Thompson, Michael Plunkett, Larry Alibrandi and Lester Kuznetz*, E.D.N.Y. (Central Islip) Case No. CV 08-0718. In that case, defendants assert that S&M "is the owner" of the Simply Fit™ Mark (Complt. ¶23); allege S&M's termination of the License Agreement on June 25, 2008 (Complt. ¶21); claim that any efforts by Simply Fit employees or agents to sell Simply Fit™ products constitute infringement of "S&M's" Mark (Complt. ¶23); and obtained an *ex parte* TRO restraining these employees and agents "from making, soliciting sales of, and selling the beverages known as Simply Fit." Defendants' *ex parte* TRO has completely paralyzed the Company's business. Having looted the Company to the point of insolvency, they have attacked its employees and agents and blamed them for its downfall. Having solicited investments aggregating at least $3,680,900, they have acted in their own selfish interest and defrauded those investors.

## COUNT I

### BREACH OF FIDUCIARY DUTY

76. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 – 75 above.

77. At all relevant times, defendants were *de facto* controlling persons of the Company.

78. Under Florida law, a controlling person owes fiduciary duties to the Company. Moreover, a controlling person who causes a corporation to transfer property for inadequate consideration is liable for conversion as well as breach of fiduciary duty.

79. By the transactions described above, defendants breached their fiduciary duties to the Company. As a result, the Company has been damaged.

WHEREFORE, plaintiff respectfully requests this Court enter judgment in his favor, derivatively on behalf of the Company, Simply Fit, and against the defendants, awarding Simply Fit damages, including but not limited to treble damages, interest, reasonable attorney's fees and costs, and such other or further remedy as the Court deems necessary, just and proper.

## COUNT II

### FRAUDULENT TRANSFERS OF THE
### COMPANY'S TRADEMARK, FUTURE REVENUES AND CASH

80. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 – 79 above.

81. Fla. Stat. § 56.29 provides:

> When any gift, transfer, assignment or other conveyance of personal property has been made or contrived by defendant to delay, hinder or defraud creditors, the court shall order the gift, transfer, assignment or other conveyance to be void.

82. Defendants Poyner, Minahan, S&M, Mazel Tuff and DP Minahan engineered fraudulent transfers to themselves of substantial and unconscionable part of the Company's current and future assets and revenues, including but not limited to:

BOS 630173.1

a) Under the June 27, 2007 License Agreement with S&M, an interest in 25% of Simply Fit's gross revenues, less only cost of goods sold, plus 20% of all consideration received by the Company in the event of a merger or other "Significant Transaction."

b) Under the Mazel Tuff Notes, $1,000,000 and $2,118,304 respectively, at usurious interest rates.

c) Under the Consulting Agreements with Mazel Tuff and DP Minahan, in addition to monthly 'consulting' fees, 10% of the Company's gross revenues -- over and above the 25% of gross revenues that Simply Fit was to pay S&M under the License Agreement -- for an aggregate transfer of interests in 35% of the Company's gross revenues.

d) Under the Trademark Assignment, defendants Poyner, Minahan, S&M and Cox caused the Company to assign its indispensable asset, the Simply Fit™ Mark, "and all intellectual property in, relating or pertaining to, or derived in any way from it," to S&M.

e) On February 22, 2008, Poyner, Minahan and Cox caused the Company to transfer $200,000 to Mazel Tuff and $100,000 to DP Minahan.

f) Poyner, Minahan and Cox caused the Company to transfer $5,999.55 to DP Minahan on March 12; $300,000 to DP Minahan and $500,000 to Mazel Tuff on March 18; $20,000 to Mazel Tuff on March 20; and $10,000 to Mazel Tuff and $10,000 to DP Minahan on March 28..

g) On June 3, 2008, Poyner, Minahan and others caused the Company to transfer $100,000 to DP Minahan and $100,000 to Mazel Tuff.

h) On June 6 and June 13, Poyner, Minahan and others caused the Company to transfer $10,000 and $20,000 to Mazel Tuff.

i) On information and belief, defendants Poyner, Minahan, Mazel Tuff, S&M, DP Minahan and others acting in collusion with them or aiding and abetting them have diverted still further funds of the Company and used Company funds to pay personal expenses.

83. Defendants' transfers exhibit the quintessential badges of fraud marking them as fraudulent transfers:  the transfers were made by insiders and controlling persons, to affiliates owned and controlled by them, without consideration or for grossly inadequate consideration; and (b) the transfers prejudiced the Company, its legitimate stockholders and its creditors, for the

benefit of the same individuals who constitute the beneficial owners of the entities involved on both sides of the transactions.

84. All of these transfers constituted fraudulent conveyances.

85. Corporate fictions and fraudulent schemes may be disregarded where:

> "two or more separate corporations are controlled or owned by the same individuals and are used merely as a convenience for accomplishing an unconscionable transaction that is in the individual interest of the parties controlling both corporations, when such individuals have so contrived to use the fiction of the presumptively separate corporate identities of the participating corporations as a means of perpetrating a fraud, or effectuating a breach of trust, to the prejudice of the complainant suing in equity for a redress of such a wrong.... [F]iduciaries … have the burden of proving both: (1) their good faith in dealing with the corporations they controlled; and, (2) the inherent fairness of those dealings to those corporations, their shareholders and their creditors....  This standard governs the entire course of dealing between fiduciary and beneficiary. The entire course of dealing (rather than the separate related transactions) must be viewed as a whole and then measured by the actual effect of the entire scheme.... [W]hen there is added the existence of a 'planned and fraudulent scheme' … the necessity of equitable relief against that fraud becomes insistent. No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it [is] the duty of the … court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart. (*Garner v. Pearson, supra,* 545 F. Supp. at 557–559).

WHEREFORE, plaintiff respectfully requests this Court enter judgment in his favor, derivatively on behalf of Simply Fit, and against the defendants, and:  (a) award Simply Fit damages, including but not limited to treble damages, together with interest, reasonable attorney's fees and costs; (b) void and rescind all of the above-described fraudulent conveyances, including but not limited to the License Agreement, Notes, Assignments and Consulting Agreements; and (c) order all assets and cash received from the Company by defendants to be disgorged and returned to the Company, together with interest and reasonable attorneys' fees and costs; and (d) and such other or further remedy as the Court deems necessary, just and proper.

- 25 -

## COUNT III

### CONVERSION

86. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 – 85 above.

87. In the transactions described above, including but not limited to the Trademark Assignment, the Trademark License, the Mazel Tuff and DP Minahan Consulting Agreements, the $1,000,000 and $2,118,304 Notes, and the transfers of at least $1,445,000 in cash, defendants unlawfully and without colorable authorization took for themselves properties and/or rights which they knew to be in the rightful possession of the Company, and purported to transfer these properties and/or rights to themselves, for no consideration or for grossly inadequate consideration. The defendants deprived the Company of property interests by causing it to transfer its ownership interests in the Trademark, equity investments, cash and future revenues.

88. Defendants were control persons of both the Company and the entities to which they caused the Company to transfer property rights for grossly inadequate consideration.

89. It is a well-established rule of corporate law that a corporation cannot authorize illegal conduct. Directors, officers acting *ultra vires*, and rogue insiders and controlling persons acting without portfolio, are without power to ratify that which the Company cannot do lawfully.

90. The Trademark Assignment, Trademark License, Mazel Tuff and DP Minahan Consulting Agreements, $1,000,000 and $2,118,304 Notes, and transfers of at least $1,445,000 in cash to Poyner, Minahan, S&M, Mazel Tuff and/or DP Minahan, constituted conversion.

WHEREFORE, plaintiff respectfully requests this Court enter judgment in his favor, derivatively on behalf of the Company, Simply Fit, and against the defendants for conversion, and: (a) award Simply Fit damages, including but not limited to treble damages, together with interest, reasonable attorney's fees and costs; (b) void and rescind all of the above-described acts

- 26 -

of conversion, including but not limited to the Trademark Assignment, the Trademark License, the Mazel Tuff and DP Minahan Consulting Agreements, the $1,000,000 and $2,118,304 Notes, and the transfers of at least $1,445,000 in cash to Poyner, Minahan, S&M, Mazel Tuff and/or DP Minahan; and (c) order all assets and cash received from the Company by defendants to be disgorged and returned to the Company, together with interest and reasonable attorneys' fees and costs; and (d) and such other or further remedy as the Court deems necessary, just and proper.

## COUNT IV

### CORPORATE WASTE

91. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 – 90 above..

92. By the transactions described above, including but not limited to the Trademark Assignment, Trademark License, Mazel Tuff and DP Minahan Consulting Agreements, $1,000,000 and $2,118,304 Notes, and transfers of cash, defendants unlawfully and without colorable authorization transferred to themselves properties and/or rights which they knew to be in the rightful possession of the Company, for no or grossly inadequate consideration.

93. The defendants deprived the Company of property interests by causing it to transfer away its direct ownership interests in the Trademark, investments and revenues.

94. Defendants were control persons of both the Company and the entities to which they caused the Company to transfer property rights for no or grossly inadequate consideration.

95.   The Trademark Assignment, Trademark License, Mazel Tuff and DP Minahan Consulting Agreements, $1,000,000 and $2,118,304 Notes, and transfers of at least $1,445,000 in cash to Poyner, Minahan, S&M, Mazel Tuff and/or DP Minahan, constituted corporate waste.

WHEREFORE, plaintiff respectfully requests this Court enter judgment in his favor, derivatively on behalf of Simply Fit, and against the defendants for corporate waste, and: (a)

award Simply Fit damages, including but not limited to treble damages, together with interest, reasonable attorney's fees and costs; (b) void and rescind all of the above-described acts of conversion, including but not limited to the Trademark Assignment, the Trademark License, the Mazel Tuff and DP Minahan Consulting Agreements, the $1,000,000 and $2,118,304 Notes, and the transfers of at least $1,444,999.95 in cash to Poyner, Minahan, S&M, Mazel Tuff and/or DP Minahan; and (c) order all assets and cash received from the Company by defendants to be disgorged and returned to the Company, together with interest and reasonable attorneys' fees and costs; and (d) and such other or further remedy as the Court deems necessary, just and proper.

## COUNT V

### TRADEMARK INFRINGEMENT

96. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 – 95 above.

97.  On May 22, 2007, Simply Fit filed Trademark Application Serial No. 76/677266 with the PTO. *See* Exhibit F.

98.  In June 2007, defendants purported to acquire the Mark (Exhibit G) and license it to Simply Fit for unconscionable consideration (Exhibit L).  In January 2007, defendants caused Simply Fit to assign the Mark to S&M for no consideration (Exhibit P).  Apparently, however, defendants were so caught up in their self-dealing that they were grossly negligent:  they failed to respond to an Office Action mailed on September 12, 2007 within the six (6)-month response period, and thereby abandoned any statutory trademark rights to the Simply Fit$^{TM}$ Mark.  A true copy of a Notice of Abandonment from the PTO dated April 9, 2008 is attached hereto as Exhibit V.  The deadline for a petition to revive or request for reinstatement expired on June 9, 2008, when defendants were focused on a golf outing and on completing their looting of the Company's cash.

99. Having abandoned the Mark, Poyner, Minahan and S&M have no statutory entitlement to the Simply Fit<sup>TM</sup> Mark. They have no common law rights, either.

100. Since May 2007, in addition to filing its Application to register the Mark, Simply Fit has established exclusive common law rights to the Mark and brand.

101. Simply Fit and only Simply Fit has used the Mark in commerce.

102. Simply Fit and only Simply Fit has born all the costs of marketing, promotion, concentrates, packaging, P.O.S., packing services, finished goods, freight and all other costs associated with commercializing the brand. Defendant S&M bore none of these costs. S&M has never commercialized the Brand, nor marketed, nor promoted, nor sold any Simply Fit products, and lacks any expertise or qualifications whatsoever to do so.

103. Simply Fit is the exclusive entity responsible for creating the consumer franchise for the Simply Fit Brand. All advertising, promotion, sampling and retail sales have been obtained and paid for by Simply Fit.

104. The distribution created by Simply Fit has been critical to creating brand viability and opening up prospects for future growth. S&M has achieved no distribution.

105. But for the hard work and personal sacrifices made by the employees and contract agents of Simply Fit, including the plaintiff, the brand distribution would never have been achieved or been lost. The brand distribution is presently threatened with imminent and irreparable danger of being lost due to the interference of Poyner, Minahan, S&M and others.

106. By comparison with other beverage company start-ups, the accomplishments of Simply Fit in building a business for the brand were remarkable. These results are owing to the efforts of persons such as Plunkett, Lester Kuznetz and Bob Thompson – not the defendants.

107. S&M added no value to Simply Fit's gaining market penetration. To the contrary, S&M and its affiliates, Poyner, Minahan, Mazel Tuff and DP Minahan, repeatedly acted in ways that undermined and threatened to undo the business development achieved by Simply Fit, most particularly by stripping the Company of half of its operating cash at critical stages, whenever funding came in; directing Cox to withhold payments due to agents, consultants, employees and creditors, so as to accommodate enormous illegitimate payments to Mazel Tuff and DP Minahan; twice terminating the license to Simply Fit without justifiable cause; threatening and disparaging agents, suppliers and distributors of Simply Fit with baseless claims; and ultimately, obtaining an *ex parte* TRO which completely paralyzed all business activities on Simply Fit's behalf.

108. Defendants have no statutory, equitable or common law claim to the Simply Fit$^{TM}$ Mark. Their actions have created not only the likelihood but the fact of confusion in the marketplace; were willful; were undertaken in egregious bad faith; and were unconscionable.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor, derivatively on behalf of the Company, and against Defendants, for trademark infringement, and: (a) award Simply Fit damages, including but not limited to treble damages, together with interest, reasonable attorney's fees and costs; (b) equitably disregard, void and rescind all of the above-described acts by or under which defendants purport to claim any right, title or interest in or to the Simply Fit$^{TM}$ Mark, including but not limited to the Asset Purchase Agreement, Bill of Sale and Assignment and Assumption Agreement; (c) determine and declare that S&M has abandoned any rights it may have claimed to the Mark; and (d) determine and declare that (i) Simply Fit is the true, rightful owner of the Simply Fit$^{TM}$ Mark, (ii) Simply Fit is entitled to use the Mark in commerce; and (iii) no other person or entity, specifically including S&M, has the

- 30 -

right to use the Mark in commerce; (d) award the plaintiff interest and reasonable attorneys' fees and costs; and (e) such other or further remedy as the Court deems necessary, just and proper.

**COUNT VI**

**DECLARATORY JUDGMENT**

109. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 – 108 above.

110. Defendants caused the Company to enter into numerous contracts, including but not limited to the License Agreement with S&M and the Amendment thereto, the $1,000,000 and $2,118,304 Notes to Mazel Tuff and the Amendments thereto, the Consulting Agreements with Mazel Tuff and DP Minahan and the Amendments thereto, the Trademark Assignment, and all other self-dealing contracts.

111. These contracts constituted patent self-dealing, breach of fiduciary duty, fraudulent transfers, conversion, and waste.

112. These contracts were unlawful and against public policy, and could be neither authorized nor ratified by the Company as a matter of law.

113. There is a bona fide, actual and urgent present practical need for a declaration by this Court as to the rights of the parties.  In particular, S&M's claim of ownership to the Simply Fit$^{TM}$ Mark has created confusion in the marketplace, made the conduct of business by the Company impossible, and brought the Company's activities to a complete halt, threatening the Company (and the brand) with irreparable harm.

114. The antagonistic and adverse interests are before this Court, and the relief sought is not a product of curiosity or a mere request for legal advice.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor, derivatively on behalf of the Company, and against Defendants, declaring that each and every

self-dealing contract into which defendants caused the Company to enter with their affiliated entities be disregarded and declared to be null and void; and in particular, Simply Fit requests declarations that: (a) Simply Fit is the true, rightful owner of the Simply Fit™ Mark; (b) Simply Fit is entitled to use the Mark in commerce; and (c) no other person or entity, specifically including S&M, has the right to use the Mark in commerce.

## COUNT VII

### CIVIL CONSPIRACY

115. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 – 114 above.

116. Poyner, Minahan, S&M, Mazel Tuff, DP Minahan, Cox, Feldman and other defendants entered into an agreement to achieve illegal objectives, including but not limited to conversion of the Mark, revenues and cash of the Company and the perpetration of fraud.

117. Defendants committed multiple overt acts in furtherance of their illegal objectives.

118. The Company suffered injury as a result of the defendants' conspiracy and acts in furtherance thereof.

WHEREFORE, plaintiff respectfully requests this Court enter judgment in his favor, derivatively on behalf of Simply Fit, and against the defendants for conspiracy, and: (a) award Simply Fit damages, including but not limited to treble damages, together with interest, reasonable attorney's fees and costs; (b) void and rescind all of the above-described acts, including but not limited to the Trademark Assignment, the Trademark License, the Mazel Tuff and DP Minahan Consulting Agreements, the $1,000,000 and $2,118,304 Notes, and the transfers of at least $1,445,000 in cash to Poyner, Minahan, S&M, Mazel Tuff and/or DP Minahan; and (c) order all assets and cash received by defendants to be disgorged and returned to

the Company, together with interest and reasonable attorneys' fees and costs; and (d) and such other or further remedy as the Court deems necessary, just and proper.

### COUNT VIII

### CIVIL RICO PURSUANT TO 18 U.S.C. § 1964

119. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 – 118 above.

120. This is a civil RICO claim predicated upon mail and wire fraud against all Defendants in this action, pursuant to 18 U.S.C. 1964.

121. Defendants intentionally participated in a complex scheme to defraud Plaintiff of money and property.

122. Defendants carried out the scheme by unlawful means, including but not limited to:

    a) Assault and battery on the Company's President and CEO, Cox;

    b) Threats to and intimidation and coercion of Cox;

    c) Bribery of officers of the Company, including Cox;

    d) Conversion of at least $1,445,000 of cash;

    e) Theft, conversion and/or fraudulent transfer of the Company's intellectual property, including its Trademark;

    f) Causing the Company to enter into fraudulent and/or self-dealing contracts and/or instruments, including the $1,000,000 Note to Mazel Tuff, the $2,118,304 Note to Mazel Tuff, the Consulting Agreements with Mazel Tuff and DP Minahan, and the License Agreement, which were unsupported by consideration, were not in the best interests of the Company, and constituted fraudulent transfers, conversion, breach of fiduciary duty, unlawful acts, misappropriation and/or corporate waste;

    g) Material misrepresentations and material omissions to investors;

    h) Material misrepresentations and material omissions to the Company's distributors and sales agents;

123. Defendants' scheme and misrepresentations were conducted on an ongoing basis with Simply Fit from approximately April 2007 and continuing through the present time, orally, in writings and through use of interstate wires and the internet.

124. Defendants used both the United States mails and United States wires to effectuate the scheme.  Defendants used the mails and/or wires to send Regulation D Subscription Agreements and other information concerning the Company, its contracts and its business; to receive monies wire transferred from the Company; and to aid in the fraudulent transfer of the Company's Trademark; all with the purpose of looting the Company's property.

125. As a consequence of the defendants' wrongful acts, the Company has suffered injury and damages in an amount which cannot presently be calculated with precision, but which is believed to exceed $5,000,000, exclusive of interest and attorney's fees and costs.

126. Plaintiff has retained undersigned counsel and plaintiff has retained the undersigned law firm, and has agreed to pay it a reasonable fee for its services together with its reasonable expenses.  Pursuant to 18 U.S.C. 1964, Plaintiff is entitled to recover its attorney's fees from Defendants in this action.

WHEREFORE, plaintiff respectfully requests this Court enter judgment in his favor, derivatively on behalf of the Company, Simply Fit, and against the defendants, awarding Simply Fit damages, including but not limited to treble damages, together with interest, reasonable attorney's fees and costs, and such other or further remedy as the Court deems necessary, just and proper.

## COUNT IX

### REQUEST FOR AN ACCOUNTING

127. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 – 126.

128. Plaintiff is entitled to a full and complete independent accounting of all amounts allegedly paid to or on behalf of the Company as consideration for the $1,000,000 and

$2,118,304 Notes to Mazel Tuff, together with complete documentation substantiating both the payments and the legitimate business purposes for which said payments were allegedly used.

129. Plaintiff is entitled to a full and complete independent accounting of all amounts transferred to or received by any of the defendants, by or from the Company or its legitimate investors, together with complete documentation substantiating both the transfers and the legitimate business purposes (if any) for which said transfers were allegedly made.

130. Plaintiff is entitled to a full and complete independent accounting of all transfers made by any of the defendants, of or from the proceeds of any funds received directly or indirectly from the Company and/or its investors, together with complete documentation substantiating both the transfers and the current locations and accounts where these fraudulently transferred funds are currently held.

WHEREFORE, plaintiff requests that the Court appoint an independent auditor to conduct, at the sole expense of the defendants, the foregoing accountings, and to report its findings to the Court and to the plaintiff; and that the Court enter such other or further relief as the Court deems necessary, just and proper.

## COUNT X

### REQUEST FOR A PRELIMINARY AND PERMANENT INJUNCTION

131. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 – 130 above.

132. Plaintiff is likely to succeed on the merits.

133. If the injunctive relief request is not granted by the Court, the Company and its legitimate shareholders, including the plaintiff, will suffer irreparable harm.

134. The irreparable harm that would be suffered by the Company and its legitimate shareholders were relief denied is not outweighed by any cognizable harm to the defendants if the relief requested is granted.

WHEREFORE, plaintiff requests that the Court enter a temporary restraining order, and after hearing, a preliminary injunction, restraining and enjoining the defendants, each of them, and all persons acting in concert or participation with any of them, from and against:

a) spending, transferring, selling or conveying in any manner the funds, assets, and/or shares of Simply Fit Holdings Group, Inc., except and solely to the extent legally necessary to pay taxes, rent, utilities, base salaries of existing employees (excluding any of the defendants) for services performed and salaries earned prior to the date of this Order;

b) spending, transferring, selling or conveying in any manner any of their own funds or assets, except to pay ordinary and necessary living expenses;

c) failing to account within ten (10) days for all amounts transferred to or received by any of the defendants, by or from the Company or its investors, together with complete documentation substantiating both the transfers and the legitimate business purposes for which said transfers were allegedly made;

d) failing to account within ten (10) days for all amounts allegedly paid to or on behalf of the Company in consideration for the $1,000,000 and $2,118,304 Notes to Mazel Tuff, together with complete documentation substantiating both the payments and the legitimate business purposes for which said payments were allegedly used;

e) failing to account within ten (10) days for all accounts (including but not limited to bank accounts, savings accounts, brokerage accounts and money market accounts), securities, bonds, or other instruments, assets or things of value into which all proceeds received by any of the defendants from the Company or its investors have been transferred, deposited, invested or used to purchase;

f) interfering with Simply Fit's relationships with its customers, suppliers, manufacturers, agents, distributors or employees;

g) claiming any right, title or interest in or to the Simply Fit[TM] Mark;

h) making, soliciting sales of, selling or collecting any monies in connection with any Simply Fit product;

- 36 -

i)   such other or further relief as the Court deems necessary, just and proper.

## COUNT XI

### REQUEST FOR APPOINTMENT OF A RECEIVER

135. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 – 134 above.

136. The appointment of a receiver by a federal court exercising diversity jurisdiction is governed by federal law. The decision lies within the discretion of the Court.

137. This case presents abundant proof of all of the factors the court may consider in the appointment of a receiver: (a) fraudulent activity has occurred; (b) the plaintiff's claims are valid; (c) there is clear and present danger that property will be lost or diminished in value; (d) legal remedies are inadequate in the circumstances; (e) less severe equitable remedies are not available; and (f) the probability that a receiver may do more harm than good is remote, since the defendants have stripped the Company of all of its assets and brought its operations to a complete halt.

138. The purpose of a receiver in this matter is to protect the remaining assets of Simply Fit; to restore the Company to honest and legitimate management; to recover the assets looted by defendants; to restore the business operations of the Company; to obtain financing for the Company; to protect the Simply Fit$^{TM}$ Mark, brand, products and distribution; to re-establish the Company's relationships with its manufacturers, suppliers, distributors, agents, creditors and customers; and to pursue the original legitimate business opportunities for which the Company was established.

139. While proof of fraud is not required to support the Court's discretionary decision to appoint a receiver, in this case, fraud, fraudulent conveyances, conversion, self-dealing, waste, the fact that Poyner and Minahan are convicted felons and that Poyner has been found liable for

securities fraud, securities fraud in the present case and much more have all been established, as has the likelihood of continuing injury and imminent irreparable harm.

140. The balance of hardships and the probability of success on the merits weigh heavily in favor of plaintiff, who seeks only to restore the Company's legitimate business.

141. While defendants, saddled with criminal records and Poyner's adverse securities fraud judgment, have no chance whatsoever to rehabilitate the Company, plaintiff does. Plunkett is the Company's most successful agent. He is a former investment banker with the ability to seek out new equity to revive the Company, and he can assemble a group of former employees, consultants and industry experts who will both represent all of the genuine industry know-how that drove Simply Fit's legitimate business activities, and are honest.

142. There are no other readily apparent legal or equitable remedies available to restore the Company to honest, legitimate management than the appointment of a receiver.

143. Plaintiff, in its forthcoming Motion for Appointment of a Receiver, will provide further detail as to his proposal for the future rehabilitation of the Company under the direction of a Court-appointed receiver.

WHEREFORE, plaintiff requests that the Court appoint a receiver to oversee the assets, management and business operations of Simply Fit Holdings Group, Inc., and grant such receiver clear and exclusive authority to use the Simply Fit™ Mark in commerce.

## COUNT XII

### BREACH OF FIDUCIARY DUTY – AGAINST ALTMAN

144. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 – 143 above.

145. According to the Convertible Note Funding Schedule (Exhibit K), on May 25, 2007, Simply Fit paid attorney Steven Altman $100,000, presumably for legal services rendered

to Simply Fit.  At the same time, Altman was representing Poyner, Minahan, and S&M in connection with <u>S&M's</u> acquisition of the Simply Fit<sup>TM</sup> Brand, Mark and other assets from AQB, as described above.  Specifically, but without limitation, on information and belief:  (a) on or about May 23, 2007, Altman, as purported counsel to Poyner, transmitted a draft "Asset Ascertainment, Due Diligence and Purchase Agreement" between AQB and <u>Poyner</u>; and (b) in or about June 2007, Altman, as purported counsel to Poyner and S&M, transmitted an "Asset Purchase Agreement" between AQB and <u>S&M</u> *"c/o"* Poyner, which designated Altman as the attorney to receive notices for S&M under the Agreement; and (c) on or about June 14, 2007, delivered a Bill of Sale purporting to transfer the Mark from AQB to S&M.  *See* <u>Exhibit W</u>.

146.   Plaintiff is informed that Altman acted as counsel for S&M in the transaction. Therefore, on information and belief, Altman participated in the purported acquisition of the Mark by S&M – at the same time that he represented and was being paid by Simply Fit.

147.   In addition, under the terms of the Asset Purchase Agreement, as a condition of closing, the Buyer – S&M – was obligated to deliver an "Alibrandi Employment Agreement … executed by Buyer or his designee."  The Employment Agreement was Schedule D to the Asset Purchase Agreement between AQB and S&M, with respect to which Altman represented S&M. Altman had to know the terms of the Employment Agreement between AQB's principal, Alibrandi, and Simply Fit, and therefore had to know that Simply Fit – not S&M – was paying this part, too, of the consideration for the acquisition of the Simply Fit<sup>TM</sup> Mark – <u>not</u> by Simply Fit, but by the clients to whom he was actually loyal – Poyner, Minahan and S&M.  Indeed, Altman billed Simply Fit for his work on the Employment Agreement (<u>Exhibit X</u>), which was part of the consideration by which S&M – not Simply Fit – acquired the Simply Fit<sup>TM</sup> Mark.

148.   The structure of the acquisition of the Simply Fit™ Brand, Mark and other assets from AQB by S&M, viewed as a whole, was grossly unfair to Simply Fit.  Although Poyner, Mazel Tuff or another affiliate may have advanced $200,000 to AQB for the acquisition, simultaneously, Simply Fit paid the $200,000 consideration by giving Poyner (through Mazel Tuff) the $1,000,000 Note dated June 1, 2007 and the $2,118,304 Note back-dated to June 1, 2007.  The "Funding Schedule" for the Notes specifically includes "205,000" on "June 18, 2007" for the "acquisition of AQB Beverage."  *See* Exhibit K.  Moreover, as described above, Mazel Tuff has already received at least $905,000 from Simply Fit in repayment of the Notes.  In addition, Simply Fit paid the remaining consideration for the Mark, *viz.*, the salary under the Alibrandi Employment Agreement.  In addition, Simply Fit was intended pay, and did pay, all or substantially all of the costs of developing, marketing, manufacturing, selling and commercializing Simply Fit™ products.

149.  The course of events demonstrates that Altman's loyalties were divided, and that his primary loyalty was to Poyner, Minahan, and, as respects S&M's acquisition of the Mark, to S&M.  Indeed, in an engagement letter between Altman and Simply Fit dated January 21, 2008, Altman stated that "if" conflicts of interest arose, he would "be free to continue to represent Mr. Poyner and Mr. Minahan."

150.  As an attorney, Altman owed a strict fiduciary duty of undivided loyalty to Simply Fit.  In fact, at all relevant times he has had a stark conflict of interest, between the interests of Simply Fit, which was paying him, and those of S&M, which was purporting to buy the Mark out from under Simply Fit.

151. Altman also transmitted, and on information and belief prepared or caused to be prepared, the January 29, 2008 Amendment to the License Agreement (Exhibit Q), which

increased S&M's rights as against Simply Fit, for no consideration – at the same time that
Altman was representing Simply Fit both in litigation and in connection with its Private
Placement sale of securities under the Securities Act.

152. Still further, Altman is counsel of record for S&M in the case *Silverman & Minahan
Beverage Company, LLC v. Robert L. Cox, Robert K. Thompson, Michael Plunkett, Larry
Alibrandi and Lester Kuznetz*, E.D.N.Y. (Central Islip), Case No. CV 08-0718 (the "SFNE
Case"). In that case, Altman pleads that S&M "is the owner" of the Simply Fit™ Mark (Complt.
¶23); alleges (and implicitly advocates the propriety and effectiveness of) S&M's termination of
the License Agreement on June 25, 2008 (Complt. ¶21); claims that the efforts of Simply Fit
employees and sales agents to sell Simply Fit™ products constitute infringement of "S&M's"
Mark (Complt. ¶23).

153. Altman was fully aware that the instant case challenges S&M's claim of ownership
to the Simply Fit™ Mark and claims such ownership for Simply Fit: Altman attached a copy of
the original Complaint in this action to a declaration he filed in the S&M Case.

154. Most unconscionably, Altman obtained an *ex parte* TRO restraining Simply Fit's
employees and agents "from making, soliciting sales of, and selling the beverages known as
Simply Fit." In other words, wearing his S&M hat, Altman obtained an *ex parte* TRO that
effectively put his client Simply Fit out of business.

155. Invoices from Altman to Simply Fit dated February 15 and March 15, 2008 (Exhibit
X) contain numerous entries referring to conferences in January 2008 with "CP" (Cort Poyner)
and "DM" (Daniel Minahan), not only for litigation matters but for "General" – *i.e.*, corporate –
matters for Simply Fit, and specific time entries such as: January 25, 2008, 4 hours, "CP [Cort
Poyner], BC (Bob Cox); rev. agmts, PPM"; and on January 31, "rev PPM." Altman billed many

hours to reviewing and/or revising the PPM, which discussed the License Agreement between his client Simply Fit and his client S&M, in the "Material Agreements" and "Conflicts of Interests and Related Party Transactions" sections, and which warned, under "Risk Factors," that Simply Fit had "not had independent directors," and "as a result, certain material agreements between related parties have not been negotiated with the oversight of independent directors and could be viewed as being 'non-arms-length'" (Exhibit H at 10).  Altman participated in causing his client Simply Fit to enter into these agreements with his clients Poyner, Minahan, S&M, Mazel Tuff and DP Minahan, which had at least the appearance of being non-arms-length, and were in fact grossly unfair to his client Simply Fit.

156. Altman actively participated as Simply Fit's attorney in its sale of securities under the Securities Act to investors who were informed that Simply Fit "is totally reliant on the rights granted under the License Agreement" (Exhibit H at 5), and that "in the event that the License Agreement terminates for any reason, it would have a material adverse impact on the Company's business ... and a complete inability on the Company's part to generate revenues" (Id. at 5). Having participated in that sale of securities on behalf of Simply Fit, Altman is currently attorney of record in a case advocating the termination of that very License, which brought about the precise "material adverse impact" and "complete inability on the Company's part to generate revenues" described in the PPM he helped to author and billed Simply Fit to help author.  This is an almost inconceivable conflict of interest.

157. A July 15, 2008 letter to the Court (Hon. Arthur D. Spatt) by counsel to SFNE, enclosing a letter to Judge Spatt by Simply Fit's former CEO, Cox, alleges that Altman "threatened and coerced" Cox, his then client, to "assert the positions and facts set forth" in the

SFNE Case.  *See* <u>Exhibit Y</u>.  Cox accuses Altman of being complicit in the scheme by which

"Poyner and Minahan looted" the proceeds of the Private Placement sale of securities:

> Simply Fit was and is essentially an attempt to "pump and
> dump" a stock.  I am coming forward now after reflecting on
> my complacency in allowing the stock scam to continue.  I
> was threatened, coerced and physically assaulted by Poyner
> and Minahan in an effort to have me continue perpetrating
> this fraud.  I believe I could take no more when Poyner and
> Minahan looted the Private Placement monies with the
> complicity of Mr. Altman, my former attorney.

158. If these allegations are true, they may represent a pattern:  it has recently been

brought to plaintiff's attention that Altman is also the subject of public administrative

proceedings instituted after investigation by the SEC.  *See Order Instituting Administrative*

*Proceedings*, attached hereto as <u>Exhibit Z</u>.  The SEC alleges that in tape recorded conversations,

Altman indicated to another attorney that, in exchange for a severance package for Altman's

client, "his client might not cooperate with the Commission and/or that her recollection of the

relevant events might 'fade.'"  *See* <u>Exhibit Z</u>.

159. Altman's breach of his fiduciary duty of undivided loyalty to Simply Fit has

damaged the Company by millions of dollars.  Altman participated in (and is advocating on

behalf of) a series of transactions whereby his clients Poyner, Minahan, S&M, Mazel Tuff and

DP Minahan gained control over a Trademark that has since been paid for in full by Simply Fit;

licensed the same Mark to Simply Fit for 25% of Simply Fit's gross revenues (minus only cost of

goods sold); obtained Promissory Notes aggregating $3,118,304 for consideration they had not

actually advanced and/or had advanced for their own benefit, not Simply Fit's; obtained

Consulting Agreements giving them an additional 10% of Simply Fit's gross revenues (minus

only cost of goods sold); obtained Amendments to certain of these Agreements, for no

consideration, giving them extraordinary control over critical corporate transactions; and

terminated Simply Fit's License.  Altman then put potentially the last nail on the coffin of the

Company's business by obtaining an *ex parte* TRO adverse to his client, which only the Court's intervention can lift.

WHEREFORE, plaintiff respectfully requests this Court enter judgment in his favor, derivatively on behalf of the Company, Simply Fit, and against defendant Altman, awarding Simply Fit damages, including but not limited to treble damages, together with interest, reasonable attorney's fees and costs, and such other or further remedy as the Court deems necessary, just and proper.

VERIFICATION

I, Michael G. Plunkett, am the plaintiff in this case, derivatively, in the right of, on behalf of, and for the benefit of Simply Fit Holdings Group, Inc. (the "Company"). I have carefully read the foregoing Verified Amended Complaint. The factual allegations stated herein are either true of my own personal knowledge, or are based on business records of the Company provided to me by officers or employees of the Company, or are based on public records such as filings with the United States Securities and Exchange Commission or other reliable records identified herein, or, in the case of allegations made "on information" or as to which I am "informed," I believe these allegations to be true.

Signed under the penalties of perjury this *18*th day of July, 2008.

Michael G. Plunkett, derivatively on behalf of
Simply Fit Holdings Group, Inc.

By his attorneys:

EDWARDS ANGELL PALMER & DODGE LLP

By:    s/Gary A. Woodfield
    Gary A. Woodfield, Florida Bar No. 563102
    C. Cory Mauro, Florida Bar No. 384739
    One North Clematis Street
    Suite 400
    West Palm Beach, FL 33401
    (561) 833-7700 - Telephone
    (561) 655-8719 – Facsimile

OF COUNSEL:    Alan M. Spiro, BBO # 475650
111 Huntington Avenue
Boston, MA  02199
(617) 951-2204

Donald E. Frechette
20 Church Street
Hartford, CT 06103
(860) 541-7713

Dated:  July 16, 2008

BOS 630173.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 18, 2008, I have electronically filed the foregoing with the Clerk of the Court pursuant to Administrative Procedures for Filing in Civil and Criminal cases of the Southern District of Florida by using the CM/ECF system and that a true and correct copy of the foregoing has been furnished to the following, by U.S. Mail, this 18th day of July, 2008.

Cort L. Poyner, 1119 Vista Del Mar Drive North, Delray Beach, Florida  33483-7145

Daniel Minahan, 920 N.E. 16th Terrace #2, Fort Lauderdale, Florida 33334

DP Minahan, Inc., c/o Anthony G. Coleman, Jr., as Registered Agent
3275 West Hillsboro Boulevard #207, Deerfield Beach, Florida  33076

Silverman & Minahan Beverage Company, LLC, c/o Blumbergexcelsior Corporate
Services, Inc., as Registered Agent, 1200 North Market Street, Suite 806, Wilmington,
Delaware  19801

The Silverman & Minahan Group, LLC, c/o Anthony G. Coleman, Jr., as Registered
Agent, 3275 West Hillsboro Boulevard #207, Deerfield Beach, Florida  33076

Mazel Tuff, LLC, c/o NRAI Services, Inc., as Registered Agent
2731 Executive Park Drive, Suite 4, Weston, Florida  33331

Robert L. Cox, 16 Woodhollow Lane, Fort Salonga, New York 11768

Carl Feldman, c/o Galaxy Group, Inc.
3210 South Ocean Boulevard, Highland Beach, FL 33487

Smitten Press: Local Lore and Legend, Inc., c/o Corporate Office Services, Inc., as
Registered Agent, 2533 North Carson Street, Suite 125, Carson City, Nevada  89706

_____ s/Gary W. Woodfield _____
Gary A. Woodfield