UNITED STATES DISTRICT COURT FOR
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 08-60953-CIV-COHN/SELTZER

---

MICHAEL G. PLUNKETT, derivatively on
behalf of SIMPLY FIT HOLDINGS GROUP,
INC.,

        Plaintiff,

        v.

CORT L. POYNER, DANIEL MINAHAN, DP
MINAHAN, INC., SILVERMAN & MINAHAN
BEVERAGE COMPANY, LLC, THE SILVERMAN
& MINAHAN GROUP, LLC, MAZEL TUFF, LLC,
ROBERT L. COX, CARL FELDMAN, SMITTEN
PRESS, LOCAL LORE AND LEGEND, INC.,
and ALTMAN & COMPANY P.C.

        Defendants,

SIMPLY FIT HOLDINGS GROUP, INC.,

        Derivative Plaintiff and
        Nominal Defendant.

---

STATE OF FLORIDA    )
              ) ss.:
COUNTY OF PALM BEACH)

      DANIEL MINAHAN declares under penalty of perjury,
pursuant to 28 U.S.C § 1746, as follows:

      1.  I am an individual defendant in this lawsuit, the
principal of defendant DP Minahan, Inc., and a managing member of
defendant Silverman & Minahan Beverage Company, LLC ("SMBC"), now
known as Silverman & Minahan Group, LLC, and am, through DP
Minahan, Inc., a consultant to Simply Fit Holdings Group, Inc.
("SF Holdings").  I submit this declaration in support of that

part of the defendants' motion to dismiss Michael Plunkett's first amended complaint (the "Complaint") in which we seek to disqualify Mr. Plunkett from serving as the derivative action plaintiff in it.

2. Some of the history of my involvement with Simply Fit beverages is set forth in a July 7, 2008 declaration that I submitted in an action that SMBC brought against Mr. Plunkett and others. A copy of that declaration is annexed hereto as Exhibit A.[1] As set forth in it, my business partner, Cort Poyner, and I, through our companies Mazel Tuff, LLC and DP Minahan, Inc., were consultants to SF Holdings in the second half of 2007 and the first half of this year. As such, we assisted that company's operations to the extent our time and other constraints allowed.

3. SF Holdings president Robert Cox introduced Mr. Poyner and myself to Michael Plunkett, the plaintiff in this action, in mid-2007. I understand that Mr. Plunkett is a former lawyer and a neighbor of Mr. Cox's in Fort Salonga, New York. SF Holdings retained Mr. Plunkett as a consultant in mid-2007. I believe he had a written contract with SF Holdings. He sold Simply Fit beverages for the company. His association with SF Holdings was reflected in SF Holdings business cards that he carried with him and handed out. A copy of one of those cards is annexed hereto as Exhibit D.

4. I also understand from Mr. Plunkett and Mr. Cox

---

[1]   Annexed hereto as Exhibits B and C, respectively, are copies of the complaint and a brief in support of the defendants' now-abandoned motion to transfer that case to this District.

that Mr. Cox owed Mr. Plunkett some money as of mid-2007. That may help explain why Mr. Cox hired him as a consultant notwithstanding his apparent lack of experience in beverage distribution, paid him to sell Simply Fit beverages, and also paid him commissions to sell its securities.

5.  Mr. Plunkett sold securities for SF Holdings in the second half of 2007 and was paid a commission of ten percent of the sales price of those securities. Mr. Plunkett alleges at paragraphs 57 and 58 of the Complaint that SF Holdings sold its securities to scores of investors in the summer of 2007. However, he omits from those allegations the facts that he was an SF Holdings consultant and is the person who sold SF Holdings securities to most of those people. In early 2008, as a substantial financing for SF Holdings approached, Mr. Plunkett told me that Bob Cox had promised him a ten percent commission on his sales of SF Holdings securities, which he said amounted to $40,000; that he had sold the securities to many people; and that he had not yet been paid. He said that he wanted to be paid out of the moneys from the coming financing. SF Holdings' computerized check detail indicates that SF Holdings (Bob Cox) in fact paid Mr. Plunkett $38,950 on March 3, 2008.[2]

6.  In mid-2007 and thereafter Mr. Plunkett was we

---

[2]  Exh. E hereto: excerpt from SF Holdings check de that we found after Robert Cox and his confederates aband Holdings' offices in June 2008. See Exh. A: declaration 15-23 for details of those persons' abandonment of SF Ho offices and our discovery of documents incriminating Mr. and others.

3

aware of the promissory notes from SF Holdings to Mazel Tuff, LLC and SF Holdings' consulting agreements with Mazel Tuff and DP Minahan, Inc. of which he complains in his Complaint. (Complaint Exhs. I, J, M, and N)  His pal Robert Cox signed those agreements.  We discussed them at the office and I believe I even discussed some of them with Mr. Plunkett on one occasion in the summer of 2007.  All of those agreements were of course also disclosed in the private placement memorandum for SF Holdings' sale of securities through Rockwell Global Capital in early 2008 (the "PPM") (Complaint Exh. H).  Yet Mr. Plunkett did not express to me any surprise when the PPM was circulated.  Now that it suits his purposes he cites the disclosures in that document as if they were just recently discovered.

7.  As set forth in Exhibit A, SF Holdings president Robert Cox and other SF Holdings officers abandoned SF Holdings in June 2008.  They took an SF Holdings computer, the company's check book, and other documents with them.  However, Robert Thompson returned the computer and some computer access codes and we found the SF Holdings "check detail," which Mr. Thompson had kept on "Quick Books," on an office computer.  (Id. at ¶ 16)  The first screen that appeared when we logged on to a computer with the codes Mr. Thompson provided to us was a list of electronic messages.  One of the messages that appeared on that computer contained a "time line" (Exh. F hereto) that Mr. Thompson drafted to memorialize activities relating to SF Holdings.  An entry for June 16, 2008 read:

4

> [SF Holdings officers and employees] Bob Cox,
> Lester Kuznetz, Bob Thompson, Bruce Schioccetti,
> and Fred McFarland held meeting at Dunkin Donuts
> to discuss going dark and the plans that Mike
> Plunkett, Jim Stellmach, Bob Cox, and Friends and
> Family shareholders had about legal action to be
> taken.  Bob Cox that we would be dark for a week
> maybe two and would reopen with the HQ being in
> the Northeast with an office in South Florida.

8.   Thus on June 16, 2008, while still employed at SF
Holdings, Messrs. Cox, Thompson, Schiocetti, and Plunkett were
plotting to close SF Holdings' officers ("go dark"), not (as
their lawyers later claimed when confronted with that time line)
because financial issues prevented them from continuing SF
Holdings' business but in order to resume a similar business from
other offices that they would establish after a week or two.
They were also at the time plotting together to institute some
legal action (obviously this one).

9.   Messrs. Plunkett and Cox and their cronies did the
things they planned at that June 16 meeting.  As stated above,
those who worked from SF Holdings' main Florida offices departed
from those offices on June 19 or 20.  (See Exh. A at ¶¶ 15-17)
Mr. Cox resigned in writing.  (Exh. G)  Michael Plunkett filed
this lawsuit against Mr. Cox, myself, and others in accordance
with their previously discussed plans.  And after SF Holdings
briefly "went dark," Messrs. Plunkett, Thompson, Cox, and others
resumed the business of selling Simply Fit beverages through
other facilities without any regard for the rights of SF
Holdings' creditors, its securities owners, or SMBC.  The
securities owners include not only the several dozen "friends and

5

family" to whom Mr. Plunkett sold stock for several hundred thousand dollars in 2007 (and whom he may or may not be able to convince to forego their legal rights against him) but also the investors who put more than $3,000,000 into the company in 2008 through Rockwell Global Capital.

10. The ongoing scheme of Mr. Plunkett and his confederates is evidenced by some of their electronic mail messages. For example, in a June 24, 2008 electronic mail message (Exh. H), Mr. Thompson wrote Messrs. Cox and Plunkett as follows:

> Guys, has anyone spoken with Tim Kezman [officer of King Juice, SF Holdings' bottler] about the production scheduled for next week? Can we arrange for him to send out a couple of sample to test since the filtration system is no longer in place? There are two outstanding payments due: [SF Holdings customer] Healthy Image for 11K+, and Garal for balance of previous invoice. Healthy Image will hold onto the check until we notify him where to send it to. Larry Alibrandi still has those 6 pallet that need to be shipped to Nutri Sport and he pays upon delivery. Lastly, if you have a copy of the documents being served [in this derivative action] I would like the opportunity to read or let me know when they are posted online. Thanks.

> Bob Thompson

As set forth in more detail in Exhibit A at ¶¶ 23 ff., other messages betray the continuing efforts of Mr. Plunkett and his accomplices to make and sell Simply Fit beverages and misuse the Simply Fit trade name and secret formulas.

11. The misconduct of Mr. Plunkett and his crew has not only affected SMBC; it has also affected SF Holdings' other creditors. The landlord, Alex Curcio, and his managing agent,

Tony Viscount, inform me that SF Holdings owes them several months' rent on the office and warehouse space they leased. Mr. Cox and the others who worked from SF Holdings Florida office did not even leave a forwarding address with the landlord or make any provision for payment of the moneys owed him. Mr. Curcio added that he had left messages on Mr. Cox's cellular telephone voice mail regarding the leased premises but that Mr. Cox had not returned any of his calls. SF Holdings' other securities owners are also harmed by those persons' misconduct.

12. The SF Holdings officers' departure from its offices is consistent with the furtive conduct of business by Messrs. Plunkett, Cox, and the rest since they left SF Holdings.[3] They did not respond to our repeated calls to their cellular and home telephone numbers. They did not leave forwarding addresses for us or SF Holdings' other creditors. The customs and methods of the beverage distribution business allow them to operate a phantom business in the way that they have done. I have come to learn over the past year that the industry is full of "diverters" who violate others' exclusive territories and other persons who buy and sell beverages in a large grey market. Outlaw operations like that of Mr. Plunkett and his crew don't raise an eyebrow in the business. Only direct threats of legal action persuade some

---

[3] When confronted with their misconduct, Mr. Plunkett and his pals contended that they were really just continuing SF Holdings' business and not running a separate business for their own account. See Exh. I: excerpt from memorandum of law submitted by Mr. Plunkett in SMBC's lawsuit against the Simply Fit pirates.

in the industry not to do business with the outlaws.

13.  Finally, I should address my conviction for a crime in 2000 or 2001, as Mr. Plunkett, always eager to take the low road, has not tired of referring to it in every legal paper he has submitted in this and the New York action to date.  The crime involved the delivery of GHB, a bodybuilding drug, to a longtime friend in another state.  I have long been a serious weightlifter.  GHB was openly sold in nutrition stores for purposes of inducing muscle gain before it became illegal in the early 1990's.  I did not keep my conviction secret from Mr. Plunkett or anybody else.  I specifically remember talking to Robert Cox and his confederates Lester Kuznetz and Robert Thompson about it at various times.  Mr. Plunkett must have known about it, and about the convictions of Cort Poyner for other (unrelated) crimes, during the time he worked for SF Holdings. To my knowledge Mr. Plunkett never expressed reservations about working with a company that was associated with us or selling its securities.  Only now that it serves his purposes has he hysterically referred to my conviction as if he is surprised and as if it should result in my forfeiture of all of my rights in this proceeding.

Dated: August 4, 2008

Daniel Minahan
Digitally signed by Daniel Minahan
DN: cn=Daniel Minahan, o, ou,
email=dpminahan@aol.com, c=US
Date: 2008.08.04 10:25:26 -04'00'

DANIEL MINAHAN

8

Altman & Company P.C.
260 Madison Avenue
New York, New York 10016
(212) 683-7600

Counsel for Plaintiff Silverman & Minahan
  Beverage Company, LLC

UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

SILVERMAN & MINAHAN BEVERAGE COMPANY,
LLC,

                            Plaintiff,

          -against-

ROBERT L. COX, ROBERT K. THOMPSON,
MICHAEL PLUNKETT, LARRY ALIBRANDI,
and LESTER KUZNETZ,

                            Defendants.

08 Civ. 2718

**DECLARATION OF**
**DANIEL MINAHAN**

STATE OF FLORIDA      )
                      ) ss.:
COUNTY OF PALM BEACH)

          DANIEL MINAHAN declares under penalty of perjury,

pursuant to 28 U.S.C § 1746, as follows:

          1.   I am a managing member of Silverman & Minahan

Beverage Company, LLC ("SMBC"), now known as Silverman & Minahan

Group, LLC, and am, through my company, DP Minahan, Inc., a

consultant to Simply Fit Holdings Group, Inc. ("SF Holdings").  I

submit this declaration in support of SMBC's motion for a

temporary restraining order and preliminary injunction

prohibiting the defendants from soliciting sales of and selling

the beverage known as Simply Fit, from infringing on SMBC's trade

marks, and from using and disclosing SMBC's formulas for Simply
Fit beverages.

**SMBC Acquisition of Simply Fit Rights;**
**Formation of SF Holdings; Licenses and**
**Confidentiality and Noncompetition Agreements**

2.   Simply Fit is a line of flavored beverages.  The
story of my involvement with Simply Fit beverages started in or
about February 2007, when my business partner, Cort Poyner, and I
heard of the product.  We tasted it and became interested in
purchasing and exploiting the rights to it.  Accordingly, our
company, SMBC, purchased the rights to Simply Fit, including the
trade mark and formulas, from American Quality Beverages ("AQB")
in June 2007.  A copy of the purchase agreement is annexed hereto
as Exhibit A.  As indicated in the agreement, SMBC paid $200,000
for those assets.  The formulas and trademarks that SMBC acquired
in that transaction were enumerated in Schedule A to it.  AQB
warranted that those marks and formulas constituted all of the
intellectual property owned by AQB and its principals pertaining
to the soft drink industry.  (Id. at § 6(e))  AQB and its
principals also promised not to disclose to others any of the
confidential information that they were selling (most
importantly, the formulas for the beverages) and agreed not to
compete in the soft drink business for four years after the
closing of the sale transaction.  (Id. at §9(d) and (h))

3.   Also in the spring of 2007, we came into contact
with a man named Robert Cox, who appeared to be someone who might
be able to operate a business to make and sell Simply Fit.  Mr.

2

Cox, who lived (and lives) in Long Island, New York, agreed to do that and formed a company, SF Holdings, for that purpose.

4.   In June 2007, simultaneously with SMBC's purchase of the rights to Simply Fit, SMBC granted SF Holdings a license to make and sell Simply Fit beverages and use the Simply Fit trademarks in exchange for fees and royalties.  (See Exh. B: June 2007 license agreement and early 2008 amendment to it)  In that agreement, which Bob Cox signed on behalf of SF Holdings, SF Holdings agreed not to publish or misuse SMBC's confidential information, which included the formulas for the Simply Fit beverages.  (See Exh. B §§ 1(c) and 3)  It also agreed that SMBC would be irreparably harmed by a breach of that license agreement and that SMBC was accordingly entitled to temporary, preliminary, and permanent injunctive relief to prevent or stop those breaches.  (Id. at § 4(a))

5.   Larry Alibrandi, who was AQB's principal and the inventor of the Simply Fit beverages, also entered into an employment agreement with SF Holdings in mid-June 2007.  A copy of that agreement is annexed as Schedule D to the SMBC/AQB purchase agreement (Exh. A).  In that agreement, Mr. Alibrandi agreed not to disclose or use SF Holdings' confidential information, which (again) consisted largely of the Simply Fit formulas that that company licensed from SMBC.  (Exh. A, Schedule D: Employment Agreement at § 5)  He also agreed, with certain exceptions not here relevant, not to compete in the soft drink business during the term of his employment and for three years

3

afterwards.  (<u>Id</u>. at §6(c))

        6.  The nondisclosure and noncompetition provisions in
each of the foregoing agreements were of course critical parts of
them.  We paid substantial moneys to be able to use the Simply
Fit formulas, trade name, and trade mark.  We would not have paid
for them if we could have used them for free.  By the same token,
we wanted to ensure that others would not misappropriate the
property for which we paid and in which we subsequently invested
so much money and time.  We treated the Simply Fit formulas as
valuable secrets.  Neither Mr. Alibrandi nor Mr. Cox ever
suggested that they were not valid trade secrets.  To the
contrary, each of them executed agreements (in Mr. Cox's case, on
behalf of SF Holdings) in which he acknowledged the value and
confidential status of those secrets.

        7.  The involvement of Mr. Poyner and myself in SF
Holdings did not end with the license agreement.  Also in June
2007, Mr. Poyner's company, Mazel Tuff LLC, advanced moneys to SF
Holdings to fund operating expenses in exchange for a $1,000,000
promissory note that is convertible into 20,000,000 shares of SF
Holdings common stock.  (See Exh. C: promissory note)[1]  Mazel
Tuff ultimately loaned far more than $1,000,000 to SF Holdings.
In or about September 2007, it and SF Holdings therefore executed
another promissory note (Exh. D), in the amount of $2,118,304.
My company, DP Minahan, Inc., and Mazel Tuff also entered into

---

        [1]    Also included in Exhibit C is an early 2008 amendment
to that promissory note.

                                4

consulting agreements with SF Holdings (Exhs. E and F)[2] pursuant
to which we have provided consulting services to SF Holdings in
exchange for fees.

8.  Beginning in mid-2007, Bob Cox was both the
principal shareholder and president of SF Holdings.  He was
responsible for overall management of the company, including most
importantly oversight of Simply Fit's sales and distribution
efforts.  Several other employees assisted him in operating that
company.  Robert Thompson kept the books and handled most of the
paperwork.  The company also hired Bruce Schiocetti, a salesman,
and Fred McFarland, who was responsible for inventory control and
management of Simply Fit's warehouse.  Lester Kuznetz, a man with
substantial experience in the beverage industry, served as SF
Holdings' chairman.  AQB principal (and inventor of the Simply
Fit product formula) Larry Alibrandi was SF Holdings' chief
technology officer pursuant to his contract with that company
(Exh. A, Schedule D).  His duties included oversight of the
production start-up for Simply Fit beverages and quality control,
product development, training, and marketing.  The company also
hired secretaries, drivers, and warehouse workers.  For a time a
seasoned beverage distribution professional, Drew Carver, also
worked for SF Holdings.

---

[2]  An amendment to the Mazel Tuff consulting agreement is
also included in Exhibit F.

**Additional Financings**

9.    In February 2008, the first closing was held on a
private debt financing that SF Holdings conducted through
Rockwell Global Capital, LLC ("Rockwell").   (See Exh. G: private
placement memorandum) Rockwell raised more than $3,000,000 for SF
Holdings through the sale of convertible promissory notes to
investors.   The first closing of that offering, in the amount of
$710,000, took place on February 22, 2008.[3]  Subsequent closings
occurred on March 7, March 17, and May 19, 2008.   In late April,
the terms of SMBC's license to SF Holdings were amended in
connection with the capital that SF Holdings had raised and would
obtain in the offering.   (Exh. I hereto: amendment)   Most of the
money from the first three closings was apparently used to
satisfy some of SF Holdings' financial obligations and to feed
that entity's seemingly insatiable need for working capital, as
its expenses remained very high and its income remained small.

10.    A man named Michael Plunkett, whom Bob Cox
introduced to us, also raised several hundred thousand dollars
for SF Holdings.   Mr. Cox told me that Mr. Plunkett was a former
lawyer and a neighbor of his in Long Island.   Mr. Plunkett
offered to buy some SF Holdings securities and sell some to
others.   On information and belief he did both and received sales
commissions of approximately ten percent of the proceeds of his
sales, though he is not to my knowledge a licensed broker.

---

[3]    See Exh. H hereto: tables of contents, closing
memoranda, and cross-receipts for SF Holdings/Rockwell closings
of note offering.

### Cox et al. Fail to Sell Product.

11.   Things did not go smoothly for SF Holdings.   The
product was promising and we and others put millions of dollars
into the company to pay Mr. Cox and the other employees and
provide for production and distribution.   Yet Mr. Cox and his
crew were unable to sell substantial amounts of the product.   He
kept telling us that orders had come in and were coming.   For
example, in or about February 2008 he told us that he had orders
for thousands of cases of Simply Fit.   He also told us that the
company had therefore paid its bottler, King Juice, and others to
produce approximately eleven trucks (25,000 cases) worth of the
product.   When SF Holdings failed to ship the product we asked
Mr. Cox where the documents reflecting the orders were.   He then
told us that the orders were "coming."   They in fact never came -
- or at least the sales never landed on SF Holdings' books.   To
this date, King Juice still has enough unused Simply Fit
ingredients to make several truckloads of Simply Fit product.   SF
Holdings paid for the ingredients and can get the product as soon
as it is ready to take delivery of it.   Additional unsold Simply
Fit beverage is sitting in SF Holdings' warehouse.

12.   Of the product of which Mr. Cox and his crew
actually took delivery, they apparently gave away (or stole)
almost as much as they sold.   They claimed to have given away at
least two truckloads of the beverages.   They did not actually
sell a whole lot more than that -- at least that they accounted
for to the business.

13.  In the meantime, Mr. Cox's conduct became less and less acceptable.  Mr. Cox, who commuted from Long Island to Florida most weeks, used an apartment of mine in Boca Raton, Florida free of charge, though that was not part of his agreed-upon compensation.  He refused to vacate the apartment this spring when I decided I wanted to sell it.  I smelled alcohol on his breath at the office on many occasions.  His New York neighbor, Michael Plunkett, told me in or about December 2007 that Mr. Cox had a bad drinking problem, which was something I already knew by then.  Once I received a call from a patron of an establishment called the "Blue Martini," who told me that "your CEO," Bob Cox, was passed out on the bar.  I told him to put Mr. Cox in a cab and send him home.  If he had been selling the product then his conduct might not have disturbed me so much. However, he was not satisfactorily selling the product.

**Defendants Loot SF Holding and Depart.**

14.  In May and early June 2008, Mr. Poyner and I visited SF Holdings' offices more and more frequently.  The cause of our increase in visits was our company's license of its promising property and Mazel Tuff's loans of money to that company with essentially nothing to show for it.  We wanted to know what on earth was going on there.  The atmosphere became more tense as we continued to let our displeasure be known.  In mid-May 2008, in the belief that the situation was not going to improve, I formally notified SF Holdings that SMBC was terminating its license to make and sell Simply Fit beverages and

8

use its trademarks.   (Exh. J)   Mr. Poyner and others prevailed

upon me to withdraw that termination notice.   Mr. Cox, DP

Minahan, Mazel Tuff, and SF Holdings entered into a new agreement

regarding rescission of SMBC's termination notice, payment of Mr.

Cox, and several related matters.   (Exh. K hereto)   However, the

problems remained.  As we were to learn, giving Mr. Cox and the

others at SF Holdings more time only allowed them better to

prepare the wholesale theft of SF Holdings' assets and hijacking

of Simply Fit business that followed.

       15.   On or about June 17, 2008, I learned from SF

Holdings CFO Carl Feldman that Lester Kuznetz had resigned from

that company on June 14.   At the time, the company was preparing

for a big weekend of events in connection with its sponsorship of

an annual charity party hosted by a local South Florida disc

jockey.   The next day, June 18, Messrs. Poyner, Cox, Thompson,

Alan Brooks, and myself met to discuss the business and the

upcoming events.   Messrs. Cox and Thompson swore they were on

board and staying with the company.   However, the next two days

nobody answered SF Holdings' telephones when I called.   Mr.

Thompson also did not answer or return the calls I made to his

cellular telephone number.   Finally Mr. Cox told me on Friday,

June 20, that he was coming over with SF Holdings' audited

financial statements.   I never saw him again.   On or about that

day, the June 19 electronic mail message by which Mr. Cox

resigned (Exh. L hereto) came to my attention.

       16.   On Monday, June 23, 2008, Mr. Feldman gained entry

to SF Holdings' offices and let Mr. Poyner and me in.  Nobody was there.  Bob Thompson and the other employees did not to my knowledge tender resignations or provide notice of their departure; they just ceased to show up for work.  A computer, some SF Holdings shareholder files, and the computer access codes were missing.  However, Mr. Thompson returned them to us shortly thereafter.  (See Exh. M: Robert Thompson memorandum regarding computer access codes)

       17.  The departing employees took the SF Holdings checkbook with them.  However, we found the SF Holdings "check detail," which Mr. Thompson had kept on "Quick Books," on an office computer.  It showed that Mr. Cox had paid himself $73,800 during the three-week period from May 22 (immediately following the fourth Rockwell closing) to June 13, 2008.  (See Exh. N hereto: excerpts from SF Holdings check detail)  Those documents also showed that SF Holdings (Bob Cox) paid Bob Thompson $27,600, Lester Kuznetz $59,133, Bruce Schiocetti $9,000, Larry Alibrandi $16,244, and Fred McFarland $9,000 during that three-week period. (Id)  At the very least, Mr. Cox and his confederates preferred themselves over SF Holdings' creditors, including most prominently SMBC and the purchasers of SF Holdings' promissory notes.

       18.  The Quickbooks also showed that Mr. Cox had withdrawn thousands of dollars for "petty cash" and a June 16, 2008 check in the amount of $49,360 to a company called "Overnight Labels."  When I called that company to inquire about

10

that order, Mr. Cox's wife, Susan Cox, answered the phone. Susan Cox told me that the $49,360 disbursed to her was in payment for some 1,500,000 labels. However, SF Holdings in no way needed anywhere near that many labels. The transaction was either a complete sham or the company ordered many times the number of labels it needed. In either event, the only effect was to enrich Mr. Cox's family.

### Defendants' Continuing Misappropriation

19. By far the most disturbing information we discovered is that Messrs. Cox, Thompson, and Kuznetz, together with Michael Plunkett and others, conspired to quit SF Holdings and shut down its offices but still sell Simply Fit beverages to customers and appropriate the proceeds of those sales. We discovered their wrongdoing when we logged onto a Simply Fit computer. (See Exh. M). The first screen that came up on the computer was a list of electronic mail messages.

20. One of the messages that appeared on the SF Holdings computer contained a "time line" (Exh. O hereto) that Mr. Thompson drafted to memorialize activities relating to SF Holdings. An entry for June 16, 2008 read:

> Bob Cox, Lester Kuznetz, Bob Thompson, Bruce Schioccetti, and Fred McFarland held meeting at Dunkin Donuts to discuss going dark and the plans that Mike Plunkett, Jim Stellmach, Bob Cox, and Friends and Family shareholders had about legal action to be taken. Bob Cox that we would be dark for a week maybe two and would reopen with the HQ being in the Northeast with an office in South Florida.

Thus on June 16, 2008, while still employed at SF Holdings,

11

Messrs. Cox, Thompson, Schiocetti, and consultant Mike Plunkett were plotting to close SF Holdings' offices ("go dark") and then resume it from other offices. They were also at that time plotting some legal action.

       21.   The defendants did the things they planned at that June 16 meeting. As stated above, they all departed from SF Holdings' offices on June 19 or 20. Mr. Cox resigned in writing. (Exh. **L** ) Mike Plunkett filed a fraudulent and collusive RICO action in the U.S. District Court for the Southern District of Florida on June 24. A copy of complaint is annexed hereto as Exhibit P. In it, he names not only SMBC, me, Cort Poyner, and our other companies but also Bob Cox as defendants, though Mr. Thompson's time line shows that Mr. Cox conspired with Mr. Plunkett (and their confederates) regarding that lawsuit. And the defendants, after SF Holdings "went dark," have indeed resumed the business of selling Simply Fit beverages through other facilities without any regard for the rights of SF Holdings' creditors or SMBC.

       22.   The defendants' ongoing scheme is evidenced by some of their electronic mail messages. For example, in a June 24, 2008 electronic mail message (Exh. Q), Mr. Thompson wrote Messrs. Cox and Plunkett as follows:

> Guys, Has anyone spoken with [King Juice officer]
> Tim Kezman about the production scheduled for next
> week? Can we arrange for him to send out a couple
> of sample to test since the filtration system is
> no longer in place? There are two outstanding
> payments due: [SF Holdings customer] Healthy Image
> for 11K+, and Garal for balance of previous
> invoice. Healthy Image will hold onto the check

> until we notify him where to send it to.  Larry
> Alibrandi still has those 6 pallet that need to be
> shipped to Nutri Sport and he pays upon delivery.
> Lastly, if you have a copy of the documents being
> served [in Mr. Plunkett's obviously collusive
> lawsuit] I would like the opportunity to read or
> let me know when they are posted online.  Thanks.

Bob Thompson

Mr. Thompson still even uses SF Holdings' office address -- the office that he, Mr. Cox, and the others abandoned and let "go dark" -- as his return address on that message.

    23.  Other messages betray the defendants' continuing efforts to make and sell Simply Fit beverages and misuse its trade name.  In a June 26 message (Exh. R), Mr. Thompson wrote to Mr. Plunkett: "I spoke with Larry Alibrandi and Healthy Image is looking to get another 12 pallets and Nutri Sport is looking for 6."  Mr. Plunkett then wrote to Lester Kuznetz: "I will call you and Larry.  Please give me Larry's contact info. ASAP."  (Exh. S) On June 27, Mr. Thompson wrote Messrs. Cox, Plunkett, and Alibrandi that "I spoke with [King Juice's] Tim Kezman this morning and the production run for plastic [bottles] has been pushed back to the week of the 7th of July instead of the coming week."  (Exh. T)

    24.  The defendants are therefore not only misappropriating SMBC's formulas and Simply Fit's name and trademark; they are pirating the entire business.  They are ordering runs of Simply Fit beverages from SF Holdings' old bottler, King Juice, for sale to others, taking orders for Simply Fit beverages from SF Holdings' customers, and delivering

13

previously manufactured Simply Fit beverages to customers.  In the meantime they are attempting to leave SMBC and creditors behind.  They are obviously not disclosing details about their new business to SMBC.  They have also failed to pay other SF Holdings creditors.  SF Holdings' landlord, Alex Curcio of Premier Estate Properties, has informed us that SF Holdings is behind in its rent payments for the offices the defendants abandoned.

25.   On Wednesday, June 25, 2008, and the following day I gave formal notice to SF Holdings, King Juice, some SF Holdings customers, and others that SMBC was terminating SF Holdings' license to use the Simply Fit name and formulas.  (Exh. U: June 25 termination notice and June 26 cease and desist notices)  The causes were the defendants' scheme to operate SF Holdings' business surreptitiously, discontinue royalties and other payments to SMBC and other creditors, harass SMBC with a collusive lawsuit, and misuse the Simply Fit formulas and trade mark.  SF Holdings has also failed to provide information about the business to SMBC upon our reasonable requests or reasonably to market and sell Simply Fit beverages.

26.   Notwithstanding our notices, threats, and demands, the defendants have steadfastly continued to sell and to provide for the manufacture of Simply Fit beverages after their hasty departures from the company in violation of SMBC's right to the Simply Fit formulas and trade marks.  Their scheme to enrich themselves at the expense of SF Holdings and SMBC even includes

14

harassment of us through the collusive RICO action they have commenced in a Florida federal court. They have also failed and refused to communicate with us or to respond to our notices.

27.   SMBC has not given up its plans to exploit the Simply Fit name and formulas. It is a terrific product and we believe that it still has a very bright future. As its owner, SMBC will be a part of that future. However, the defendants' continuing solicitations and sales of Simply Fit beverage undermine SMBC's efforts to recover quickly from the setback that those defendants have dealt it. Selling the product ourselves or getting other companies interested in it will be much more difficult if the defendants sell it into the market and at least implicitly represent that they have the right to do so. Among many other things, the confusion regarding the right to make Simply Fit beverages tarnishes both SMBC and the Simply Fit name in the beverage industry. It appears that only the Court's intervention can put an end to the defendants' despicable course of conduct and allow SMBC to exploit the Simply Fit name and formulas.

Dated: July 7, 2008

DANIEL MINAHAN

15

Altman & Company P.C.
260 Madison Avenue
New York, New York 10016
(212) 683-7600

Counsel for Plaintiff Silverman & Minahan
  Beverage Company, LLC

**CV-08 2718**

RECEIVED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★ 'JUL 08 2008] ☆

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LONG ISLAND OFFICE

SILVERMAN & MINAHAN BEVERAGE COMPANY,
LLC,

WEXLER, J.

                                   Plaintiff,          08 Civ.

        -against-

ROBERT L. COX, ROBERT K. THOMPSON,          **COMPLAINT**
MICHAEL PLUNKETT, LARRY ALIBRANDI,
and LESTER KUZNETZ,

                                   Defendants.          TOMLINSON, M

        Plaintiff Silverman & Minahan Beverage Company, LLC ("SMBC"), by its

attorneys, Altman & Company P.C., for its complaint, alleges as follows:

                            **INTRODUCTION**

        1.  This is an action for trademark infringement, unfair competition, breach of

contract, tortious interference, and misappropriation.  SMBC is the owner of the Simply Fit trade

name, trade dress and trade marks and of formulas for "Simply Fit" beverages.  In mid-2007,

SMBC entered into a license agreement pursuant to which Simply Fit Holdings Group, Inc. ("SF

Holdings") was allowed to make and sell Simply Fit beverages and use the Simply Fit formulas,

trade name, trade dress and mark.  The defendants, who are officers and an owner of, and

consultants to, SF Holdings, while still working for SF Holdings, conspired to resign from that

company en masse, divert to themselves payments from SF Holdings customers, and make and

sell Simply Fit beverages and use the Simply Fit trade name trade dress and trade mark for their

own benefit.  They did exactly that in June 2008 and continue to solicit sales of, sell, and receive

payment for Simply Fit beverages to this day. They continued (and continue) their misconduct even after SMBC formally terminated SF Holdings' license and demanded that they cease and desist from their infringing conduct. In sum, they have hijacked SF Holdings' business and with it the Simply Fit formulas, trade name, dress and marks.

## JURISDICTION AND VENUE

2. Jurisdiction in this Court is based on 28 U.S.C. § 1331, as SMBC asserts claims arising under the Lanham Act.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Many of the acts and transactions constituting and in furtherance of the violations of law alleged in this complaint have occurred, are occurring, and unless enjoined will continue to occur, in this District, and defendants Cox and Plunkett reside here.

## PARTIES

4. Plaintiff SMBC is a Delaware limited liability company with its offices located in the State of Florida. Its two managing members are Daniel Minahan and Cort Poyner. It has recently changed its name to "Silverman & Minahan Group, LLC."

5. On information and belief defendant Robert Cox is an individual residing at 16 Woodhollow Lane, Fort Salonga, New York 11768.

6. On information and belief defendant Michael Plunkett is an individual residing at 7 Milemore Court, Fort Salonga, New York 11768.

7. On information and belief defendant Robert Thompson is an individual residing in the State of Florida.

8. On information and belief defendant Larry Alibrandi is an individual residing in the State of New York. Mr. Alibrandi was and on information and belief still is a principal of American Quality Beverages, LLC ("AQB").

9. On information and belief defendant Lester Kuznetz is an individual residing in the State of Florida.

2

## FACTS

10. SMBC purchased the rights to a line of beverages called "Simply Fit," including all trade marks and formulas for manufacture of those beverages, from AQB, Larry Alibrandi, and AQB's other principals in June 2007. At section 6(e) of those parties' asset purchase agreement, AQB and its principals warranted that the marks and formulas that they were selling and assigning to SMBC constituted all of the intellectual property they owned pertaining to the soft drink industry. At subsections 9(d) and (h) of that agreement they also promised not to disclose to others any of the confidential information that they were selling (most importantly, the formulas for the beverages) and agreed not to compete in the soft drink business for four years after the closing of the sale transaction.

11. Also in the spring of 2007, SMBC came into contact with Robert Cox. Mr. Cox agreed to operate a business to make and sell Simply Fit. He formed a Florida corporation, SF Holdings, for that purpose.

12. In June 2007, upon SMBC's purchase of the rights to Simply Fit beverages, SMBC granted SF Holdings a license to make and sell Simply Fit beverages and use the Simply Fit trademarks in exchange for fees and royalties. At sections 1(c) and 3 of that agreement, which Robert Cox signed on behalf of SF Holdings, SF Holdings agreed not to publish or misuse SMBC's confidential information, which included the formulas for the Simply Fit beverages. In section 4(a) of that agreement it also agreed that SMBC would be irreparably harmed by a breach of that license agreement and that SMBC was accordingly entitled to temporary, preliminary, and permanent injunctive relief to prevent or stop any such breaches.

13. Larry Alibrandi, who was the inventor of the Simply Fit beverage formulas, also entered into an employment agreement with SF Holdings in mid-June 2007. At paragraph 5 of that agreement, Mr. Alibrandi agreed not to disclose or use SF Holdings' confidential information, which consisted largely of the Simply Fit formulas that that company licensed from SMBC. At paragraph 6 of that agreement he also agreed, with certain exceptions not here

3

relevant, not to compete in the soft drink business during the term of his employment and for three years afterwards.

14. The Simply Fit beverage formulas are and were at all times genuine trade secrets that provide their owner and licensees thereof competitive advantages in the beverage industry. SMBC has at all times taken reasonable measures to protect those trade secrets from disclosure.

15. Beginning in mid-2007, Robert Cox was both the principal shareholder and president of SF Holdings. Several other employees assisted him in operating that company. Robert Thompson kept the books and handled most of the paperwork. The company also hired Bruce Schiocetti, a salesman, and Fred McFarland, who was responsible for inventory control and management of Simply Fit's warehouse. Lester Kuznetz, a man with experience in the beverage industry, served as SF Holdings' chairman. Larry Alibrandi was SF Holdings' chief technology officer pursuant to his contract with that company. His duties included oversight of the production start-up for Simply Fit beverages and quality control, product development, training, and marketing. The company also hired other employees.

16. In or before June 2008, the defendants conspired to depart from SF Holdings' offices en masse; to misappropriate SF Holdings' business, receivables, inventory, beverage formulas, and customer orders; to distribute SF Holdings' cash to themselves; to cause SF Holdings to cease to make payments to SMBC and some or all of its other creditors; and to continue to sell Simply Fit beverages. While still employed at SF Holdings, they agreed to close that company's offices, move their operations from Florida to the northeastern United States, and then sell Simply Fit beverages under the "Simply Fit" name to SF Holdings' existing customers and others. On information and belief one meeting at which Robert Cox, Robert Thompson, Lester Kuznetz, and other of their confederates discussed and agreed to those plans occurred at a Dunkin Donuts restaurant on June 16, 2008.

17. Pursuant to their plan, Lester Kuznetz and Robert Cox tendered resignations

4

from SF Holdings on or about June 14 and 19, 2008, respectively. Robert Thompson, as well as several other of the defendants' accomplices, also stopped going to work at SF Holdings' offices on June 19 or 20, 2008. They did not leave empty-handed. In the three weeks between May 22 and June 13, 2008, Mr. Cox had paid himself $73,800 from SF Holdings' account. During that period, he had also paid Bob Thompson $27,600, Lester Kuznetz $59,133, Bruce Schiocetti $9,000, Larry Alibrandi $16,244, and Fred McFarland $9,000 of SF Holdings' moneys. The defendants also took with them upon their departures SF Holdings' checkbook and at least one of its computers. Mr. Thompson, upon consultation with Robert Cox, thereafter returned a computer and some computer access codes to SF Holdings' offices but did not return the check book.

18.   On June 20, 2008, Mr. Cox promised SMBC principal Daniel Minahan that he would deliver SF Holdings' financial statements to SMBC. However, he never did that and thereafter failed and refused to communicate with SMBC about SF Holdings' business. Nor did he, Mr. Thompson, and SF Holdings' other employees respond to SMBC's requests for information regarding the status of SF Holdings' business, including promotional events that were scheduled to take place the weekend of June 20-22.

19.   Both before and after their departures from SF Holdings, Robert Thompson, with the explicit agreement of Messrs. Cox, Plunkett, and Kuznetz, requested that SF Holdings' bottler, King Juice, produce Simply Fit beverages, using the confidential Simply Fit formulas, for them to sell under the "Simply Fit" name. They, and specifically Messrs. Cox, Kuznetz, Plunkett, and Thompson, also continued to solicit sales of Simply Fit beverages and to take and fill orders for them. Larry Alibrandi has, among other things, solicited sales and taken steps to deliver Simply Fit beverage to purchasers Healthy Image and Nutri Sport. He has also agreed with the other defendants to contest SMBC's rights to the Simply Fit formulas and name in order to cause confusion and thereby diminish the legal action that the defendants fear SMBC will commence against them.

5

20.  As the defendants had also planned and agreed before their departures from SF Holdings, Michael Plunkett commenced a factually baseless derivative action, purportedly on behalf of SF Holdings, against SMBC, its principals, other companies they own, Robert Cox, and others.  On information and belief, Mr. Plunkett had and has no intention of collecting any judgment against Robert Cox; the main reason Mr. Plunkett named him was to satisfy fraudulently the derivative lawsuit demand excuse requirement.  Mr. Cox agreed in advance to the filing of that action.  The purpose of that derivative action is to harass SBMC and its principals and require them to expend legal fees in order to pressure them not to prosecute the defendants for their misappropriation and misuse of the Simply Fit name, trade dress, trade mark, and secret formulas.

21.  SMBC became aware of the defendants' scheme to operate SF Holdings' business surreptitiously, discontinue royalties and other payments to SMBC and other creditors, harass SMBC with a collusive lawsuit, and misuse the Simply Fit formulas, name, trade dress and trade mark.  Additionally, SF Holdings failed to provide information about its business to SMBC upon SMBC's reasonable request and failed reasonably to market and sell Simply Fit beverages.  SMBC therefore terminated SF Holdings' license on June 25, 2008.  SMBC communicated the termination of that license to SF Holdings, the defendants, King Juice, and others.  Notwithstanding that termination and SMBC's demands that the defendants cease and desist in their use of the Simply Fit name, distinctive trade mark, and beverage formulas, the defendants have continued their efforts to make, solicit sales of, and sell those beverages under the "Simply Fit" name.

### FIRST CAUSE OF ACTION
(Against All Defendants, For Unfair Competition and
Trade Mark Infringement In Violation of Lanham Act)

22.  Plaintiff SMBC incorporates by reference the allegations contained in paragraphs 1 through 21 of this complaint.

23.  SMBC is the owner of the "Simply Fit" trade name and related distinctive

trade mark and design trade dress for use with respect to beverages. That name, mark, and trade dress are distinctive and distinguish the beverages to which SMBC has the exclusive rights to make and sell from those of other manufacturers and sellers of beverages. SMBC has attempted to exploit that mark, dress, and name and plans to continue to do so notwithstanding the defendants' temporary frustration of its efforts. The defendants have infringed that mark, trade dress and trade name by using them in connection with the solicitation, sale, and manufacture of Simply Fit beverages without license to do so. That conduct has caused and will cause confusion in the market between products that the defendants are marketing and those which SMBC has the exclusive rights to make and sell.

24.  By reason of the foregoing willful and wanton unfair competition and trade mark infringement, SMBC has suffered damages in amounts to be determined at trial. The defendants are therefore liable to SMBC for the greater of statutory damages or actual damages, plus SMBC's attorneys' fees and costs. However, because monetary damages are insufficient to compensate SMBC, the defendants and all other persons acting in concert with them should be preliminarily and permanently enjoined from using Simply Fit's name, trade dress, and trade mark and selling and/or making Simply Fit beverages; they should be ordered to account for all profits earned by them from the sale of those beverages; and a constructive trust should be imposed on profits from sales of Simply Fit beverages in violation of SMBC's rights.

**SECOND CAUSE OF ACTION**
(Against All Defendants, For
State Law Unfair Competition)

25.  Plaintiff SMBC incorporates by reference the allegations contained in paragraphs 1 through 24 of this complaint.

26.  By reason of the foregoing unfair competition, SMBC has suffered damages in amounts to be determined at trial, for which the defendants are liable. However, because monetary damages are insufficient to compensate SMBC, the defendants and all other persons acting in concert with them should be preliminarily and permanently enjoined from using the

Simply Fit formulas, name, trade dress, and trade mark and selling and making Simply Fit beverages. They should also be ordered to account for all profits earned by them from the sale of those beverages and a constructive trust should be imposed on profits from sales of Simply Fit beverages in violation of SMBC's rights.

## THIRD CAUSE OF ACTION
(Against All Defendants, For Misappropriation)

27. Plaintiff SMBC incorporates by reference the allegations contained in paragraphs 1 through 26 of this complaint.

28. As alleged herein, the defendants have misappropriated the Simply Fit beverage formulas, which are valuable trade secrets, the Simply Fit name and its trade dress and trade mark by using them in connection with the manufacture and sale of Simply Fit beverages without license to do so.

29. By reason of the foregoing misappropriation, SMBC has suffered damages in amounts to be determined at trial, for which the defendants are liable. However, because monetary damages are insufficient to compensate SMBC, the defendants and all other persons acting in concert with them should be preliminarily and permanently enjoined from using or disclosing the Simply Fit beverage formulas, name, trade dress, and trade mark and selling and/or making Simply Fit beverages. They should be ordered to account for all profits earned by them from the sale of those beverages and a constructive trust should be imposed on profits from sales of Simply Fit beverages in violation of SMBC's rights.

## FOURTH CAUSE OF ACTION
(Against Larry Alibrandi, For Breach of Contract)

30. Plaintiff SMBC incorporates by reference the allegations contained in paragraphs 1 through 29 of this complaint.

31. Larry Alibrandi has breached the June 2007 agreement between himself, AQB, and AQB's other principals, on the one hand, and SMBC, on the other hand, by inter alia his participation in the unauthorized use of the Simply Fit name, trade mark, trade dress, and

8

beverage formulas, including the defendants' manufacture of Simply Fit beverages and sale of those beverages to Nutri Sport, Healthy Image, and other customers.

32. By reason of those breaches of contract, Mr. Alibrandi is liable to SMBC for amounts to be determined at trial. However, because monetary damages are insufficient to compensate SMBC, Mr. Alibrandi and all other persons acting in concert with him should be preliminarily and permanently enjoined from using or disclosing the Simply Fit beverage formulas, name, trade dress, and trade mark and selling and/or making Simply Fit beverages. He should be ordered to account for all profits earned by them from the sale of those beverages and a constructive trust should be imposed on monies he receives from or in connection with sales of Simply Fit beverages in violation of SMBC's rights.

### FIFTH CAUSE OF ACTION
(Against Defendants Cox, Thompson, Kuznetz, and
Plunkett, For Tortious Interference With Contract)

33. Plaintiff SMBC incorporates by reference the allegations contained in paragraphs 1 through 32 of this complaint.

34. All of the defendants were at all relevant times aware of the contract between SMBC, on the one hand, and AQB, Larry Alibrandi, and other AQB principals, on the other hand. In or before June 2007, defendants Robert Cox, Robert Thompson, and on information and belief Michael Plunkett induced Larry Alibrandi to breach that contract, and on information and belief also to contest SMBC's continuing rights to exploit the Simply Fit beverage formulas and name, by promising to pay him if he did so. Mr. Alibrandi thereafter did breach that contract as set forth above.

35. By reason of that tortious interference with contract, Messrs. Cox, Thompson, and Plunkett are liable to SMBC for amounts to be determined at trial.

WHEREFORE, plaintiff Silverman & Minahan Beverage Company, LLC demands judgment against the defendants for compensatory damages in amounts to be determined at trial or, at its election, for statutory damages for unfair competition and trade mark

9

infringement; for its attorneys' fees and costs; for orders preliminarily and permanently enjoining the defendants from using and/or disclosing the Simply Fit beverage formulas, name, trade dress, and trade mark and selling and/or making Simply Fit beverages; an accounting of all profits earned by the defendants from the sale of Simply Fit beverages; imposition of a constructive trust on all profits from sales of Simply Fit beverages in violation of SMBC's rights; and such other and further relief as the Court deems just and proper.

New York, New York
July 7, 2008

Respectfully submitted,

ALTMAN & COMPANY P.C.

By:_____
        Steven Altman

260 Madison Avenue, 22nd Floor
New York, New York 10016
(212) 683-7600

Attorneys for Plaintiff
   Silverman & Minahan Beverage
   Company, LLC

10

ꓤ. Frechette (DF 7880)
⸝RDS ANGELL PALMER & DODGE LLP
⸝ᴜ Church Street
Hartford, Connecticut 06103
Tel. No. (860) 541-7713
Fax No. (860) 527-4198
Email: dfrechette@eapdlaw.com
*Attorneys for Defendant Michael Plunkett*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SILVERMAN & MINAHAN BEVERAGE COMPANY, LLC,<br><br>               Plaintiffs,<br><br>  - against -<br><br>ROBERT L. COX, ROBERT K. THOMPSON, MICHALE PLUNKETT, LARRY ALIBRANDI, and LESTER KUZNETZ.<br>             Defendants. | CIVIL ACTION NUMBER<br>2:08-CV-02718-LDW-AKT |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHAEL PLUNKETT'S MOTION TO TRANSFER VENUE OR, IN THE ALTERNATIVE, TO STAY PROCEEDINGS

Defendant Michael Plunkett ("Plunkett") respectfully submits this memorandum of law in support of his *Motion To Transfer Venue Or, In The Alternative, To Stay Proceedings*. Because another suit is already pending in the United States District Court for the Southern District of Florida that deals with the same core issues presented here, that "first-filed" suit has priority and this matter should be transferred to the Florida Federal Court. Alternatively, this Court should stay these proceedings.

### FACTUAL STATEMENT

On June 24, 2008, Plunkett, acting derivatively on behalf of Simply Fit Holdings Group, Inc. ("Simply Fit"), filed a action in the United States District Court for the

Southern District of Florida (the "Florida Action") against plaintiff, Silverman &

Minahan Beverage Company, LLC ("S&M"), among other the defendants.[1]  The

complaint, which was amended on July 18, 2008, asserts twelve counts against the

defendants (the "Florida Complaint").

The sordid allegations of the Florida Complaint speak for themselves and need

not be recounted here, except to note that, at its core, the Florida Action seeks to establish

that S&M doesn't even own the intellectual property that is at the heart of these

proceedings.  Instead, the Florida Complaint asserts that such property – including the

"Simply Fit™" trademark – is really owned by Simply Fit.  Plunkett, acting on behalf of

Simply Fit, requested to have a receiver appointed in the Florida Action to take control of

Simply Fit's assets and operations during the pendency of that case.[2]

The Florida Complaint was filed on June 24, 2008, and there can be no doubt that

the Florida Action is properly venued.  Nevertheless, S&M initiated this case by

complaint dated July 8, 2008 (the "New York Complaint").  Obviously aware that it

would need to somehow explain why it was not proceeding in Florida given the lawsuit

already pending there, S&M characterizes the Florida Complaint as a "factually baseless"

sham, designed and pursued merely to "harass" S&M.  New York Complaint, ¶ 20.

Plunkett will defer to this Court's judgment the issue of whether there is, based

on the exhibits filed therewith, an adequate factual basis for the Florida Complaint.  But

the real point, and the one S&M tries mightily to avoid, remains that the principal dispute

between the parties here turns on the same issue that is at the heart of the Florida Action –

---

[1] A copy of the Florida Complaint, with all exhibits, is attached hereto as *Exhibit A.*

[2] *See Exhibit A, Florida Complaint*, at Count XI.

that is, who owns and has the right to use the "Simply Fit™" trademark and related intellectual property?

Since the Florida Action was already pending when S&M filed this suit, and since both suits involve a determination as to whether S&M has any rights in and to the relevant intellectual property, this case should, pursuant to the Prior Pending Action Doctrine, be transferred to the Southern District of Florida.

Alternatively, because the Southern District of Florida will be tasked with the job of deciding – both as a preliminary matter in connection with Plunkett's pending receivership motion, and as the ultimate issue in the case – whether the "Simply Fit™" trademark and associated intellectual property belongs to Simply Fit or to S&M, this Court should stay these proceedings until that issue is adjudicated. Quite simply, if the Florida Federal Court determines that Simply Fit is the rightful owner of that intellectual property, S&M will lack any standing to proceed here. As such, and to again avoid the possibility of wasteful and duplicative proceedings, as well as potentially conflicting results, if this Court is disinclined to transfer these proceedings, a stay should enter.

## ARGUMENT

### A.  THIS COURT SHOULD TRANSFER THESE PROCEEDINGS TO THE SOUTHERN DISTRICT OF FLORIDA.

Motions to transfer venue are governed by 28 *U.S.C.* § 1404. Such motions are subject to "a two-part test: (1) whether the action to be transferred might have been brought in the transferee venue; and (2) whether the balance of convenience and justice favors transfer." *Villante v. Vandyke*, 2008 WL 1809400, at *3 (N.D.N.Y. April 21, 2008) (citation omitted) (attached as *Exhibit B*).

### 1.  The Prior Pending Action Doctrine Creates A Presumption

**That The Interests Of Justice Favor Transfer**

Taking the second prong of that analysis first, it is important to note that the Prior

Pending Action Doctrine creates a presumption in favor of transfer. *Employers Ins. of*

*Wausau v. Fox Entm't Group, Inc.* 522 F.3d 271, 275 (2d Cir. 2008). When a district

court is confronted by a case that raises the same issues that are the subject of another

already pending federal proceeding, the court before which the second-filed suit is

pending has discretion to "stay the second suit, dismiss it without prejudice, enjoin the

parties from proceeding with it, or consolidate the two actions." *Curtis v. Citibank, N.A.*,

226 F.3d 133, 138 (2d Cir. 2000).

> Transfer of related cases to a single forum facilitates efficient,
> economical, and expeditious pretrial proceedings and avoids
> duplicative litigation. [*Durham Prods., Inc. v. Sterling Film
> Portfolio, Ltd.*, 537 F.Supp. 1241, 1243 (S.D.N.Y.1982)] (citing
> *National Super Spuds, Inc. v. New York Mercantile Exchange*, 425
> F.Supp. 665, 667 (S.D.N.Y.1977)). *A transfer of venue pursuant
> to § 1404(a) 'is particularly appropriate where there is a prior
> pending lawsuit in the transferee district involving the same
> facts, transaction or occurrences.'* Levitt v. State of Maryland
> *Deposit Ins. Fund Corp.*, 643 F.Supp. 1485, 1493 (E.D.N.Y.1986).

*James v. Prudential-Bache Sec., Inc.*, 1990 WL 180913, at \*3 (S.D.N.Y. Nov. 9, 1990)

(emphasis added) (attached as *Exhibit C*).

The Second Circuit has been highly supportive of the Prior Pending Action

Doctrine, ruling time and again that "the first suit should have priority, absent the

showing of balance of convenience in favor of the second action . . . or unless there are

special circumstances which justify giving priority to the second." *Factors Etc., Inc. v.*

*Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978) (internal quotation and citations

omitted); *see also Employers Ins. of Wausau*, 522 F.3d 271, 274-75 (2d Cir. 2008)

(general rule is that "where there are two competing lawsuits, the first suit should have

priority" (internal quotes omitted)).  Indeed, it has been observed that '[i]n general, a first-filed action will preempt all later filed actions." *PRPJ Bergen, Inc. v. Plate*, 774 F.Supp. 200, 203 (S.D.N.Y. 1991); *see also BBC Intern. Ltd. v. Lumino Designs, Inc.*, 441 F.Supp.2d 438, 442 (E.D.N.Y. 2006) ("well-settled that earlier-filed related lawsuits take precedence").

It is of no consequence that the parties to the two suits may be different.  Instead, the real focus is on the facts, transactions or issues that are central to both cases:

> In *Continental Grain Co. v. Barge FBL-585,* 364 U.S. 19, 26, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960), the Supreme Court observed that '[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that §1404(a) was designed to prevent.'  Since *Continental Grain,* courts have observed that transfer is particularly appropriate in patent cases where a prior pending lawsuit involves the same facts, transactions, or occurrences, **and is warranted even when the parties are different.** *See e.g., Hunter Eng'g Co. v. ACCU Indus.*, 245 F.Supp.2d 761, 766 (E.D.Va.2002).  .

*Inline Connection Corp. v. Verizon Internet Serv., Inc.*, 402 F.Supp.2d 695 (E.D. Va. 2005) (emphasis added).

### 2.   S&M Cannot Overcome The Presumption That Transfer Is Warranted.

The presumption favoring a "first-filed" suit can only be overcome by demonstrating that the "balance of convenience" weighs in its favor of the later filed suit. *Employers Ins. of Wausau*, 522 F.3d 275.  Thus, in order to avoid a transfer, S&M bears the burden of demonstrating that New York is the preferred forum here.  S&M's efforts to shoulder that burden fall far short of the mark.

### a.   The "Balance of Convenience" Favors Transfer

To begin with, in order to avoid transfer, S&M must show that the balance of

convenience tilts conclusively in its favor. *Columbia Pictures Indus., Inc. v. Schneider*, 435 F.Supp. 742, 751 (S.D.N.Y. 1977) ("[A]n even or inconclusively tilted 'balance of convenience' would ordinarily support application of the first-filed rule.").

> In applying the 'balance of convenience' exception, we have considered the ties between the litigation and the forum of the first-filed action. We agree with several district courts within our Circuit that the 'factors relevant to the balance of convenience analysis are essentially the same as those considered in connection with motions to transfer venue pursuant to 28 U.S.C. § 1404(a)." Among these factors are:
>
>> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of the parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties.

*Employers Ins. of Wausau*, 522 F.3d at 275 (citations omitted).   Here, the "balance of convenience" is insufficient to overcome the presumption favoring transfer; in fact, the balance actually *supports* the assertion that transfer is here warranted.   Each of the factors is examined below.

**Plaintiff's Choice of Forum.** "While ordinarily a plaintiff's choice of forum is entitled to significant weight, when the forum chosen is not the plaintiff's home forum, the choice is given less deference." *Foley v. Sammons Preston, Inc.*, 2004 WL 35438, at *5 (S.D.N.Y. Jan. 6, 2004) (citation omitted) (attached as *Exhibit D*).   Here, S&M, a Delaware corporation, is physically located in the state of Florida.   Florida Complaint, ¶ 4.   In addition, its two managing members – Daniel Minahan and Cort Poyner – are also both Florida residents.   *See Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Preliminary Injunction*, dated July 25 2008, at p. 10.   S&M's choice of a New

York forum is, therefore, entitled to only minimal weight. Additionally, and as discussed below, that weight is even further diminished because the operative facts of this dispute have little connection with S&M's chosen forum, New York, and, instead, are actually more grounded in Florida. *Frame vs. Whole Foods Market, Inc.*, 2007 WL 2815613, at *5 (S.D.N.Y. Sept. 24, 2007) (attached as *Exhibit E*).

**Convenience of Witnesses.** To the extent S&M seeks to assert that witnesses will be inconvenienced by any transfer of these proceedings to Florida, S&M must identify those witnesses and provide a general statement about the substance of their potential testimony. *Frame*, 2007 WL 2815613, at *5. In making that identification, S&M "may not artificially inflate the number of witnesses to be inconvenienced . . . by listing witnesses whose testimony is not material." *Id.* (citation omitted). "When assessing the convenience of witnesses, a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum. Instead, the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide." *Id.* (citation omitted).

Here, the only potential witnesses mentioned in the New York Complaint that are not parties (an issue that is treated below) are Messrs. McFarland and Schiocetti, *both* of whom are Florida residents. These two individuals would obviously be significantly convenienced by having these proceedings transferred to Florida, and this factor thus weighs against S&M.

**The Location of Relevant Documents and Relative Ease of Access to Sources of Proof.** This factor is rendered essentially irrelevant unless S&M can show that the "documents are particularly bulky or difficult to transport," or that it is somehow more

difficult for S&M to produce its documents in Florida – its *home* state – than in New York. *Constitution Reinsurance Corp. v. Stonewall Ins. Co.,* 872 F.Supp. 1247, 1251 (S.D.N.Y.1995).

Of course, *both* S&M and Simply Fit are located in Florida. Thus, their documents and computer records – which have, in large part, served as the basis for S&M's claims – are all sited in Florida. If anything, this factor actually adds further support to the proposition that transfer is warranted.

**The Convenience of the Parties.** S&M and its principals are all Florida residents. So, too, are defendants Thompson and Kuznetz. That, then, leaves only defendants Plunkett, Cox, and Alibrandi, and *all* of them would prefer to have this matter heard in Florida. Plainly, this factor again supports transfer.

**The Locus of Operative Facts.** The locus of operative facts is an important element in any motion to transfer venue. *Cancel v. Mazzuca,* 2002 WL 1891395, at *3 (S.D.N.Y. Aug. 15, 2002) (attached as *Exhibit F*). Moreover, a plaintiff's choice of forum is given lesser weight "when the case's operative facts have little connection with the chosen forum." *USA Interactive vs. Savannah Air Center, LLC,* 2002 WL 1808236, at *1 (S.D.N.Y. Aug. 7, 2002) (citation omitted) (attached as *Exhibit G*).

Here, the operative facts of this case are firmly grounded in Florida and this factor heavily favors transfer. S&M is a *Florida* corporation. It contracted with Simply Fit in *Florida*. The defendants allegedly conspired with one another to destroy a *Florida* based

corporation, and their conspiracy was actively pursued in *Florida*. Plunkett supposedly filed a "factually baseless derivative action" in *Florida*.[3]

**The Availability of Process to Compel the Attendance of Unwilling Witnesses.** It will, of course, be necessary for S&M to identify individual *material* witnesses that it believes could not be compelled to testify in Florida, but who would otherwise be available in New York. For his part, Plunkett is aware of no such witnesses. At the same time, however, Plunkett does observe that Messrs. Schiocetti and McFarland are both Florida residents who could not be compelled to voluntarily appear in these proceedings. Plunkett submits that this factor weighs in favor of transfer as well.

**The Relative Means of the Parties.** A party that relies on this factor "must offer documentation showing the granting or denying the transfer would be unduly burdensome." *Frame*, 2007 WL 2815613, at *6 (citation omitted). Here, and especially in light of the documented evidence demonstrating that, over the last several months, S&M and its principles have received large cash payments from Simply Fit, there can be no suggestion that S&M is financially disadvantaged as compared to the individual defendants. *See Exhibit A.* Again, this factor has no effect on the transfer analysis.

It is thus beyond peradventure that the "balance of convenience" factors actually lend further support to the presumption favoring transfer created by the Prior Pending Action Doctrine. This is particularly so given the fact that "[p]iecemeal litigation in the complex and technical area of patent *and trademark law* is especially undesirable."

---

[3] The mere fact that this Court is being asked to, in effect, declare a proceeding that is pending before another federal judge to be without merit, alone showcases the desirability of transfer.

*Smiths Indus. Med. Sys., Inc. v. Ballard Med. Prod., Inc.*, 728 F. Supp. 6, 7 (D.D.C. 1989) (emphasis added). In fact, "[i]n such cases, the 'interest of justice' may dictate transfer *even if* the convenience of the parties and witnesses calls for a different result." *DataTreasury Corp. v. First Data Corp.*, 243 F.Supp.2d 591, 594 (N.D. Tex. 2003) (emphasis added), citing *The Black & Decker Corp. v. Amirra, Inc.*, 909 F. Supp. 633, 639 (W.D. Ark 1995).

Here, the sheer wastefulness of two federal courts struggling with the same issues of trademark ownership – not to mention the possibility of inconsistent results – strongly counsels in favor of transfer.

**b.      There Are No "Special Circumstance" Present Here**

The special circumstances that may undercut application of the Prior Pending Action Doctrine are "quite rare." *Employers Ins. of Wausau*, 522 F.3d at 275.

> One exists where the first-filed lawsuit is an improper anticipatory declaratory judgment action. District courts in this circuit have recognized that, in order for a declaratory judgment action to be anticipatory, it must be filed in response to a direct threat of litigation that gives specific warnings as to deadlines and subsequent legal action. Another special circumstance is where forum shopping *alone* motivated the choice of the situs for the first suit. This does not mean that any evidence of forum shopping will suffice. Any lawyer who files a case on behalf of a client must consider which of the available forum might yield some advantage to his client, and thus, to that degree, engages in 'forum shopping.' Rather, the first-filing plaintiff must engage in some manipulative or deceptive behavior, or the ties between the litigation and the first forum must be so tenuous or de minimus that a full 'balance of convenience' analysis would not be necessary to determine that the second forum is more appropriate than the first.

*Id.* at 275-276 (footnotes, internal quotations, and citations omitted; emphasis in original).

"Special circumstances" do not exist here. The Florida Action was commenced in order to address the S&M's thievery and was anything other than anticipatory. In addition, and notwithstanding S&M's protestations to the contrary, the Florida Action is supported by specific and concrete evidence, drawn from Simply Fit's own documents, and it plainly sets forth a significant tie between the operative facts and the chosen jurisdiction – Florida.

### 3.    This Action Could Have Been Brought In Florida

Section 1404's first prong – that the action pending before this Court "might" have been properly brought in Florida – is easily satisfied. Trademark infringement actions are not benefited by a special venue provision and, as such, the general venue requirements of 28 *U.S.C.* § 1391 (b) control. *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995). Under Section 1391 (b), an action may be maintained in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

Here, and as the New York Complaint quickly reveals, there can be little argument over whether a "substantial part" of the alleged wrongdoings perpetrated by each of the Defendants occurred within the Middle District of Florida::

A.    Plaintiff alleges, for example, that the conspiracy that ultimately resulted in the suppose misappropriation of S&M's alleged property occurred "while [the defendants were] still at [Simply Fit]," which was located *in Florida*. Specifically, S&M alleges that the defendants "agreed to close [Simply Fit's] offices, move their operations *from Florida*, to the northeastern United States, and then sell Simply Fit beverages under the 'Simply Fit' name to [Simply Fit's] existing customers and others." New York Complaint, ¶ 16 (emphasis added).

B.    S&M also claims defendant Thompson, with the express agreement of defendants Cox, Plunkett and Kuznetz, "requested that [Simply Fit's] bottler, King Juice, produce Simply Fit beverages, using the confidential Simply Fit formulas, for them to sell under the 'Simply Fit' name." (*Id.*, ¶

19).  These actions took place both *before* and after the relevant defendants left Simply Fit's *Florida* offices.  *Id.*

C.  Plunkett also commenced his supposedly "baseless" lawsuit against S&M *in Florida*.  *Id.*, ¶ 20.

Plainly, S&M, had it so chosen, could have brought this action in the Southern District of Florida.  Accordingly, and given the already pending Florida Complaint, this matter should be transferred to there.

## CONCLUSION

S&M is located in Florida, and so are both of its principals.  More to the point, the corporation that is the focal point for these proceedings – Simply Fit – is also located in Florida.  Most of the relevant documents and records, electronic and otherwise, are in Florida.  All of the defendants are either Florida residents or, alternatively, are willing to litigate in S&M's home state – Florida.  It is thus difficult to understand why S&M would choose to bring these proceedings in New York, or why it would oppose transfer of these proceedings to Florida, unless , of course, S&M's real motivation is to open a two-front war against the defendants in order to drive up there litigation costs and extract retribution for Plunkett's filing of the Florida Complaint.

In the end, though, the simple fact remains – the Florida Action was first-filed and it addresses the same threshold issues presented here, namely ownership of, *inter alia*, the "Simply Fit™" trademark.  The Prior Pending Action Doctrine thus creates a presumption favoring transfer of these proceedings.  Moreover, even under a traditional transfer analysis, this case still should be moved to the Southern District of Florida, especially given that the locus of operative facts is firmly sited in that District.

Alternatively, if this Court elects not to transfer these proceedings, this Court should elect to stay this matter until it is decided *in Florida* whether S&M even owns the property rights that it is seeking to vindicate here.  That issue is squarely before the Florida District Court and, until that question is resolved, S&M's standing to bring its claims here remains in doubt.  Moreover, S&M shouldn't be heard to assert that this Court can make its own determination of that issue as regards Simply Fit, a non-party in this case, because doing so would essentially allow S&M to wholly side-step the Florida proceedings without regard for the co-existent jurisdiction of the District Court there.

Dated: Hartford, Connecticut
        July 29, 2008

                        Respectfully submitted,
                        THE DEFENDANT,
                        MICHAEL PLUNKETT


                        By _____*/s/ Donald E. Frechette*_____
                           Donald E. Frechette (DF7880)
                           EDWARDS ANGELL PALMER & DODGE LLP
                           20 Church Street
                           Hartford, Connecticut 06103
                           Telephone: (860) 541-7713
                           Facsimile: (860) 527-4198
                           Email: dfrechette@eapdlaw.com
                           *Attorneys for Defendant Michael Plunkett*

## **CERTIFICATION**

I hereby certify that on this 29th day of July 2008, a copy of the foregoing *Memorandum Of Law In Support Of Defendant Michael Plunkett's Motion To Transfer Venue Or, In The Alternative, To Stay Proceedings* was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

This is to further certify that a copy of the foregoing was served by U.S. Mail on the following counsel of record:

Steven Altman, Esq.
ALTMAN & COMPANY
260 Madison Avenue
New York, NY 10016
Tel No. (212) 683-7600
Fax No. (212) 683-7655
Email: saltman@altmanco.net
*Counsel for Plaintiff,*
*Silverman & Minahan Beverage Company, LLC*


By        */s/ Donald E. Frechette*_____
                Donald E. Frechette (DF7880)

RECYCLED



**Michael G. Plunkett**
Manufacturer's Representative

7 Milemore Court
Fort Salonga, NY 11768

michaelplunkett36@yahoo.com
www.drinksimplyfit.com

toll free: 877-639-1FIT   Direct: 631-560-3683   Fax: 631-663-5283

1:00 PM

06/23/08

# Simply Fit Holdings Group, Inc.
## Check Detail
### January 1 through June 23, 2008

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount |
|---|---|---|---|---|---|---|---|
| Check | 1063 | 3/2/2008 | Massachusetts Se... | | Bank of America - ... | | -500.00 |
| | | | | | Business License &... | -500.00 | 500.00 |
| TOTAL | | | | | | -500.00 | 500.00 |
| Check | 1066 | 3/3/2008 | MICHAEL PLUNKE... | | Bank of America - ... | | -38,950.00 |
| | | | | | Professional Fees | -38,950.00 | 38,950.00 |
| TOTAL | | | | | | -38,950.00 | 38,950.00 |
| Check | | 3/3/2008 | | | Bank of America - ... | | -9.95 |
| | | | | | Bank Service Charg... | -9.95 | 9.95 |
| TOTAL | | | | | | -9.95 | 9.95 |
| Bill Pmt -Check | 1067 | 3/5/2008 | Sign A Rama | | Bank of America - ... | | -2,113.75 |
| Bill | 12619 | 3/5/2008 | | | Printing and Graphics | -2,113.75 | 2,113.75 |
| TOTAL | | | | | | -2,113.75 | 2,113.75 |
| Bill Pmt -Check | wire | 3/5/2008 | Mastertaste Inc. | | Bank of America - ... | | -1,674.00 |
| Bill | 130333 | 3/31/2008 | | mangom... | Inventory Asset | -1,674.00 | 1,822.75 |
| TOTAL | | | | | | -1,674.00 | 1,822.75 |
| Bill Pmt -Check | wire | 3/5/2008 | Fortitech | | Bank of America - ... | | -13,160.00 |
| Bill | 0390 | 3/5/2008 | | Raw Mat... | Inventory Asset | -13,160.00 | 13,160.00 |
| TOTAL | | | | | | -13,160.00 | 13,160.00 |
| Check | | 3/5/2008 | | | Bank of America - ... | | -25.00 |
| | | | | | Bank Service Charg... | -25.00 | 25.00 |
| TOTAL | | | | | | -25.00 | 25.00 |

# Simply Fit Timeline

| | |
|---|---|
| June 2006 | Dukes Distribution and American Nutritional Exchange came together to become National Nutritional Network a distributor in South Florida. The principals were Lester Kuznetz, Ismael Gonzales, Donald Montellesse, Bob Thompson and Bruce Schiocchetti |
| Late 2006 | Lester Kuznetz, Ismael Gonzalez, and Donald Montellesse entered into a verbal agreement with Lawrence Alibrandi of American Quality Beverage of Syracuse New York for acquisition. Lawrence is the inventor and co-owner of Simply Fit Beverages a brand owned by American Quality Beverages. |
| Feburary 2007 | National Nutritional Network Low On Working Capital, Bruce hears from Tami @ Y-2 that Cort Poyner has done very well over the years/talk to him. Lester had a relationship with Cort approximately 20 years earlier. Lester reaches out to Cort and begin discussions |
| 2/22/2007 | $50K from Cort Poyner to Dukes Distribution that then went to NNN as working capital |
| 3/15/2007 | $50K from Cort Poyner to NNN for working capital and inventory |
| 3/17/2007 | $50K from Cort Poyner to NNN for working capital and inventory |
| 3/28/2007 | Simply Fit Holdings, LLC was formed. The principal place of business to 09/01/2007 was at  1825 NW 38th Avenue Lauderhill, Florida. Principals wives listed as Managers/Members National Nutritional Network continued on as Distribution Company in same building with Simply Fit |
| Early April 2007 | Founders (Kuznetz, Gonzalez, Montellese) begin operating the company and performing their duties as executive management. |
| 4/2/2007 | Simply Fit Holding Group, Inc was from by Cort Poyner's attorney Brenda Hamilton. No officers or directors are noted. |
| Early May 2007 | Robert L. Cox is hired as Chief Executive Office and President by investors (Cort L. Poyner and Daniel P. Minihan) No meetings were ever held with founders, shareholders, directors, or acting management. |

6/1/2007
Founders began as executive management of the company with executive salaries being accrued as follows:
Lester Kuznetz, Executive Chairman: $200,000 annually
Ismael Gonzalez, VP Sales and Marketing: $150,000 annually
Donald Montellese, VP of Manufacturing: $150,000 annually

6/17/2007
See Convertible Promissory note Cort Poyner/Robert Cox $2,118,304.00

6/8/2007
See executive summary page 3 letter from chairman, page 22 use of proceeds, page 27 management,

6/27/2007
See Fax from Brenda Hamilton Esquire in reference to consulting agreements in D² Minahan
See consulting agreement and exhibits for Mazel Tuff.
See Convertible Promissory Note and Agreement Mazel Tuff.
See License agreement signed by Poyner and Cox

June 2007
Founders and Robert Cox begin payroll. Robert Cox begins at $10,000 per month. Founders are paid $2,000 bi-weekly

07/05/2007
See hand written fax from Cox to Poyner and Minihan in reference to Maddox proposal

August 2007
Founders not paid for payroll periods; August 17, Sept 28, Oct 12, Oct 26, Nov 9, and Nov 23.
Deal with International Warehouse Solutions (would become Simply Fit North America) Sal. Received 24 pallets
of product for free and then purchased 24 pallets and wrote bad check.

08/01/2007
See business plan pages 33 and 34 in reference to Founders, management and directors equity ownership.
See page 8 organizational chart

9/26/2007
National Marketing Inc/Window Rock Enterprises, Ken Swain Deal with GNC

10/1/2007
See page 10 organizational chart. See page 37 equity ownership. See pages 38, 39, and 40 reference to management

Mid October
Drew Carver Brought into firm

10/29/2007
See Correspondence from Brenda Hamilton Esquire referencing another consultant to the company.

11/23/2007
Founders Gonzalez and Montellese had bi-weekly salaries reduced to $600 and were told by Poyner and Minahan
that the were now being paid as independent contractors (1099)

| Date | Description |
|---|---|
| 12/3/2007 | Cort Poyner and Dan Minahan Informed Bob Thompson that he would have his pay reduced by 50% and issued him a check for $750 as a Thanksgiving bonus from Simply Fit. |
| 12/3/2007 | See Monies in and out Worksheet |
| 12/7/2008 | After weeks of insistence by Cort Poyner National Nutritional Network ceased distribution. |
| 12/13/2007 | See Monies in and out Worksheet |
| 1/2/2008 | Founders Gonzalez and Montelese wer terminated without board of directors vote and based on the recommendation of investers Poyner and Minihan due to a dispute over salary accrual as agreed upon in June |
| 2/6/2008 | Assaulted Bob Cox |
| 2/7/2008 | See Document from Mike Plunkett |
| 2/22/2007 | See Monies in and out Worksheet |
| 3/6/2008 | See Letter to Scott Salberg that Bob Cox had Lester Kuznetz sign at the request of Poyner and Minahan |
| 3/10/2007 | See Monies in and out Worksheet |
| | See ammendment to consulting agreement Mazel Tuff |
| | See ammendment to Convertible promissory note and agreement Mazel Tuff. |
| | See ammendment to License agreement. |
| 3/14/2008 | See ammendment to option purchase Mazel Tuff |
| 3/18/2008 | See Monies in and out Worksheet |
| 4/2/2008 | See complete Stock Holder List Smitten Press |
| 4/28/2008 | See amendment 2 to License Agreement |
| 5/15/2008 | Silverman and Minahan Beverage Company terminate license agreement. |

| 5/17/2008 | Locks changed on Bob Cox apartment and personal items were not returned. |

| 5/20/2008 | Dan Minihan kicked in Bob Cox office door and removed Cox's computer |

| 5/22/2008 | Document from Altman & Compay PC in reference to Simply Fit North America |

| 5/29/2008 | See Monies in and out Worksheet |

| 6/3/2008 | See internet document printed in reference to complaint SEC with Cort Poyner.  See internet document showing verdict against Cort L. Poyner for fraud. |

| 6/7/2008 | Lester Kuznetz received telephone call from Carl Feltman telling him that Alan Brooks was now in charge of Sales for Florida (per Poyner and Minahan) and that Lester would be working for Alan.  Carl wanted to Lester know over the weekend so there wouldn't be any problems Monday morning. |

| 6/9/2008 | Lester was informed by Carl Feldman that Alan Brooks would be working out of Lester office and that Lester would be doing up and down the street sales vs the Distributor Sales he had been doing. |

| 6/13/2008 | Lester told Bob Cox to tell Poyner and Minahan that he had had enough of the abuse and harassment and that he resigned effective 06/14/2008
See Monies in and out Worksheet
Discussion with Bob Cox that the company was basically bankrupt (all monies were gone) and that we would go dark next week. (Go dark = lock up the doors and leave) |

| 6/16/2008
✳ | Bob Cox, Lester Kuznetz, Bob Thompson, Bruce Schioccetti, and Fred McFarland held meeting at Dunkin Donuts to discuss going dark and the plans that Mike Plunkett, Jim Stellmach, Bob Cox, and Friends and Family shareholders had about legal action to be taken.  Bob Cox that we would be dark for a week maybe two and would reopen with the HQ being in the Northeast with an office in South Florida.
11:19 am Bob Thompson was instructed by Carl Feldman that everything I would do for the company I should run by Daniel Minahan, call him on his cell 954-275-3656
Bob Cox instructed Bob Thompson to remove the signed subcription agreements from the office and back up all of the computers. |

| 6/17/2008 | Meeting held at Simply Fit HQ at 1 pm. Attendee's were Bob Cox, Cort Poyner, Daniel Minahan, Carl Feldman and Alan Brooks. The discussion were pertaining to running advertisments for sales help, Alan Brooks immediate agenda Bob Thompson was questions (if he was staying, the DJ Irie event, and budget. See Montes in and out Worksheet (reference Vince Beatty) |
| --- | --- |
| 6/18/2008 | Breakfast meeting with Bob Cox. He said he was taking all of his clothing, which was stored at Simply Fit HQ, and packing up his car to go home. Once Bob Cox and Bob Thompson returned to the office Bob Cox immediately packed gave Bob Thompson the mail box key and instructed him to hold onto it. He then stated that he was going to Ft. Lauderdale to talk with the D.A. and then driving to New York. He also instructed Bob Thompson that he should vacate the office as quickly as possible. Bob Thompson left office at approximately 10:00 am. Bob Thompson received voicemail message from Daniel Minahan "It's 11:30 in the morning, can't figure out why you would not be answering your phone. This is your Boss calling you need to call me back!" (recorded) Bob Thompson received call from Damian Pinto (recorded) |
| 6/19/2008 | Bob Thompson received notification from Alarm Company that they hear male voices inside the building and the alarm has not been reset, they are dispatching the police. Bob Thompson instructed them to not send the police. Lester Kuznetz called Carl Feldman and gave him the alarm code to turn off alarm. Poyner, Minahan, Feldman, and Brooks gained entrance by calling a locksmith. Bob Thompson received voicemail on home phone from Daniel Minahan (1:33 pm) recorded Bob Thompson received call from Bob Cox instructing him to return the subscription agreements and mailbox to Simply Fit HQ. Approximately 4 pm completed return of items. Approximately 5 pm Bob Thompson called Carl Feldman to inform him that the items had been returned. Carl made attempts to have Bob Thompson return to work. |
| 6/20/2008 | Lester Kuznetz receives call from Dan Keil informing him that Cort Poyner stated that he had fired everyone in the office. |

**From:** dpminahan@aol.com
**To:** eprosen@aol.com
**Subject:** Fwd: (no subject)
**Date:** Mon, 30 Jun 2008 1:34 pm

---

Daniel Minahan

-----Original Message-----
From: Robert Cox <bobcox38@msn.com>
To: loisfl@yahoo.com; dpminahan@aol.com; mkain@k-vlaw.com; bguarino@rockwellglobal.com; dorourke@moritthock.com; adam@cfooncall.com
Sent: Thu, 19 Jun 2008 11:39 am
Subject: (no subject)

June 19, 2008

Mr. Carl Feldman
Chief Operating Officer
Simply Fit Holdings Group, Inc.
2501 NW 34th Place, Unit 24
Pompano Beach, Florida  33069

Dear Mr. Feldman:

Please accept this letter as my formal resignation as President, Chief Executive Officer and Director of Simply Fit Holdings Group, Inc. effective immediately.

Thank you,

Robert L. Cox

cc:

Silverman & Minahan Beverage, LLC

Michelle Kain, Esq.

Bruce Guarino
Rockwell Global Capital

Dennis O'Rourke, Esq.

Adam Wasserman
CFO On Call

Scott Salberg
Salberg & Co.

Bob Cox
President & CEO
Simply Fit Holdings Group, Inc.
2501 NW 34th Place, Unit 24
Pompano Beach, Florida 33069
877 639-1FIT (1348)


**YAHOO! MAIL** Classic

**Simply Fit**

Tuesday, June 24, 2008 4:13 PM

**From:** "Bob Thompson" <takincareofbusiness1@yahoo.com>
**To:** "Mike Plunkett" <milemoregang@optonline.net>, "Bob Cox" <bobcox38@msn.com>
**Cc:** jimstellmach@msn.com
**Bcc:** "Lester Kuznetz" <lesterk@vzw.blackberry.net>

Guys,

Has anyone spoken with Tim Kezman about the production scheduled for next week?

Can we arrange for him to send out a couple of sample to test since the filtration system is no longer in place?

There are two outstanding payments due: Healthy Image for 11K+, and Garal for balance of previous invoice.  Healthy Image will hold onto the check until we notify him where to send it to.

Larry Alibrandi still has those 6 pallet that need to be shipped to Nutri Sport and he pays upon delivery.

Lastly,  If you have a copy of the documents being served I would like the opportunity to read or let me know when they are posted online.

Thanks,

**Bob Thompson**
Simply Fit
2501 NW 34 Place
Suite 24
Pompano Beach, FL 33069
954-242-5065

Donald E. Frechette (DF 7880)
EDWARDS ANGELL PALMER & DODGE LLP
20 Church Street
Hartford, Connecticut 06103
(860) 541-7713

Attorneys for Defendant Michael G. Plunkett

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SILVERMAN & MINAHAN BEVERAGE COMPANY, LLC, <br>                  Plaintiff, <br><br>       v. <br><br> ROBERT L. COX, ROBERT K. THOMPSON, MICHAEL PLUNKETT, LARRY ALIBRANDI, and LESTER KUZNETZ, <br>                  Defendants. | No.  CV 08-02718 |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF TRANSFER

### I. The Truth About What Happened To Simply Fit

Between February 22 and June 19, 2008, Simply Fit Holdings Group, Inc. ("Simply Fit" or "the Company") received $3,110,000 in investments from a private placement offering of securities, and netted $2,646,859.70. (Minahan Dec. Exh. G (Private Placement Memorandum) and Exh. H (Closing Memos); Florida Complaint[1] Exh. T (ledgers)).  The owners of plaintiff Silverman & Minahan Beverage Company LLC ("S&M"), Daniel Minahan and Cort Poyner (Minahan Dec. ¶¶ 1–2), both convicted felons[2], looted at least $1,373,499.95, or more than 51%,

---

[1] "Florida Complaint" refers to the Verified Amended Complaint in *Michael G. Plunkett, Derivatively on Behalf of Simply Fit Holdings Group, Inc. v. Cort L. Poyner et al.*, Case No. 08-CIV-60953 (S.D. Fla.) filed herewith.

[2] On July 24, 2003, Poyner pled *nolo contendere* to felony charges including possession of cocaine, delivery of drug paraphernalia, and possession, sale and delivery of a controlled substance. *State of Florida v. Cort Lee Poyner*, Crim. Case No. 03010269CF10A, 17th Judicial Circuit, Broward County, Oct. 31, 2003 (WESTLAW FL-BROWARD-DW 03010269CF10A).  (Florida Complaint ¶ 9 and Exh. D).  Minahan pled guilty to a felony under 21 U.S.C. § 843(b) (use of a communications facility to distribute narcotics) and was sentenced to 12 months, 1 day

8 days later from Mr. Cox, who was named as a defendant.[10] The essence of the "conspiracy" was "to misappropriate [Simply Fit's] business, receivables, inventory, beverage formulas, and customer orders; [and] to distribute [Simply Fit's] cash to themselves" (Compl. ¶16) – but the Florida Complaint makes absolutely clear that its purpose is exactly the opposite: as a shareholder derivative suit, its purpose is to *recover* Simply Fit's stolen assets and cash – *on behalf of and for the benefit of Simply Fit*. Messrs. Minahan and Altman are so mired in their own conflicts of interest that they cannot see that they spend half their Complaint excoriating defendants for alleged disloyalty to Simply Fit – which plaintiff, a would-be competitor, has no standing to do – and the rest of the Complaint trying to take Simply Fit's business away from itself. The persons who are alleged to have been "disloyal" to Simply Fit were, it turns out, trying to keep its business alive, in its own name; whereas the persons who feign loyalty to Simply Fit looted it and want it to stay out of business.

The Complaint accuses defendants of conspiring to "sell Simply Fit beverages under the 'Simply Fit' name to [Simply Fit's] existing customers" – trying to make this case *sound* like a theft of corporate opportunity case. But it is just the reverse: *defendants* were trying to sell Simply Fit products to Simply Fit customers *for the benefit of Simply Fit*, whereas Poyner, Minahan and S&M are trying to take that business *away* from Simply Fit and for themselves.

Let us be absolutely clear: the plaintiff in this case is owned by two felons, one of whom was found liable for securities fraud when he was in the midst of <u>another</u> securities fraud and was looting Simply Fit. This is not speculation: since the filing of the Florida Complaint, in a letter to the Court (Spatt, J.) dated June 30, Simply Fit's CEO, Robert Cox, has <u>confessed</u>:

---

[10] The Florida Complaint is candid about Mr. Cox's involvement with the preparations for the lawsuit: "6. Cox vacillated between supporting plaintiff's efforts by supplying records, on the one hand, and continuing to transfer cash to defendants, executing contracts he knew to be self-dealing, and otherwise aiding and abetting defendants' looting, on the other."