UNITED STATES DISTRICT COURT FOR
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 08-60953-CIV-COHN/SELTZER

---

MICHAEL G. PLUNKETT, derivatively on
behalf of SIMPLY FIT HOLDINGS GROUP,
INC.,

        Plaintiff,

        v.

CORT L. POYNER, DANIEL MINAHAN, DP
MINAHAN, INC., SILVERMAN & MINAHAN
BEVERAGE COMPANY, LLC, THE SILVERMAN
& MINAHAN GROUP, LLC, MAZEL TUFF, LLC,
ROBERT L. COX, CARL FELDMAN, SMITTEN
PRESS, LOCAL LORE AND LEGEND, INC.,
and ALTMAN & COMPANY P.C.

        Defendants,

SIMPLY FIT HOLDINGS GROUP, INC.,

        Derivative Plaintiff and
        Nominal Defendant.

---

## MOTION TO DISMISS FIRST AMENDED COMPLAINT

ALTMAN & COMPANY P.C.
260 Madison Avenue
22nd Floor
New York, New York 10016
(212) 683-7600

Local Counsel
KAHN, CHENKIN & RESNIK, PL
Howard Kahn, Esq.
Fla. Bar No: 0724416
1815 Griffin Road
Suite 207
Dania, Florida 33004

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 3

    The Complaint . . . . . . . . . . . . . . . . . . . 3

    Michael Plunkett's Attempts to
    Take Over SF Holdings' Business . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    STANDARDS ON MOTION TO DISMISS. . . . . . . . . . . 6

II.   MR. PLUNKETT HAS FAILED TO STATE A RICO CLAIM. . . . 7

III. MR. PLUNKETT'S ALLEGATIONS OF SF
    HOLDINGS PAYMENTS TO DEFENDANTS ARE
    INSUFFICIENT TO OBTAIN OWNERSHIP OF THE SF IP. . . . 10

IV.  MR. PLUNKETT'S NEW ARGUMENT, THAT THE
    SF IP WAS AN SF HOLDINGS OPPORTUNITY
    THAT SMBC USURPED, IS MERITLESS. . . . . . . . . . . 13

V.    PLAINTIFF HAS NOT ALLEGED FACTS SHOWING THAT
    SF HOLDINGS OWNS ANY "SIMPLY FIT" TRADEMARK. . . . . 14

VI.  THIS ACTION SHOULD ALSO BE
    DISMISSED BECAUSE MICHAEL PLUNKETT
    IS AN INADEQUATE DERIVATIVE PLAINTIFF. . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 20

UNITED STATES DISTRICT COURT FOR
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 08-60953-CIV-COHN/SELTZER

MICHAEL G. PLUNKETT, derivatively on
behalf of SIMPLY FIT HOLDINGS GROUP,
INC.,

          Plaintiff,

          v.

CORT L. POYNER, DANIEL MINAHAN, DP
MINAHAN, INC., SILVERMAN & MINAHAN
BEVERAGE COMPANY, LLC, THE SILVERMAN
& MINAHAN GROUP, LLC, MAZEL TUFF, LLC,
ROBERT L. COX, CARL FELDMAN, SMITTEN
PRESS, LOCAL LORE AND LEGEND, INC.,
and ALTMAN & COMPANY P.C.

          Defendants,

SIMPLY FIT HOLDINGS GROUP, INC.,

          Derivative Plaintiff and
          Nominal Defendant.

## MOTION TO DISMISS FIRST AMENDED COMPLAINT

## INTRODUCTION

      Defendants Daniel Minahan, Cort Poyner, DP Minahan, Inc., Mazel Tuff, LLC,

The Silverman & Minahan Group, LLC, and Silverman & Minahan Beverage Company, LLC

("SMBC") hereby move, pursuant to Fed.R.Civ.P. 12(b) and 23.1, to dismiss Michael Plunkett's

first amended complaint (the "Complaint") on grounds of failure to state a claim, lack of subject

matter jurisdiction, and Mr. Plunkett's inadequacy as a derivative plaintiff.  The motion is

supported by the August 4 and August 29, 2008 declarations of Daniel Minahan (Docket # 32)

and Eric Rosenberg (Docket # 38) and the exhibits to them.

      With few exceptions, the exhibits to the Complaint tell a straightforward story

concerning ownership of the beverage formulas and trade marks relating to Simply Fit beverages

(the "SF IP"): SMBC purchased the SF IP from American Quality Beverages ("AQB") in mid-June 2007 and then licensed it to Simply Fit Holdings Group, Inc. ("SF Holdings") until SMBC's termination of the license on June 25, 2008.  However, in his pleading, Mr. Plunkett advances two meritless legal theories to support his contention that SF Holdings and not SMBC owns the SF IP.  The first is that SMBC's principals caused SF Holdings to repay SMBC for the cost of the SF IP at a time when they controlled SF Holdings.  Mr. Plunkett implies that SMBC therefore holds that property in trust for SF Holdings. One of the fatal flaws in that theory is that SF Holdings must have paid for the SF IP or unconditionally obligated itself to pay AQB for it at or before the time of the purchase in order to impress a trust on that property for SF Holdings' benefit.  Even Mr. Plunkett concedes that SMBC "initially" paid those moneys to AQB.   His second theory, that SMBC "abandoned" the SF IP and that SF Holdings acquired rights in it through its marketing of Simply Fit beverages under license from SMBC, is also deficient.  A trade mark licensor (SMBC), not its licensee (SF Holdings), acquires and maintains rights to the mark through the licensee's use of it.

Mr. Plunkett has also recently promoted a third theory to support his claim that SF Holdings owns the SF IP: that SMBC usurped SF Holdings' opportunity when its principals acquired the SF IP for SMBC rather than for SF Holdings.  However, he has not stated any such claim in the Complaint.  That theory is also meritless because Mr. Plunkett has not alleged that SF Holdings was financially able to purchase the SF IP or that any then-existing SF Holdings shareholders were ignorant of the transaction or did not approve of it. Even more fundamentally, that unpleaded claim is deficient because, as the Complaint implies, the defendants became interested in the SF IP and decided to acquire it before SF Holdings existed.

Mr. Plunkett's eighth claim, for RICO liability, should be dismissed because he does not sufficiently allege predicate RICO violations or a corrupt enterprise and does not allege fraud and related mailings and wirings with particularity.  Upon dismissal of that claim, the action should be dismissed for lack of subject matter jurisdiction.  Indeed, the entire complaint

2

should also be dismissed because Michael Plunkett is not an adequate derivative plaintiff. Mr. Plunkett has engaged in a scheme to sell Simply Fit beverages through a pirating operation and to misappropriate the entire business of SF Holdings for himself and his confederates. He is using this lawsuit to pressure the defendants to allow him to misappropriate SF Holdings and the SF IP. His interests therefore conflict with those of other SF Holdings shareholders.

## BACKGROUND

### The Complaint

In his Complaint, Michael Plunkett alleges that SF Holdings is a Florida corporation that was formed on April 2, 2007 to make and distribute "functional beverages," including beverages marketed under the "Simply Fit" name. (Docket # 13: Complaint ¶¶ 8 and 26)  Defendants Cort Poyner and Daniel Minahan allegedly controlled SF Holdings "from [its] inception" even though they were not officers or directors of that company. (Id. at ¶¶ 25, 31). They therefore obviously knew of the company's purpose, and the Simply Fit business opportunity, prior to the formation and naming of SF Holdings under their control. Mr. Plunkett also alleges that Messrs. Poyner and Minahan own and control SMBC. (Id. at ¶ 14)

Mr. Plunkett alleges that he is and has at all relevant times been the owner of 400,000 shares of SF Holdings stock, which he says makes him that company's largest bona fide shareholder. (Docket # 13: Complaint ¶ 3)  He allegedly purchased his stock in the summer of 2007 together with 41 other investors (the "friends and family" shareholders"). (Id. at ¶ 57)  Mr. Plunkett does not allege the identities of the persons who owned SF Holdings stock prior to the summer of 2007. [1]

According to Mr. Plunkett, AQB originally owned the SF IP. (Docket # 13:Complaint ¶ 26)  On June 13, 2007, SMBC "purported" to purchase the SF IP from AQB for

---

[1]      Mr. Plunkett has recently taken the position that SF Holdings has no stockholders other than the friends and family shareholders. (Docket # 39: Mr. Plunkett's TRO motion at p. 17 ("only bona fide stockholders" are "Friends and Family".)  Apparently, according to Mr. Plunkett, SF Holdings had no shareholders before the summer of 2007.

$200,000. (Id. at ¶ 30)   Attached to the Complaint as Exhibit G are a written contract between SMBC and AQB providing for AQB's sale to SMBC of the SF IP and related agreements.  Mr. Plunkett acknowledges that Messrs. Poyner and Minahan "may have initially advanced funds to acquire" the SF IP.  (Id. at ¶ 33)  However, he contends that SF Holdings paid the consideration for that acquisition, as Messrs. Poyner and Minahan intended all along, by providing promissory notes to Mr. Poyner's company, Mazel Tuff.  (Complaint ¶¶ 16, 33)  The earliest he alleges that SF Holdings actually paid moneys to Messrs. Poyner and Minahan and their companies is December 2007.  (See Complaint ¶¶ 58, 72) SF Holdings allegedly paid far more than the AQB purchase price to them. (¶¶ 34, 35, and 37)   Mr. Plunkett contends that the moneys SF Holdings paid to Messrs. Poyner and Minahan and their companies constituted repayment for the purchase price of the SF IP.

Mr. Plunkett alleges that on June 27, 2007, SMBC entered into a written agreement with SF Holdings pursuant to which it licensed SF Holdings to make and sell Simply Fit beverages through use of the SF IP.  (Docket # 13: Complaint ¶ 39)  He attaches a copy of that written license agreement, executed by Robert Cox on SF Holdings' behalf, as Exhibit L to his complaint.

In consequence of those and his other allegations, Mr. Plunkett asserts twelve claims on behalf of SF Holdings.  In his second, third, fourth, and sixth claims, for "fraudulent transfers," conversion, waste, and a declaratory judgment, he appears to demand that ownership of the SF IP -- or at least the (abandoned) trademark application -- be awarded to SF Holdings or declared to belong to that company.  (See e.g. Complaint at pp. 23-28 and 31-32)  He purports to state his eighth claim, under the RICO statute, pursuant to the remedies section of that statute, 18 U.S.C. 1964.  (Id. at ¶¶ 120-26)  In his fifth claim, for trademark infringement, Mr. Plunkett asserts that SMBC does not own any trade mark rights in the SF IP due to its purported abandonment of the trademark application and SF Holdings' exclusive marketing of

4

Simply Fit beverages after May 2007.  (Complaint at ¶¶ 98-103)

**Michael Plunkett's Attempts
to Take Over SF Holdings' Business**

Mr. Plunkett has recently admitted that, beginning in or about March 2008, he concocted plans to take over SF Holdings by various means.  He discussed with SF Holdings president Bob Cox and others the possibility of buying out and operating SF Holdings.  (Docket # 38: Rosenberg Dec. Exh. J at pp. 127, 140, 155-59)  Those persons also discussed other means of taking control of the company, including the commencement of this derivative action to force the defendants (other than Bob Cox) to relinquish their interests in it and in the SF IP.  (Id. and Exh. J pp. 154-56, 171-73; Exhs. M and N)

Defendant Bob Cox assisted Mr. Plunkett with this lawsuit.  Mr. Plunkett has admitted that he asked Mr. Cox for documents and also asked him to cause SF Holdings to contribute $20,000 toward the legal fees for it.  (Docket # 38: Rosenberg Dec. Exh. J at pp. 164-65, 174)  He testified that Mr. Cox participated in and encouraged this action and provided documents and information to him for use in it both before and after the complaint was filed.  (Id. at pp. 164-65, 188-90, 201, 203-04)  Mr. Cox ultimately did not join the lawsuit as a plaintiff, explaining that he would be better off as a defendant in it.  (Id. at 202-03)

In the spring of 2008, Mr. Plunkett and his confederates planned to depart en masse from SF Holdings' offices and thereafter to sell Simply Fit beverages furtively.  A June 16, 2008 entry in a time line that co-conspirator Bob Thompson wrote states that:

> [SF Holdings officers and employees] Bob Cox, Lester Kuznetz, Bob Thompson, Bruce Schioccetti, and Fred McFarland held meeting at Dunkin Donuts to discuss going dark and the plans that Mike Plunkett, Jim Stellmach, Bob Cox, and Friends and Family shareholders had about legal action to be taken.  Bob Cox that we would be dark for a week maybe two and would reopen with the HQ being in the Northeast with an office in South Florida.

Docket # 32-2: Minahan Dec. Exh. F.

Mr. Plunkett and his accomplices put that plan in motion only days later.  On or about June 19, 2008, Bob Cox resigned as SF Holdings' president and CEO and he and other SF

Holdings officers abandoned that company's offices.  (Docket # 32: Minahan Dec. ¶ 7; Exh. A at ¶ 15; and Exh. G)  Thereafter, SMBC obtained electronic mail messages written by Mr. Cox, Michael Plunkett, and other former SF Holdings officers indicating that they were surreptitiously attempting to make and sell Simply Fit beverages. (Minahan Dec. ¶¶ 7-10 and Exhs. F (June 16 entry), H, and I; Exh. A at ¶¶ 19-24)  In the face of that evidence, Mr. Plunkett nonetheless insists that he did not plan to make or sell Simply Fit beverages after the resignations and abandonment of SF Holdings' offices.  He says he also knows of no attempts to do so after he received Daniel Minahan's June 25 or 26, 2008 cease and desist letter.[2]  However, the communications that SMBC obtained prove the contrary.[3]

## ARGUMENT

### I.   STANDARDS ON MOTION TO DISMISS

> Factual allegations [of a complaint] must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) . . . ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all of the allegations in the complaint are true . . .

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

The "need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" a legally cognizable cause of action 'reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'"  Bell Atlantic, 127 S. Ct. at 1966.  See also Financial Security Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282 (11th Cir. 2007).  "A plausible entitlement to relief exists when the allegations in the complaint traverse the thresholds separating the 'conclusory' from the

---

[2]      Docket # 38: Rosenberg Exh. J at 186-87, 205, 224-28; Rosenberg Dec. Exh. Q: cease and desist letters.The cease and desist letters (Rosenberg Exh. Q) were annexed as Exhibit U to the July 7, 2008 declaration of Daniel Minahan that is in turn attached to the Minahan Dec. (Docket # 32) as Exhibit A.

[3]      See also Docket # 32: Minahan Dec. Exhs. F (June 16 entry), H, and I, Docket # 38: Rosenberg Dec. Exhs. R through V; Rosenberg Exh. J at 240-42 (referring to Exh. T).

'factual' and the 'factually neutral' from the 'factually suggestive.'" 316, Inc. v. Maryland Casualty Co., 2008 WL 2157084 at * 2 (N.D. Fla. 2008), quoting Bell Atlantic, 127 S. Ct. at 1966 fn. 5.

In determining whether a plaintiff has met those standards in connection with a motion to dismiss the complaint, the courts consider the face of the complaint, any documents attached to it, and other undisputed documents that are central to the plaintiff's claims. Financial Security Assurance, Inc. v. Stephens, Inc., 500 F.3d at 1284; Moton v. Cowart, 2008 WL 2117120 at * 8, fn. 2 (M.D. Fla. 2008). And "[w]hile normally on a motion to dismiss the Court must accept the facts alleged in a complaint as true, if an allegation in the complaint is contradicted by a document incorporated by reference therein and which reveals facts foreclosing recovery as a matter of law, dismissal is appropriate." CC - Aventura, Inc. v. The Weitz Company, LLC, 2007 WL 117935 at * 4 (S.D. Fla. 2007). Courts are also "not bound to accept as true a legal conclusion couched as a factual allegation". Bell Atlantic, 127 S. Ct. at 1965.

## II.    MR. PLUNKETT HAS FAILED TO STATE A RICO CLAIM.

> To state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as "criminal RICO." In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.[4]

Michael Plunkett's complaint satisfies virtually none of those requirements. He does not allege which of the subsections of 18 U.S.C. § 1962 each of the defendants supposedly violated. Nor does he adequately allege a corrupt "enterprise." To sufficiently allege a RICO enterprise, a plaintiff must allege "exactly how each defendant participated in th[at] enterprise."

---

[4]    Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983); Biondolillo v. City of Sunrise, 736 F. Supp. 258, 260 (S.D. Fla. 1990). See also Smart Science Laboratories v. Promotional Marketing Svces., 2008 WL 2790219 at * 4 (M.D. Fla. 2008) (same, but distilling into four elements and additional sub-elements); Kucher v. Alternative Treatment Center, 2006 WL 2527851 at *2 (E.D.N.Y. 2006); Flaherty v. All Hampton Limousine, Inc., 2008 WL 2788171 at * 4 (E.D.N.Y. 2008).

Choi v. Kim, 2006 WL 3535931 at * 7 (E.D.N.Y. 2006).  It must "plead specific facts, and not mere conclusory allegations, which establish the existence of an enterprise," which facts should include details of the enterprise's structure.  Id.  Mr. Plunkett alleges little about the composition and structure of the defendants' purported enterprise other than that Messrs. Poyner and Minahan belong to it.  (Docket # 13: Complaint ¶¶ 1-2 and 120-26)

Mr. Plunkett also fails adequately to allege defendants' pattern of "racketeering activity."  "Racketeering activity" is defined in 18 U.S.C. § 1961 to include certain enumerated crimes.  Those crimes do not include common-law fraud.  Burke v. Town of East Hampton, 2001 WL 624821 at * 16 (E.D.N.Y. 2001).  The torts of conversion, assault and battery, and misappropriation, all of which are listed in Mr. Plunkett's RICO claim, are also not among the enumerated "racketeering activities." (Complaint at ¶ 122)  Although "bribery" can constitute racketeering, Mr. Plunkett does not identify a bribery statute forbidding any "bribery" alleged in the complaint.  Certainly it is not Florida's bribery statute, F.S.A. § 838.016, or 18 U.S.C. § 201.

Mr. Plunkett's allegations of mail fraud, securities fraud, and wire fraud are not stated with the required specificity.  RICO claims based on allegedly fraudulent conduct must meet the particularity requirements of Fed.R.Civ.P. 9(b).[5]  To pass muster under Rule 9(b):

> a complaint "must allege with some specificity the acts constituting fraud" . . . Specifically, Rule 9(b) requires plaintiffs to allege "(1) the specific statement or omission; (2) the aspect of the statement or omission that makes it false or misleading; (3) when the statement was made; (4) where the statement was made; and (5) which defendant was responsible for the statement or omission." [citations omitted][6]

---

[5]        Ambrosia Coal & Constr. Co. v. Morales, 482 F.3d 1309, 1316-17 (11th Cir. 2007); Anatian v. Coutts Bank, 193 F.3d 85, 88 (2d Cir. 1999); Kucher v. Alternative Treatment Center, supra, 2006 WL 2527851 at * 3;  Choi v. Kim, 2006 WL 3535931 at * 7 (E.D.N.Y. 2006).

[6]        Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp.2d 282, 293 (S.D.N.Y. 2000).  See also U.S. ex rel. Atkins v. McInteer, 470 F.3d 1350, 1357 (11th Cir. 2006); Malloy v. Wiseman, 2008 WL 150072 at * 2 (M.D. Fla. 2008); Ryan v. Hunton & Williams, 2000 WL 1375265 at * 7 (E.D.N.Y. 2000); Planetarium Travel, Inc. v. Whitehouse Travel Co., Inc., 1998 WL 85796 at * 3 (S.D.N.Y. 1998).

Mail fraud and wire fraud allegations must also state the "content, time, place, and speaker of each alleged mailing or wire transmission." Choi v. Kim, supra, 2006 WL 3535931 at * 7.

Mr. Plunkett has wholly failed to meet those standards. He simply alleges that "defendants used both the United States mails and wires to effectuate the scheme" without providing further details of mailings and wirings. (Docket # 13: Complaint ¶ 124) He also does not identify the persons who drafted and distributed the allegedly false business plan and PPM, their recipients, or the times and places of distribution. (Id. at ¶¶ 57, 71) Nor has he adequately pleaded any other mail fraud and wire fraud counts. One way to measure the shortcomings of Mr. Plunkett's RICO claim is to compare it to the requirements of the civil RICO case statement that Mr. Plunkett was required to serve a month ago pursuant to Local Rule 12.1. That Rule requires the plaintiff to assert his RICO allegations with great specificity. Mr. Plunkett never served such a statement, which is another reason why his RICO claim should be dismissed. He has also not met any of the requirements of that Rule in his Complaint.

Upon dismissal of Mr. Plunkett's RICO claim, his entire complaint should be dismissed for lack of subject matter jurisdiction. The grounds on which he bases jurisdiction are his RICO claim and diversity of citizenship. (Docket # 13: Complaint at ¶¶ 21-22) He has not sufficiently pled diversity jurisdiction because he has not specifically alleged the citizenships or domiciles of himself and each defendant. American Motorists Ins. Co. v. American Employers' Ins. Co., 600 F.2d 15, 16 (5th Cir. 1979); Turner v. Pennsylvania Lumberman's Mutual Fire Ins. Co., 2007 WL 3104930 at * 3-4 (M.D. Fla. 2007) (domicile, not residence, determines citizenship). In fact, Mr. Plunkett has alleged facts casting grave doubt on diversity jurisdiction, as he implies that both he and Robert Cox are residents of the State of New York. (Complaint ¶¶ 3, 17)[7]

---

[7]        If SF Holdings is aligned as a plaintiff in this action then the lack of diversity is even clearer because Mr. Plunkett alleges that it is a Florida corporation with a principal place of business in Florida and most of the other defendants are Florida residents and entities. (Complaint at ¶¶ 8-16) Duffey v. Wheeler, 820 F.2d 1161, 1163 (11th Cir. 1987).

III.    **MR. PLUNKETT'S ALLEGATIONS OF SF HOLDINGS PAYMENTS TO DEFENDANTS ARE INSUFFICIENT TO OBTAIN OWNERSHIP OF THE SF IP.**

Mr. Plunkett appears to contend that the alleged conduct of Messrs. Poyner and Minahan should result, or has resulted, in SF Holding's ownership of the SF IP.  He even repeatedly cites a case, Garner v. Pearson, 545 F. Supp. 549 (M.D. Fla. 1982), aff'd, 732 F.2d 850 (11th Cir. 1984), involving the imposition of a "resulting trust" on some stock that officer/fiduciaries obtained with moneys from their company/beneficiary.  (Complaint at pp. 9-10, fn. 3, and ¶ 85)[8]  However, Mr. Plunkett's "trust" theory is meritless.

The applicable law is that pertaining to constructive and resulting trusts.  Where "the purchase price of a property is provided by one person but title is taken in the name of another," a resulting trust is presumed to require the title holder to hold the property in trust for the payor.  Bakst v. Griffin, 123 B.R. 933, 934 (Bruptcy S.D. Fla. 1991).  A constructive trust, by contrast, "is an equitable remedy available 'in a situation where there is a wrongful taking of the property of another.  [citation omitted]  The trust is 'constructed' by equity to prevent an unjust enrichment of one person at the expense of another as the result of fraud," etc.  Joseph v. Chanin, 940 So.2d 483, 487 (Fla. App. 4 Dist. 2006).

Constructive trusts are imposed only on the specific property that the trustee or wrongdoer takes or withholds from the beneficiary and on the traceable proceeds of that property.  "The very essence of the remedy of constructive trust is the identification of specific property or funds as the res upon which the trust may be attached."  Collinson v. Miller, 903 So.2d 221, 229 (Fla.App. 2 Dist. 2005).  "A constructive trust may be imposed only where the res is specific identifiable property or can be clearly traced in the assets of the defendants that are claimed by the party seeking relief."  55A Fla. Jur.2d Trusts § 105.  In other words, only those of the trustee's

_____

[8]    More recently Mr. Plunkett has advanced a new interpretation of Garner. However, in the Complaint he cites it for the proposition that a trustee who agrees to buy property for his company and uses his company's money to buy it holds the property in trust for the company. (Docket # 13: Complaint at pp. 9-10 fn. 3)

assets that the beneficiary proves to be the proceeds of the beneficiary's own misappropriated property are subject to a constructive trust.  Restatement (Second) of the Law of Trusts at §202, Comment O; Bogert on the Law of Trusts and Trustees § 921.[9]

As a matter of logic, proceeds of misappropriated assets of a beneficiary or trust can only be assets that the wrongdoer/trustee acquired after he obtains the beneficiary's or trust's assets.  Proceeds cannot precede the assets from which they are derived or traced.  See Bird v. Stein, 258 F.2d 168, 181 (5th Cir. 1958) ("the beneficiary cannot trace his cash into the fee simple title to the realty because that was held by the trustee before the misappropriation . . .") Even where the beneficiary shows that its moneys were used to remove an encumbrance on property, its remedy is limited to a lien on that property in the amount of the reduction of the encumbrance where the wrongdoer/title owner owned the property before the beneficiary's money was used on it.  Id.  The beneficiary is entitled to no equity interest in the property.

The rule for resulting trusts is the same.  "The complaining party must have paid the purchase price, or bound himself or herself to the transferor by an absolute obligation to pay it, as part of the [purchase] transaction.  An agreement or payment made after the title is taken will not, by retrospective effect, create a resulting trust." 55A Fla. Jur. 2d Trusts § 100.  See also Bakst v. Griffin, supra, 123 B.R. at 934-35; Espino v. Anez, 665 So.2d 1080, 1082 (Fla. App. 3 Dist. 1996) ("A resulting trust arises, if at all, at the instant legal title vests") Harnish v. Peele, 386 So.2d 8, 10 (Fla. App. 5 Dist. 1980).  Thus a putative beneficiary cannot impose a resulting trust on property where the trustee/title holder, and not the beneficiary, "supplied the vast majority of the consideration at the time legal title vested in" the trustee [emphasis supplied].  Bakst, 123 B.R. at 935.  See also Espino, 665 So.2d at 1082.

The case that Mr. Plunkett has cited in the Complaint, Garner v. Pearson, is not to the contrary.  There defendant officers of a Bahamian bank ("B-A") entered into an agreement

---

[9]      See also Dixon v. Hopkins, 56 F.2d 783, 784 (5th Cir. 1932); In re Sheresky's Estate, 157 N.Y.S.2d 829, 832 (Surr. Ct. N.Y. Co. 1956) (same, under New York law).

with B-A that allowed them to buy stock of another bank ("Citizens") in their own name with B-A's moneys.  The defendants were to hold the Citizens stock in their own name until the banking authorities approved B-A's ownership of it.  However, when the banking authorities disapproved of B-A's ownership of the stock the defendants caused B-A to purchase the stock in their name, sold it, and kept the proceeds for themselves.

Some of Garner's language indicates that B-A was entitled to a resulting trust merely by virtue of the defendants' agreement to buy the stock for B-A and the use of B-A's moneys to repay a loan the defendants took in order to finance the purchase of that stock.  That is no doubt why Mr. Plunkett was so excited about that case that he repeatedly cited it in his complaint.  However, the Fifth Circuit Court of Appeals corrected that misimpression.  In affirming the decision, it emphasized that the defendants had used B-A's moneys for the downpayment, had used its credit to obtain the loan, and had used its moneys to repay the loan.  All of the original purchase money therefore came from B-A and none came from the defendants.  Specifically, the Court of Appeals wrote:

> Defendants also contend that B-A Fund, not B-A Bank, paid for the Citizens stock.  This argument ignores that B-A Fund, which defendants controlled, obtained all of that money from B-A Bank.  In other words, B-A Bank funds merely passed through B-A Fund before entering defendants' hands for the purchase of the Citizens' stock.  One million dollars of this purchase price came from a loan by the Chemical Bank New York Trust Co. made to B-A Bancorp on the credit of B-A Bank in April 1970.  B-A Bank continued to repay this loan. . . . The rest of the purchase price came from funds that defendants moved from B-A Bank to B-A Fund's account at American Bank.

Garner v. Pearson, 732 F.2d at 855.  Accordingly, that case does not conflict with the foregoing authorities that have uniformly stated for decades that, to create a constructive or resulting trust due to use of a beneficiary's moneys, the beneficiary's moneys must pay for the subject property at or before the time of its acquisition.

Mr. Plunkett's allegations that SF Holdings paid the purchase price of the Simply Fit property after SMBC initially paid for it and that SMBC's principals looted SF Holdings during in late 2007 and early 2008 are therefore insufficient to divest SMBC of ownership of that

property.  Mr. Plunkett admits that SMBC "may have" initially "advanced" the money to AQB

for the license.  (Complaint ¶ 33)  It acquired legal ownership of that property through the

purchase agreement and assignment annexed as Exhibit G to Mr. Plunkett's complaint.  He does

not allege that SF Holdings paid AQB or legally bound itself to do so.  And the earliest that he

alleges SF Holdings to have actually paid Messrs. Poyner and Minahan (not even SMBC) any

moneys is December 2007.  (Id. at ¶¶ 58, 72)  Those allegations, even if true, would be

inadequate as a matter of law to affect SMBC's ownership of the SF IP. [10]

## IV.   MR. PLUNKETT'S NEW ARGUMENT, THAT THE SF IP WAS AN SF HOLDINGS OPPORTUNITY THAT SMBC USURPED, IS MERITLESS.

Nowhere in the Complaint does Mr. Plunkett assert a usurpation claim.  That is

reason enough in itself to disregard any mention of a usurpation theory that Mr. Plunkett may

make in response to the instant motion.  Further, the usurpation argument that Mr. Plunkett has

recently made elsewhere (see, e.g., docket # 39: motion at pp. 14-17) is also meritless.  Courts

have held that, to state a claim for usurpation of a "corporate opportunity," a plaintiff must plead

that the corporation would have been financially and otherwise able to acquire that opportunity

had its fiduciary (officer/director) not done so. [11]  Mr. Plunkett has not pleaded facts showing that

SF Holdings could have acquired the SF IP in or before June 2007, when SMBC acquired it.

(Docket # 13: Complaint ¶ 31)  To the contrary, the earliest receipt of moneys by SF Holdings

that he alleges is the "friends and family" investments in the summer of 2007.  (Id. at ¶ 57)    That

---

[10]     Mr. Plunkett's apparent attempt to circumvent those established rules, by asserting that SF Holdings "paid the purchase price [for the SF IP] by giving [promissory notes]" to Mazel Tuff in June 2007 and thereafter, is ineffective.  (See Docket # 13: Complaint at ¶ 32)  A promissory note, of course, is not actual payment; rather, it "constitutes no more than a promise to pay."  Alkap, Inc. v. John J. Demarest Supply Co., 54 B.R. 151, 154 (Btcy D.N.J. 1984); see also Till v. SCS Credit Corp., 124 S. Ct. 1951, 1967 (2004) ("note (i.e., a promise to pay").

[11]     Wolfensohn v. Madison Fund, Inc., 253 A.2d 72, 76 (Del. 1969); Gibralt Capital Corp. v. Smith, 2001 WL 647837 at * 8-9 (Del. Ch. 2001) (plaintiff must allege those facts in complaint; rule applies even if the officer disabled the corporation from ability to acquire the opportunity); Benerofe v. Cha, 1998 WL 83081 at * 4-5 (Del. Ch. 1998) (must be alleged in complaint).

deficiency is particularly clear  where, as here, the plaintiff has not alleged that any shareholders were deceived or uninformed, that anybody objected to the transaction, or that shareholders other than the defendants even existed when SMBC acquired the SF IP on June 13, 2007.[12]

   Mr. Plunkett's new-found, unpleaded corporate opportunity theory is also deficient because he does not allege that the defendants first undertook to obtain the SF IP while SF Holdings existed.  He implies exactly the opposite, as the defendants had to have known of that opportunity and decided to obtain it before SF Holdings was formed under their control in the name of "Simply Fit."  (Complaint at ¶¶ 25, 26, and 30)  Accordingly, they were free to take that opportunity for another of their companies and need not have given it to SF Holdings.[13]

## V. PLAINTIFF HAS NOT ALLEGED FACTS SHOWING THAT SF HOLDINGS OWNS ANY "SIMPLY FIT" TRADEMARK.

   Federal law protects both unregistered and registered trade marks.  <u>Warner Bros. v. Gay Toys</u>, 658 F.2d 76, 77-78 (2d Cir. 1981) ". . . [A] trademark is not acquired by registration.  The right to a trademark stems from prior appropriation and use.  This is recognized in the Lanham Act itself, 15 U.S.C. § 1501 nts. at p. 541 . . ., which expressly provides for the preservation of existing rights."  <u>Louis Ender, Inc. v. General Foods Corp.</u>, 169 U.S.P.Q. 92, 93 (S.D.N.Y. 1971).  Indeed:

> one must be the owner of a mark before it can be registered.  The right to use is unaffected either by failure to register or expiration of a registration. Not even the right to exclude is obtained from registration of trademarks and service marks.

<u>Holiday Inn v. Holiday Inns, Inc.</u>, 534 F.2d 312, 319 fn. 6 (USCCPA 1976).  <u>See</u> also <u>Weiner</u>

---

[12] <u>See</u> <u>e.g.</u> <u>In Re Tufts Electronics, Inc.</u>, 746 F.2d 915, 917 (1st Cir. 1984); <u>The Mediators, Inc. v. Manney</u>, 1996 WL 297086 at * 10 (S.D.N.Y. 1996); <u>Battleground Veterinary Hosp. v. McGeough</u>, 2007 WL 3071618 at * 17-18 (N.C. Super. 2007).   Therefore Mr. Plunkett's claim would still be deficient even if a fiduciary were required to disclose to the corporation an opportunity the corporation does not presently have the financial resources to purchase.

[13] <u>See</u> <u>Puritan Medical Center, Inc. v. Cashman</u>, 596 N.E.2d 1004, 1011, 413 Mass. 167, 177-78 (1992); <u>Licensing Development Group, Inc. v. Freedman</u>, 184 A.D.2d 682, 683-84, 585 N.Y.S.2d 456, 457-58 (2d Dep't 1992).

King, Inc. v. Wiener King Corp., 615 F.2d 512, 521 fn. 5 (USCCPA 1980).  It follows that "senior use bars registration whether the senior use be an unregistered 'mark' or 'trade name' . . ." Natural Footwear Ltd. v. Hart Schaffner & Marx, 577 F. Supp. 128, 132 (D.N.J. 1983).

"[U]nder common law, trademark rights are 'appropriated only through actual prior use in commerce.'" SM Licensing Corp. v. U.S. Medical Care Holdings LLC, 2007 WL 2051009 at * 9 (S.D. Fla. 2007), quoting Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 (11th Cir. 2001).  "Evidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark, is competent to establish ownership . . ." Id. See also Shchegol v. Rabinovich, 1999 WL 398025 at * 3 (S.D.N.Y. 1999).  The rights to a trade mark can also be purchased from the person or entity that has established ownership of them through prior use.  See e.g. Planetary Motion, Inc. v. Techsplosion, Inc., 2000 WL 34015863 at * 9 (S.D.Fla. 2000), aff'd in pertinent part, 261 F.3d 1188, supra.  "The assignee of a trade name or service mark steps into the shoes of the assignor." Id.

Accordingly, the May 2007 trademark application to which Mr. Plunkett refers (Complaint ¶ 27 and Exh. F)  did not establish any rights of SF Holdings to any trade mark.[14]  It was of course only an application; Mr. Plunkett does not allege that the trade mark was actually registered. He later alleges that the application was abandoned.  (Complaint ¶ 98)  As the foregoing cases show, even its registration would not itself create rights for SF Holdings.  Rather, SF Holdings would need to show that it already owned the mark through appropriation and use in order to obtain that registration.  However, Mr. Plunkett does not allege that SF Holdings used the mark or sold Simply Fit beverages prior to the May 2007 trademark application or even its June 27 license agreement with SMBC.  To the contrary, he alleges vaguely that SF Holdings

---

[14]    Much less did it establish any rights in SF Holdings to the rest of the SF IP.  The trademark application of course only related to a single trade mark and had nothing to do with the beverage formulas and the rest of the SF IP.

"established exclusive common law rights to" the SF IP "<u>since</u> May 2007" (Complaint ¶ 100). That allegation effectively establishes that the May 2007 filing could not have lawfully been made, much less granted, on the basis of SF Holdings' prior adoption and use of the mark.

Nor does Mr. Plunkett allege facts showing that SF Holdings acquired any Simply Fit trade mark through its own purchase of any such mark. He acknowledges that AQB originally owned the trade mark and the other SF IP (Docket # 13: Complaint ¶ 26) but does not allege that SF Holdings ever purchased any of those properties from AQB or anybody else. To the contrary, he attaches copies of the written agreement, assignment, and other documents by which SMBC acquired the Simply Fit marks and the other SF IP. (<u>Id.</u> at ¶ 30 and Exh. G)

Mr. Plunkett's contention, that the May 2007 SF Holdings trade mark application and its January 2008 assignment to SMBC evidence SF Holdings' ownership of the subject trade mark,[15] is utterly implausible. His own allegations and documents show that AQB owned the SF IP and that SMBC acquired it from AQB in June 2007, "initially" paid for it, and licensed it to SF Holdings. (Docket # 13: Complaint ¶¶ 26, 30, 33, 39)  In light of that showing, "Ismael Gonzalez'" mere application on behalf of SF Holdings for a trademark (Exh. F) proves nothing. The application is certainly no admission by SMBC or its principals. The assignment of that application to SMBC shows, if anything, that the application was improperly made -- which is obviously the case -- requiring that corrective action.[16]

Mr. Plunkett also does not show that SMBC abandoned the trade mark that was the subject of the rogue trademark application, or that SF Holdings acquired rights in it, on the ground that SF Holdings was the entity that sold Simply Fit beverages after June 2007. To establish abandonment, "it is necessary to show either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its

_____

[15]      Complaint at ¶¶ 27, 59-60.

[16]      As the application was abandoned, the issue is moot. (Complaint ¶ 98 and Exh. V) Given the fraudulent provenance of the application, its abandonment was fortuitous.

significance as a mark." Hermes Int'l v. Lederer De Paris Fifth Avenue, Inc., 219 F.3d 104, 110

(2d Cir. 2000). Mr. Plunkett alleges no such thing.

SF Holdings' use of Simply Fit trade marks does not create rights for it in those

marks. It used those marks under license from SMBC pursuant to those parties' written license

agreement. (Complaint ¶ 39 and Exh. L) A licensor (SMBC) can acquire and maintain

ownership of a trade mark through its licensee (SF Holdings) because the licensee's use of the

mark inures to the benefit of the licensor.[17] It follows, of course, that "use of a mark by a person

while such person was a licensee builds up no rights in the mark as against the licensor." The

Apollo Theatre Foundation v. Western Int'l Syndication, 2005 WL 1041141 at * 18 (S.D.N.Y.

2005). Therefore it was SMBC, and not SF Holdings, that maintained the rights in the Simply

Fit trade marks through SF Holdings' licensed use of those marks.

Far from acquiring rights in Simply Fit trade marks by making and marketing

beverages under license from SMBC, that licensed use in fact estops SF Holdings from

contesting SMBC's ownership of the marks on the basis of facts predating the termination of the

license agreement in June 2008.[18] The license agreement between SMBC and SF Holdings

(Complaint Exh. L) amply buttresses an estoppel. Its opening "wherefore" clauses contain

several recitations of SMBC's ownership of all of the SF IP and its acquisition of that property

from AQB. Further, article 7(c) provides for SMBC's intervention in the event SF Holdings

devalues the SF IP, and Mr. Plunkett repeatedly alleges that SMBC's principals controlled both

SMBC and SF Holdings. (Complaint ¶¶ 14, 25, 31) Article 7(a) even required SF Holdings to

---

[17]     Turner v. HMH Pub. Co., 380 F.2d 224, 229 (5th Cir. 1967); Hawaii-Pacific
Apparel Group, Inc. v. Cleveland Browns Football Company, 418 F. Supp.2d 501, 506
(S.D.N.Y. 2006); EMachines, Inc. v. Ready Access Memory, Inc., 2001 WL 456404 at * 8 (C.D.
Cal. 2001); Pneutek, Inc. v. Scherr, 211 U.S.P.Q. 824, 833 (T.T.A.B.) 1981).

[18]     See Professional Golfers Ass'n of America v. Bankers Life & Cas. Co., 514 F.2d
665, 671 (5th Cir. 1975); The Apollo Theatre Foundation v. Western Int'l Syndication, supra,
2005 WL 1041141 at * 18; Westco Group, Inc. v. K.B. & Assocs., 128 F. Supp.2d 1082, 1089
(N.D. Ohio 2001); Council of Better Business Bureaus v. Better Business Bureau of South
Florida, Inc., 200 U.S.P.Q. 282, 288 (S.D. Fla. 1978).

stamp all Simply Fit beverage packaging with a legend indicating that it is made under license from SMBC. Mr. Plunkett does not allege that SF Holdings failed to comply with that provision (and it in fact did comply with it).

## VI.   THIS ACTION SHOULD ALSO BE DISMISSED BECAUSE MICHAEL PLUNKETT IS AN INADEQUATE DERIVATIVE PLAINTIFF.

Pursuant to Red.R.Civ.P. 23.1, a plaintiff bringing a derivative shareholder action "must be qualified to serve in a fiduciary capacity as a representative of the class of stockholders, whose interest is dependent upon the representative's adequate and fair prosecution of the action." Emerald Partners v. Berlin, 564 A.2d 670, 673 (Del. Ch. 1989); see also Fed.R.Civ.P. 23.1 ("The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation"). . . . Where "economic antagonism" exists between a potential plaintiff and other shareholders, courts have disqualified derivative plaintiffs, finding their interests conflict with the interests of similarly situated shareholders. See Pacemaker Plastics Co. v. AFM Corp., 139 F. Supp.2d 851, 855-56 (N.D. Ohio 2001) (disqualifying as derivative representatives plaintiffs who would benefit in the form of increased ownership of a corporation if derivative suit succeeded); Torchmark Corp. v. Bixby, 708 F. Supp. 1070, 1077-78 (W.D. Mo. 1988) . . . See also Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1833 (2nd ed. 1986) ("Perhaps the most important element to be considered is whether plaintiff's interests are antagonistic to those he is seeking to represent.").[19]

Michael Plunkett should be disqualified as a derivative plaintiff because his interests conflict with those of SF Holdings and other of its securities holders. Notwithstanding the impression he conveys in his Complaint, Mr. Plunkett is not a passive shareholder in SF Holdings. Rather he was a consultant to the company who sold SF Holdings stock and was paid a ten percent commission on those sales.[20] His failure to disclose those facts at paragraphs 57

---

[19]      Bender v. Parks, 2004 WL 3737124 at * 3 (D.D.C. 2004). See also Pacemaker Plastics Co., Inc. v. AFM Corp., 139 F. Supp.2d 851, 855 (N.D. Oh. 2001); Adiel v. Electronic Financial Systems, Inc., 513 So.2d 1347 (Fla. App. 3 Dist. 1987) (plaintiff's attempts to cajole directors into merger disqualify him).

[20]      Docket # 32: Minahan Dec. at ¶¶ 3-5 and Exhs. D and E; Docket # 38: Rosenberg Dec. Exh. J at pp. 32-33, 39, 45-48, 136 and Exhs. K and L. Because Mr. Plunkett was not a registered securities broker, his sales likely also violated Securities Exchange Act § 15(a), 15

and 58 of the Complaint renders them materially misleading.  If, as he claims, materials that were distributed to those shareholders were misleading, then he may also be liable to them.  A failure by him to disclose the commissions he received would likely also constitute a violation of the federal securities laws.  See e.g. Mirman v. Berk & Michaels, P.C., 1994 WL 410881 at * 7 (S.D.N.Y. 1994); SEC v. Hasho, 784 F. Supp. 1059, 1110 (S.D.N.Y. 1992).

More importantly, Mr. Plunkett's involvement in a conspiracy with SF Holdings officers to take over SF Holdings' business puts him in direct conflict with SF Holdings and other of its securities holders.  While still working for SF Holdings, Mr. Plunkett and his co-conspirators planned to close that company's offices, furtively operate a business to sell Simply Fit beverages, and leave SMBC, SF Holdings' landlord, and its other creditors behind.[21]  Part of their plan was to commence this lawsuit against Messrs. Poyner and Minahan and also Mr. Cox himself.[22]  They in fact did those things.  Messrs. Cox and Kuznetz formally resigned from SF Holdings; the other conspirator-employees disappeared from SF Holdings' offices; and they and Mr. Plunkett attempted to make and sell Simply Fit beverages from secret locations.[23]  They did not leave forwarding contact information for SMBC, SF Holdings' landlord, or its other creditors.  (Docket # 32: Minahan Dec. ¶¶ 11-12; Exh. A at ¶ 24)  Indeed, they have for some time been engaged in an effort to steal SF Holdings and its business entirely and to use some claim of right

---

U.S.C. § 78(o).  See e.g. Greenway Environmental Services, Inc., 1997 WL 244977 (May 14, 1997) (person who "sold Greenway debentures to retail investors from Greenway's offices for four months in mid-1992 without being registered with the Commission as a broker or dealer" charged with § 15(a) violation and consents to injunction).

[21]     Docket # 32: Minahan Dec. ¶¶ 7-12 and Exh. A at ¶¶ 19-26; Minahan Exh. F at June 16 entry; Docket # 38: Rosenberg Dec. Exh. J at 127, 140, 154-59, 171-73 and Exhs. M and N.

[22]     Id. and Docket # 32 at Exh. F at June 16 entry; Docket # 38: Rosenberg Dec. Exh. J at pp. 164-65, 174, 188-90, 201-04, and Exhs. M, O, and P.

[23]     Docket # 32: Minahan Dec. ¶¶ 9-11; Exh. A at ¶¶ 21-26 and Exhs. F, H, and I; Docket # 38: Rosenberg Dec. Exh. J at 240-42 (referring to Rosenberg Exh. T), Rosenberg Exhs. R through V.

derived from that company to justify their pirating operation.[24]

      Mr. Plunkett's entanglement in schemes to take over SF Holdings' business and/or sell Simply Fit beverages without authorization puts him in a uniquely bad position to represent SF Holdings in this derivative action.  Because he is involved in those endeavors his interests are not the same as those of other SF Holdings' securities owners.  That is particularly the case because Mr. Plunkett can use this action to pressure the defendants to allow him to steal the Simply Fit franchise for himself.  The evidence suggests that he brought this action as a collusive anticipatory lawsuit to pressure the defendants to allow him to steal SF Holdings' business.

## CONCLUSION

      For the foregoing reasons, this action should be dismissed.

Dated: September 24, 2008

      Respectfully submitted,

ALTMAN & COMPANY P.C.

By: Eric Rosenberg
    260 Madison Avenue
    22nd Floor
    New York, New York 10016
    (212) 683-7600
    (212) 683-7655 (facsimile)
    eprosen@aol.com (e-mail)
    Admitted pro hac vice

Attorneys for Defendants Cort
Poyner, Daniel Minahan, DP Minahan,
Inc., Silverman & Minahan Beverage
Company, LLC, The Silverman &
Minahan Group, LLC, Mazel Tuff,
LLC, and Altman & Company PC

Local Counsel:
KAHN, CHENKIN & RESNIK, PL
Howard Kahn, Esq.
Fla. Bar No: 0724416
1815 Griffin Road
Suite 207
Dania, Florida 33004
(954) 321-0176
(954) 321-0177 (facsimile)
Howard@kcrlawyers.com (E-mail)

---

[24]    Docket # 32: Minahan Exh. F at June 16 entry; Docket # 38: Rosenberg Dec. Exh. J at 127, 140, 154-59, 171-73 and Exhs. M and N.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 24, 2008, I caused the foregoing document to be electronically filed with the Clerk of the Court using CM/EFC.  I also certify that the foregoing is being served this day on all counsel of record and pro se parties identified on the following service list in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/EFC or in some other authorized manner for those counsel or parties who have appeared but are not authorized to receive electronic notices of filing.

Eric Rosenberg

Service List

Gary A. Woodfield
Edwards Angell Palmer & Dodge, LLP
One North Clematis Street
Suite 400
West Palm Beach, Florida 33401
Attorneys for Michael Plunkett

Valorie S. Chavin
Michael L. Feinstein, PA
888 East Olas Boulevard
Suite 700
Fort Lauderdale, Florida 33301
(954) 767-9662
Attorneys for Carl Feldman

Robert Cox
16 Woodhollow Lane
Fort Salonga, New York 11768

Smitten Press: Local Lore and Legend, Inc.
c/o Corporate Office Services, Inc.
Registered Agent
2533 North Carson Street
Suite 125
Carson City, Nevada 89706